# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREAT HILL EQUITY PARTNERS IV, LP, GREAT HILL INVESTORS LLC, FREMONT HOLDCO, INC., and BLUESNAP, INC. (F/K/A PLIMUS), | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 7906-VCG |
| SIG GROWTH EQUITY FUND I, LLLP, SIG GROWTH EQUITY MANAGEMENT, LLC, AMIR GOLDMAN, JONATHAN KLAHR, HAGAI TAL, TOMER HERZOG, DANIEL KLEINBERG, IRIT SEGAL ITSHAYEK, DONORS CAPITAL FUND, INC., and KIDS CONNECT CHARITABLE FUND, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 7, 2018
Date Decided: December 3, 2018

Gregory V. Varallo, Rudolf Koch, and Robert L. Burns, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Stephen D. Poss and Adam Slutsky, of GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Plaintiffs*.

William B. Chandler III, Ian R. Liston, and Jessica A. Hartwell, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; OF COUNSEL: Mark A. Kirsch, Scott A. Edelman, Aric H. Wu, Jeremy W. Stamelman, and Laura K. O'Boyle, of GIBSON, DUNN & CRUTCHER LLP, New York, New York, *Attorneys for Defendants SIG Growth Equity Fund I, LLLP, SIG Growth Equity Management, LLC, Amir Goldman, Jonathan Klahr, Donors Capital Fund, Inc., and Kids Connect Charitable Fund*.

Lewis H. Lazarus and Meghan A. Adams, of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Peter N. Flocos and Joanna A. Diakos, of K&L GATES LLP, New York, New York, *Attorneys for Defendants Tomer Herzog and Daniel Kleinberg*.

David S. Eagle and Sean M. Brennecke, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; OF COUNSEL: Michael K. Coran, William T. Hill, Monica Clarke Platt, and Gregory R. Sellers, of KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania, *Attorneys for Defendants Hagai Tal and Irit Segal Itshayek*.

GLASSCOCK, Vice Chancellor

This matter involves the acquisition of a California company, Plimus, by a private equity firm, Great Hill. Plimus's business was to facilitate transactions between online retailers of digital goods and credit card holders. Under Plimus's model, it operated as a "reseller;" where a retail buyer made an online purchase, Plimus would first constructively "acquire" the product from the retailer, and receive payment for that retailer from payment processors with whom Plimus had contractual relationships. Those payment processors, in turn, had contractual relationships with the credit card companies and their banks. The service or product would be delivered directly to the credit card holder/purchaser from the online merchant. The arrangement allowed the payment processors—PayPal being a well-known example—to deal with a single reseller, Plimus, with which they had a relationship, rather than trying to contract with the large number of small retailers, known in the business as "long-tail" vendors, occupying this market. The system works so long as the retailers deliver a satisfactory product. If they do not, the credit card companies are responsible to their card holders for "chargebacks," cancellation of debt incurred by the card holder for fraudulent or misrepresented services or goods provided by the retailers. In such cases, the banks and card companies impose contractual "fines" on the payment processors, which, in turn, implicates the relationship of the processors with facilitators/resellers like Plimus. In other words, if the reseller handles transactions from retailers whose business practices engender

1

excessive chargebacks, the contractual relationship between the reseller and the payment processor will be strained or ruptured. Without such relationships, the reseller cannot exist.

In 2011, Great Hill bought Plimus. It valued Plimus based on diligence performed before the sale, management projections, and representations and warranties made in the Merger Agreement. After the purchase, Plimus's performance was disappointing. Great Hill sued the individual defendants, principals and stockholders of Plimus, alleging breaches of the representations and warranties, and fraud and fraudulent inducement, primarily relating to the Defendants' knowledge that excessive chargebacks endangered Plimus's business model. The matter was bifurcated, and trial of the Defendants' liability ensued. What follows is my post-trial determination of certain issues of liability.

Directly below is a full plate of facts. The litigants and their counsel will no doubt find self-interest—pecuniary or professional—relish sufficient to the consumption thereof. Casual readers, I fear, will strain at the swallowing.[1] Following that, I address the facts in light of tort law and the contractual provisions at issue. I find that certain of the Defendants are liable for indemnification for losses arising from certain breaches of the representations and warranties, and that

---

[1] As though, in Holmes' memorable phrase, eating sawdust without butter.

Defendant Hagai Tal committed fraud by failing to disclose the threatened termination of Plimus's relationship with one payment processor, PayPal.

## I. BACKGROUND

Trial took place over ten days, during which thirteen witnesses gave live testimony. The parties submitted over two thousand exhibits and lodged fifty-eight depositions. The following facts were stipulated by the parties or proven by a preponderance of the evidence.[2]

### A. *Plimus Is Founded, and SGE Invests in the Company*

Defendants Tomer Herzog and Daniel Kleinberg (the "Founders") founded Plimus in 2002.[3] Before the closing of the merger that gave rise to this litigation, Plimus was a California corporation headquartered in Fremont, California.[4] Plimus provided payment solutions that allowed online merchants to sell digital products to buyers.[5] Specifically, Plimus operated as an e-commerce reseller: the company took title to an online merchant's products just before a sale, serving as the merchant of record in the transaction with the consumer.[6] To process credit card transactions with consumers, Plimus entered into contractual relationships with third-party

---

[2] To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In an attempt at brevity—relatively speaking—I have often omitted from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicted testimony, and rejected it.
[3] Joint Statement of Undisputed Facts ("JSUF") ¶ 44.
[4] *Id.* ¶ 43.
[5] *Id.* ¶ 64.
[6] *Id.* ¶ 66.

payment processors, including PayPal Pro and Global Collect.[7]  For their part, the payment processors maintained relationships with acquiring banks, which were members of credit card networks and thus authorized to process transactions involving the networks' credit cards.[8]

From 2002 to 2008, Plimus did well, achieving significant revenue growth.[9] For the first few years after the founding, Herzog and Kleinberg ran the company.[10] Both Herzog and Kleinberg are software engineers,[11] and by 2007 or 2008, they had decided to bring in "professional help" to manage Plimus.[12]  Given their software backgrounds, they felt they were not "up to the task of taking [the company] even further."[13]  Thus, in 2008, Herzog asked Defendant Hagai Tal, who served as a consultant for a Plimus client, to help sell the company.[14]  Tal met with potential buyers, but he eventually came to the conclusion that Plimus should not yet be sold.[15] Instead, Tal offered to find an investor who would purchase a fifty percent stake in

---

[7] *Id.* ¶¶ 65, 102, 104.
[8] *Id.* ¶ 65.
[9] Trial Tr. 2348:9–15 (Herzog); *id.* at 2469:6–22 (Kleinberg).
[10] *Id.* at 2347:16–2348:1 (Herzog).
[11] JSUF ¶¶ 7, 9.
[12] Trial Tr. 2350:21–2351:2 (Herzog).
[13] *Id.* at 2469:17–18 (Kleinberg).
[14] JSUF ¶ 45.
[15] *Id.* ¶ 46.

the company.[16] Following that investment, Tal would run Plimus and position it for an eventual sale.[17]

Around that time, Tal was introduced to Defendant Jonathan Klahr, a managing director at Defendant SIG Growth Equity Management, LLC ("SGE").[18] Klahr was impressed by Tal's "vision for [Plimus],"[19] and Tal identified Defendant SIG Growth Equity Fund I, LLLP ("SIG Fund") as a potential investor.[20] Following a sales process run by Tal,[21] SIG Fund, which was managed by SGE,[22] agreed in June 2008 to purchase a forty-five percent stake in Plimus.[23] SGE/SIG Fund's purchase of these shares valued Plimus at $41 million.[24]

Before it made its investment, SGE conducted due diligence on Plimus; as part of that process, it contacted Paymentech, one of the company's payment processors.[25] Indeed, SGE hired a "payment expert" to review Plimus's contract with Paymentech.[26] That expert opined that the contract was "not as favorable as we would like."[27] Among other things, the expert found that the rates were too high,

---

[16] *Id.*
[17] *Id.*
[18] *Id.* ¶¶ 19, 22; Trial Tr. 1877:16–19 (Klahr).
[19] Trial Tr. 1878:2–13 (Klahr).
[20] JSUF ¶ 47.
[21] Trial Tr. 2351:10–20 (Herzog).
[22] Trial Tr. 1747:11-17 (Klahr).
[23] JSUF ¶¶ 48, 57.
[24] *Id.* ¶ 49.  SGE also invested through a participating preferred security. *Id.* ¶ 50.
[25] Trial Tr. 1878:14–1879:8 (Klahr).
[26] *Id.* at 1879:1–2 (Klahr).
[27] JX 6, at 2.

and that the termination provisions were unfavorable to Plimus.[28]  When Klahr received this report in March 2008, he summarized its contents as follows: "In brief, 'we got screwed.'"[29]  Plimus management was also concerned about the Paymentech relationship, and around this time the company informed Paymentech of "a desire among executive management to have a fresh look at the relationship."[30]

In July 2008, Tal became Plimus's CEO and a member of its Board of Directors, which also included Herzog, Kleinberg, Klahr, and Defendant Amir Goldman, a managing director at SGE.[31]  As part of its investment in Plimus, SGE entered into an earn-out agreement with Tal, under which he would earn a transaction bonus if Plimus was sold.[32]  Herzog and Kleinberg likewise entered into an earn-out agreement with Tal, and while neither side disputes that an agreement existed, the parties to the earn-out agreement later came to disagree about how much Tal was owed under it.[33]

Consistent with SGE's investment philosophy,[34] Klahr and Goldman attended Plimus board meetings and assisted management with strategic issues, but they did

---

[28] *Id.*
[29] *Id.* at 4.
[30] JX 8, at 2.
[31] JSUF ¶¶ 11, 12, 21–22.
[32] *Id.* ¶ 55.
[33] JX 18; Trial Tr. 1498:6–1499:22 (Tal); Trial Tr. 2325:4–24 (Herzog); Trial Tr. 2423:11–21 (Kleinberg).
[34] Trial Tr. 1858:1–1859:18 (Klahr).

not manage the company on a day-to-day basis.[35]  Likewise, by 2009, Herzog and Kleinberg were no longer involved in Plimus's daily operations.[36]  The four directors relied on Plimus's management, primarily Tal, to raise issues that required their attention.[37]

### B. The Failed Silver Lake Deal

Plimus continued to do well under Tal's leadership, achieving EBITDA of $2.9 million and $4.6 million in 2009 and 2010, respectively.[38]  In late-2009 and early-2010, Tal began to express a desire to sell Plimus to a large private equity firm.[39]  Tal supported a sale because he wanted personal liquidity and thought a large private equity firm could provide Plimus, which he would continue to lead, with "operational assistance" and "additional capital."[40]

In March 2010, Plimus executed a term sheet with Silver Lake Partners ("Silver Lake"), a private equity firm.[41]  Silver Lake proposed to acquire Plimus at a valuation of $92 million, and the parties agreed to a forty-five day exclusivity period.[42]  Silver Lake eventually grew concerned about Plimus's declining performance, which Klahr attributed to the company's decision, in the first quarter

---

[35] *Id.* at 1907:12–1909:11 (Klahr); *id.* at 2063:20–2065:3 (Goldman).
[36] *Id.* at 2353:1–14 (Herzog); *id.* at 2469:23–2470:12 (Kleinberg).
[37] *Id.* at 2064:20–2065:3 (Goldman); *id.* at 2290:2–5 (Herzog); *id.* at 2473:1–2474:7 (Kleinberg).
[38] JX 307, at 8.
[39] Trial Tr. 1864:7–9 (Klahr); *id.* at 1960:22–1961:5 (Goldman).
[40] *Id.* at 1864:8–9 (Klahr); *id.* at 1962:7–20 (Goldman).
[41] JX 59.
[42] *Id.* at 3; JX 82.

of 2010, to terminate vendors that produced large numbers of chargebacks.[43]  A chargeback takes place when a customer disputes a charge on her credit card directly with her card issuer, and the card issuer charges back the transaction to the acquiring bank.[44]  The acquiring bank "then deducts the value of the transaction from the merchant's account and refunds the amount to the issuer, so that a credit can be issued to the consumer."[45]  This contrasts to a situation where a buyer raises a dispute directly with the merchant, leading to the merchant initiating the refund.[46]

Silver Lake had not completed its diligence by the end of the forty-five day exclusivity period, and it asked Plimus for an extension.[47]  Klahr took this as a sign that Silver Lake "fe[lt] no pressure" and was "not serious."[48]  Klahr also thought Silver Lake's offer undervalued the company, writing in an e-mail that "we cannot knowingly sell an asset for less than what we estimate to be the market price."[49]  Klahr's view rested on his perception that the market had improved since the Silver Lake offer came in, and that "there [wa]s pressure from within SIG not to sell at this

---

[43] Trial Tr. 1770:19–22 (Klahr); JX 121.
[44] JSUF ¶ 67.
[45] JX 1129 ¶ 22.
[46] Trial Tr. 2870:10–19 (Moran).  Sellers of digital goods may generate a relatively higher number of chargebacks because there is no physical product to return and, in many cases, no physical store to which one can return that product. *Id.*
[47] *Id.* at 1865:5–10 (Klahr).
[48] JX 82, at 1.
[49] *Id.*

price."[50]  Thus, Plimus declined to extend Silver Lake's exclusivity period.[51]  Tal

disagreed with this decision,[52] and Silver Lake was disappointed by Plimus's refusal

to extend exclusivity.[53]  Silver Lake attempted unsuccessfully to re-engage on the

potential transaction.[54]

Goldman and Klahr later discussed how to present the failed Silver Lake deal

to their colleagues at SGE.  Klahr initially proposed the following account: "Plimus

received firm acquisition interest from . . . Silverlake in the form of a term sheet. A

term sheet was signed however the transaction was not consummated due to drop in

revenue run rate as a result of terminating the more problematic vendors."[55]

Goldman insisted on changing the story, because he did not want to say that the "deal

wasn't consummated because of performance – want to keep it as if it was us who

killed it (the chagai version)."[56]  Klahr agreed with Goldman: "Worse - if we end up

doing a deal at a lower price we look like chumps - whereas if we keep the real story

we make it clear that this opportunity wasn't real . . . ."[57]  Nevertheless, while Klahr

---

[50] *Id.*

[51] JX 97, at 1; Trial Tr. 1865:8–12 (Klahr).

[52] Trial Tr. 1480:15–1841:4 (Tal); *id.* at 1867:19–22 (Klahr).

[53] JX 97.

[54] JX 97; JX 2006.

[55] JX 123, at 1.

[56] *Id.*

[57] *Id.*

acknowledged that Plimus had had a disappointing second quarter in 2010, he also believed that revenue and earnings would rebound in the third and fourth quarters.[58]

After the Silver Lake deal fell through, Plimus turned to a potential acquisition of JourneyEd, an online software company.[59] Therefore, in September and October 2010, Klahr did not think a sale of the company was feasible in light of the pending transaction with JourneyEd and the disappointing second quarter results.[60] But the JourneyEd acquisition eventually fell through when a competitor of Plimus acquired the company.[61] On the bright side, Plimus's numbers rebounded from the losses previously caused by terminating the problematic vendors.[62] Thus, in November 2010, Plimus decided to engage investment bankers to run a formal sales process.[63] Three investment banks, including Raymond James, gave presentations to the Plimus Board of Directors about a possible sale of the company.[64] On November 22, 2010, Plimus selected Raymond James to serve as the company's investment banker for the sales process.[65] A little over one week later, Plimus and Raymond James executed a letter agreement formalizing the engagement.[66]

---

[58] JX 88, at 1.
[59] Trial Tr. 1971:18–23 (Goldman).
[60] JX 133; JX 139.
[61] Trial Tr. 1971:24–1972:7 (Goldman).
[62] *Id.* at 1776:9–12 (Klahr).
[63] *Id.* at 1972:8–11 (Goldman).
[64] JSUF ¶ 107.
[65] *Id.* ¶ 109.
[66] *Id.* ¶ 111.

*C. The Formal Sales Process Begins, and Great Hill Enters the Picture*

The same day that Plimus and Raymond James executed the engagement letter, Jonathan Steele of Raymond James received the "first buyer call" for Plimus from Great Hill, a private equity firm that in 2011 managed over $2.7 billion in capital.[67]  The call came from Nicholas Cayer, who told Steele that he had "been pursuing Hagai [Tal] for a while and really likes the business."[68]

Cayer was one of five members of the Great Hill team for the Plimus transaction; the others were Matthew Vettel, Christopher Busby, Daniel Madden, and William Hurley.[69]  Busby served as the "deal quarterback," overseeing the due diligence and analyzing the Plimus investment opportunity.[70]  Cayer ran diligence projects and was the primary author of the deal team's diligence memo.[71]  Vettel was the only Great Hill partner on the deal, though his role in the diligence was minimal.[72]  Finally, Madden and Hurley were the junior members of the deal team; they conducted financial and business analyses of Plimus.[73]

Once Raymond James was formally engaged, it began working with Plimus management to prepare marketing materials, including a confidential information

---

[67] JX 161, at 2; JX 429, at 2.  I refer to Plaintiffs Great Hill Equity Partners IV, LP, and Great Hill Investors LLC collectively as "Great Hill."
[68] JX 161, at 2.
[69] JSUF ¶ 119.
[70] *Id.* ¶ 120.
[71] *Id.* ¶ 121.
[72] Trial Tr. 785:18–20 (Vettel).
[73] *Id.* at 843:7–13 (Cayer).

memorandum ("CIM").[74] Tal, Goldman, and Klahr provided information on Plimus to Raymond James to be used in the CIM and other materials.[75] Raymond James also worked with Plimus management to compile a list of potential buyers.[76] One of those potential buyers was Great Hill, which signed a non-disclosure agreement with Plimus around February 2, 2011.[77] Over fifty other potential buyers signed non-disclosure agreements with the company.[78]

On February 23, 2011, Raymond James sent Great Hill the Plimus CIM.[79] The CIM claimed that Plimus was "experiencing robust growth across its seller base, transactions, revenue and EBITDA driven by favorable market trends and its defensible position."[80] The CIM also touted the company's "strong visibility into its future revenue growth."[81] The information in the CIM was important to Great Hill, which was impressed by (among other things) the company's strong revenue growth.[82]

---

[74] Steele Dep. 49:22–51:3.
[75] Steele Dep. 50:4–50:23; Trial Tr. 1482:12–19, 1488:20–1489:3 (Tal); Trial Tr. at 1784:3–1786:2 (Klahr); JX 213, at 1; JX 230, at 1.
[76] Steele Dep. 51:13–22.
[77] JSUF ¶ 118.
[78] JX 304, at 2.
[79] JX 241, at 1.
[80] *Id.* at 8.
[81] *Id.* at 19.
[82] Trial Tr. 41:1–13, 61:1–62:16, 62:17–63:2 (Busby).

On March 15, 2011, Great Hill submitted a non-binding preliminary bid for Plimus.[83] The bid valued Plimus at between $95 million and $105 million.[84] Sixteen other potential buyers submitted preliminary bids,[85] and each bidder was invited to meet in-person with Plimus management and perform additional due diligence.[86] Around this time, Raymond James created a virtual data room containing information and documents related to Plimus.[87]

Plimus management made a presentation to Great Hill on March 30, 2011.[88] In the presentation, Plimus claimed that it "carefully monitor[ed] the performance of [its] seller base and w[ould] 'cleanse' any that have a negative perception, consistent issues with buyers or high chargeback ratios."[89] The presentation also noted that in the second quarter of 2010, the company had removed several sellers that generated above-average numbers of chargebacks.[90] According to the presentation, while the removals "decreased total sales," they led to an "increase[] [in] EBITDA as [Plimus] avoided any future negative impact from consistently having chargebacks."[91]

---

[83] JSUF ¶ 122.
[84] *Id.*
[85] JX 324, at 3–5.
[86] Trial Tr. 64:6–65:4 (Busby).
[87] JSUF ¶¶ 124–25.
[88] *Id.* ¶ 123.
[89] JX 307, at 52.
[90] *Id.*
[91] *Id.*

In mid-April, Great Hill (along with the other bidders) received access to the data room,[92] and continued to meet with Plimus management.[93] On April 13, 2011, Great Hill submitted a revised bid for Plimus at a valuation range of $110 million to $115 million.[94] Only five of the seventeen preliminary bidders submitted revised bids; of those five, three reduced their bids, one made the same bid, and one (Great Hill) increased its bid.[95] General Atlantic, which reduced its bid, appeared concerned that Plimus was "just a way in which the smaller/long-tail 'grimier' guys can find a merchant account and get their higher chargebacks bundled into a portfolio."[96] "Long-tail" vendors are defined in the CIM as "single proprietor, home-based businesses."[97] Another potential purchaser that reduced its bid thought Plimus's recent numbers were "inflated by lower quality . . . clients that ultimately might get purged if chargebacks creep up."[98]

The deadline for final bids was May 18, 2011.[99] Before it made its final bid, Great Hill analyzed the top 400 sellers on Plimus's platform.[100] Cayer asked Madden and Hurley to evaluate the "quality / sustainability of the sellers you profiled," asking

---

[92] JSUF ¶ 125.
[93] *Id.* ¶ 130; Trial Tr. 64:6–65:4 (Busby).
[94] JSUF ¶ 129.
[95] JX 324, at 3.
[96] JX 378.
[97] JX 241, at 8.
[98] JX 387.
[99] JSUF ¶ 131.
[100] JX 347.

14

whether they were "real businesses with real websites in real industries."[101] Hurley reported that most of the websites he examined "seemed either very sketchy or small/outdated."[102] Madden agreed with Hurley that "there were plenty of sketchy sites," but he also found "plenty of legit 'long-tail' business such as Fx trading strategies, language translation, high-tech programming tools, and run of the mill utility software."[103] At trial, Cayer testified that these analyses focused on whether Plimus's clients had sustainable business models, and not on whether they complied with credit card association rules.[104] The credit card associations, such as Visa and MasterCard,[105] issue three broad categories of rules: brand rules to protect the card association's reputation; chargeback rules to protect consumers (and merchants) from fraudulent transactions; and compliance rules to ensure compliance with government and regulatory rules, such as anti-money laundering rules, prohibitions on the sale of illegal goods and services, and protection of intellectual property rights.[106]

Great Hill submitted a final bid for Plimus on May 18, 2011, which valued the company at $115 million.[107] No other party submitted a final bid by the May 18

---

[101] *Id.* at 1.
[102] *Id.*
[103] *Id.*
[104] Trial Tr. 862:4–13 (Cayer).
[105] JX 1129, ¶ 15.
[106] *Id.* ¶ 23.
[107] JSUF ¶ 132.

deadline.[108]  Two days after submitting its final bid, Great Hill learned from Raymond James that Plimus had missed its projected EBITDA for the first quarter of 2011 by over $200,000 (approximately thirteen percent of the projected EBITDA).[109]  Raymond James reassured Great Hill that "confidence in the projections for the remainder of 2011 has never been higher."[110]  Busby told Raymond James that the EBITDA miss did not "change [Great Hill's] proposal," because Great Hill was "more buying into the vision and the larger picture."[111]  Furthermore, Raymond James reported that Busby expressed these views without Raymond James having to "put any of this in focus for [Busby]."[112]  Along with the financial results for the first quarter of 2011, Plimus also shared with Great Hill a draft disclosure schedule,[113] intended to accompany the prospective merger agreement.  Busby told Raymond James that "on first review [Great Hill] didn't envision any show stoppers or items that couldn't be structured around."[114]

On May 26, 2011, Great Hill signed a letter of intent (the "Letter of Intent") to acquire Plimus for $115 million.[115]  Great Hill conditioned the acquisition on

---

[108] JX 397, at 1.
[109] JX 413, at 22–23; JX 415.
[110] JX 413, at 22.
[111] JX 415.
[112] *Id.*
[113] JX 413, at 2–20.
[114] JX 415.
[115] JSUF ¶ 133.

16

"completion of customer calls and customary legal, accounting, technology and insurance due diligence on Plimus."[116]

*D. The Paymentech Saga*

The Plimus acquisition did not close until September 29, 2011.[117] Many events relevant to this case took place between the signing of the Letter of Intent and closing. Before turning to the remainder of the sales process, however, I pause to describe one component of the purported fraudulent scheme—Plimus's disclosure on the end of the company's relationship with Paymentech—which primarily involved events that took place before the Letter of Intent was signed.

1. The Paymentech Relationship Prior to February 2011

As noted above, by early 2008, Plimus had begun to have reservations about its relationship with Paymentech, one of the company's payment processors. Between 2008 and 2010, Plimus entered into contractual relationships with several other payment processors, including Global Collect, Payvision, PayPal Pro, and Moneybookers.[118] During this period, Plimus continued to be dissatisfied with Paymentech. For example, Defendant Irit Segal Itshayek, Plimus's Vice President of Financial Strategy and Payment Solutions, testified that Paymentech's fees did not reflect the number of transactions Plimus was actually routing through

---

[116] JX 429, at 4.
[117] JSUF ¶ 152.
[118] *Id.* ¶¶ 102–05.

17

Paymentech.[119]   Indeed, in September 2010, Plimus met with a Paymentech representative and discussed, among other things, "Fee Increases – What can be done to reduce the impact on Plimus."[120]   According to Klahr, Plimus management's unhappiness with Paymentech was "a constant theme" in Plimus management's discussions with him.[121]

In November 2010, at the beginning of the formal sales process, Plimus told Steele of Raymond James that the company "was looking to move away from Paymentech to Wells Fargo."[122]   Later, on January 19, 2011, Steele told one of his colleagues to refrain from reaching out to Paymentech as part of the auction process, because Tal had "been moving processing away from them real-time."[123]   The breaking point for the Plimus-Paymentech relationship came in the same time period, when Paymentech informed Plimus that it would stop processing Plimus transactions outside the United States, Canada, and the European Union, including areas in which Plimus did significant business.[124]   When he learned this, Tal told Itshayek, "[b]asically they don't support our model anymore."[125]   Tal and Itshayek

---

[119] Trial Tr. 1381:11–24 (Itshayek); *see also, e.g.*, JX 147.
[120] JX 136, at 2.
[121] Trial Tr. 1922:12–21 (Klahr).
[122] Steele Dep. 280:5–9.
[123] JX 207, at 1; *see also* Steele Dep. 541:9–545:12.
[124] JX 212, at 3–6; Trial Tr. 1388:5–20 (Itshayek); Trial Tr. 1925:11–17 (Klahr).
[125] JX 212, at 6.

thus concluded that Plimus needed to end its relationship with Paymentech.[126] The then-current contract with Paymentech was to terminate in September 2011.[127]

Paymentech had its own reasons to be frustrated with Plimus. Paymentech had informed Plimus on multiple occasions in 2010 alone that Plimus was failing to comply with various credit card association rules.[128] Indeed, in January 2011, Paymentech informed Itshayek and Tal that while it was "committed to providing you will [sic] new pricing . . . at this time we need to remain focused on resolution of existing compliance concerns."[129] Paymentech explained that "these issues could result in large fines to Plimus and can also put Chase Paymentech at risk."[130]

### 2. The Paymentech Relationship Ended

On February 4, 2011, Paymentech sent a letter to Tal informing him that it was terminating its processing relationship with Plimus.[131] The letter explained the decision as follows:

> As you are aware, Paymentech has previously informed Plimus, on multiple occasions, of Plimus'[s] breach of the Agreements [with Paymentech]. Those breaches include, without limitation, submitting cross border transactions from countries for which Paymentech has no license, acting as an aggregator without a license to do so, and violations of Association rules regarding the unauthorized sale of Intellectual Property (as defined by the Associations). As you are also

---

[126] Trial Tr. 1390:15–1391:7 (Itshayek); Trial Tr. 1611:7–1612:8 (Tal); JX 3055.
[127] JX 1, at 3; *see also* JX 413, at 7.
[128] *E.g.*, JX 49; JX 50; JX 57; JX 63; JX 67; JX 78; JX 112; JX 115.
[129] JX 198, at 2.
[130] *Id.* at 1.
[131] JX 218.

aware, Plimus has failed to cure such breaches for a period of time in excess of 30 days.[132]

The letter indicated that Paymentech would establish a reserve account of approximately $535,000 from funds otherwise payable to Plimus, to cover Plimus's anticipated liability.[133]

Of the specific reasons Paymentech gave for termination, at least one was inaccurate: Paymentech had fined Plimus in 2010 for failing to register as a Member Service Provider in relation to MasterCard.[134] Thereafter, Plimus registered and was approved on January 27, 2011, which cured the aggregator issue before February 4, 2011.[135]

The same day the termination letter was sent (or shortly before), Tal spoke to a Paymentech representative on the phone.[136] The Paymentech representative told Tal that Paymentech needed to terminate the relationship; Tal responded that "we also have the same interest, and it's fine with us not to continue working together."[137] Tal responded in writing to Paymentech's termination letter on February 11, 2011.[138] He expressed "surprise[] at [the] suggested termination date" of May 5, and he complained about the "abrupt letter and demand to terminate the agreement with

---

[132] *Id.*
[133] *Id.*
[134] JX 143; JX 148.
[135] JX 214; Trial Tr. 1347:4–23 (Itshayek).
[136] Trial Tr. 1611:3–17 (Tal).
[137] *Id.* at 1611:20–1612:4 (Tal).
[138] JX 227.

such short notice."[139]  According to Tal, Paymentech's actions would "have a dramatic negative impact on Plimus."[140]  Thus, Tal asked Paymentech for a sixty-day extension on the termination date and assistance in "mak[ing] the transition as smooth as possible."[141]  Notably, Tal did not request in this letter that Paymentech reverse its decision to end its processing relationship with Plimus; instead, he sought only additional time to prepare for the transition away from Paymentech.[142]

Paymentech responded by letter on February 14, 2011.[143]  It agreed to extend the termination date to June 20, but it emphasized that Plimus was "still not in compliance with respect to the issues surrounding cross-border acquiring and India transactions."[144]  Paymentech did not reference the previous allegations of acting as an unlicensed aggregator or unauthorized sales of intellectual property.[145]  "Cross-border acquiring," in this context, is the processing of transactions that are wholly internal to a foreign country; in other words, both the buyer and the seller (but not the processor) reside in the foreign country.  The "cross-border acquiring" issues had begun in December 2010, when Visa told Paymentech that the Reserve Bank of India had informed Visa that Paymentech was engaged in cross-border acquiring in India

---

[139] *Id.* at 1.
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] JX 231.
[144] *Id.*
[145] *Id.*

21

without a license, relating to its processing of Plimus transactions involving Indian vendors and Indian customers.[146] Plimus argued that there was no cross-border acquiring because Plimus was the merchant of record; therefore, the transactions should be considered to be between Plimus, which was based in the United States, and the Indian customers.[147] Itshayek believed that this issue led Paymentech to cease processing any Plimus transactions outside the United States, Canada, and the European Union.[148]

Apparently unsatisfied with Plimus's progress in remedying the cross-border acquiring issues, Paymentech informed Plimus in another letter on March 1, 2011 that, despite its agreement to extend its relationship with Plimus through the end of June, it would now terminate the agreement effective March 7.[149] After further discussions between the two parties, Paymentech agreed in a letter dated March 3, 2011 to extend the termination date to March 21.[150] Paymentech also wrote in this letter that "MasterCard has indicated it intends to impose substantial fines against Paymentech for Plimus'[s] noncompliance" and therefore Paymentech planned to hold "all of Plimus'[s] settlement proceeds in a reserve account."[151] Tal responded on March 4, 2011. While noting appreciation for Paymentech's flexibility on the

---

[146] JX 174; JX 194.
[147] JX 172; Trial Tr. 1385:15–1387:2 (Itshayek).
[148] Trial Tr. 1389:17–1390:9 (Itshayek).
[149] JX 250.
[150] JX 257.
[151] *Id.*

termination date, Tal stated that "implementing both the disconnect from [Paymentech's] services as well as the move to a new processor" in the time frame provided meant that Plimus would be "expending tremendous engineering resources," which represented a "huge challenge," even with the time extension.[152] Tal also wanted to state, for the record, "that it is still not very clear why Plimus is being thrust into this sudden disconnect . . . we are doing nothing differently than what we did for the last 4.5 years . . . . Thus we cannot accept the unilateral declaration that we are in breach of our agreement."[153] Despite this, Tal concluded that Plimus would be "happy to re-engage with Paymentech in the future."[154] The processing relationship between Paymentech and Plimus ended on March 21, 2011.[155]

As part of its termination of Plimus, Paymentech put Plimus on the Master Card Alert to Control High-Risk Merchant list or "MATCH" list on February 25, 2011, providing the reason code "Violation of MasterCard Standards."[156] The MATCH list serves as a system to alert processors to problematic merchants, and when processors terminate merchants, they often place them on the list.[157] When, in

---

[152] JX 260, at 1.
[153] *Id.* at 2.
[154] *Id.*
[155] JSUF ¶ 89.
[156] JSUF ¶ 94; JX 244.
[157] Trial Tr. 2561:10–2561:20, 2570:12–19, 2574:4–2575:22 (Layman); *id.* at 2882:19–2883:18 (Moran).

turn, processors add merchants, MasterCard recommends that the processor check the MATCH list; if the merchant appears on the MATCH list, that is a red flag that the merchant may present a high risk.[158] Processors generally conduct more detailed review of a merchant as a result of finding it on the list.[159] However, appearing on the MATCH list does not preclude a merchant from being added by a processor;[160] indeed, Plimus added new processor relationships after being added to the list by Paymentech.[161] Plimus, like all other merchants, does not have access to the MATCH list.[162] Plimus was unaware that it had been added to the list by Paymentech, and was unaware of the reason given: violation of MasterCard standards.

### 3. The Plimus Board Learned of the End of the Paymentech Relationship and Plimus Recovered Its Reserve Account

The Plimus Board first learned of the end of the Paymentech relationship in early-March 2011. Tal called Klahr in early March to inform him of the end of the Paymentech relationship.[163] Tal cited problems with processing transactions in India and noted that Paymentech was holding a substantial sum of money in a reserve account.[164] Goldman also knew by March 7, 2011, on which date he e-mailed Tal

---

[158] *Id.* at 2561:10–15, 2653:13–21 (Layman); *id.* at 2883:11–18 (Moran).
[159] *Id.* at 2562:1–15 (Layman); *id.* at 2883:7–2885:19 (Moran).
[160] *Id.* at 2652:2–6 (Layman); *id.* at 2883:19–2884:14 (Moran).
[161] JSUF ¶¶ 178, 179.
[162] Trial Tr. 2882:9–12 (Moran).
[163] *Id.* at 1925:5–22 (Klahr).
[164] *Id.*

asking for the relevant Paymentech correspondence.[165]  Plimus's legal counsel, Perkins Coie, become involved, and on March 18, 2011, Ralph Arnheim of Perkins Coie sent Paymentech a letter addressing the reserve account that Paymentech was holding, which at that time totaled approximately $2.7 million.[166]  Perkins Coie also served as Plimus's deal counsel throughout the sale process.[167]

On March 18, 2011 Tal subsequently provided Goldman and Klahr with copies of the letters dated February 4, February 11, February 14, and March 1.[168]  On March 20, Klahr asked Tal to forward relevant documents to Herzog and Kleinberg, and also asked Tal to set up a call for Goldman and Klahr to speak with Arnheim.[169]  Goldman and Klahr had several conversations regarding Paymentech with Tal throughout March; after the March 20 call, Goldman and Klahr waited for Perkins Coie to report back on the end of the Paymentech relationship.[170]

Klahr provided the Paymentech letters to Herzog and Kleinberg on March 22, 2011.[171]  Herzog and Kleinberg initially discussed the Paymentech termination among themselves.[172]  They were worried that the termination could drive up costs

---

[165] JSUF ¶ 85; JX 262.
[166] JSUF ¶ 87; JX 284.
[167] JSUF ¶¶ 114, 137.
[168] JSUF ¶ 86; JX 283.
[169] JX 285.
[170] Trial Tr. 1787:22–1791:20, 1792:21–24, 1926:10–1927:19, 1934:13–19 (Klahr); *id.* at 2197:22–2198:15 (Goldman); JX 268; JX 285.
[171] JSUF ¶ 90.
[172] JSUF ¶ 92.

and depress Plimus's financial performance.[173] This initial worry was based in part on a misunderstanding of the other processing relationships Plimus had in place.[174] After talking to Tal later on March 22, 2011, Herzog reported to Kleinberg that Tal had said there was nothing to worry about and that Plimus had other processors.[175] At that point, Herzog and Kleinberg felt their duty as directors had been satisfied and that no further inquiry was necessary.[176]

In his initial letter on March 18, 2011 to Paymentech, Arnheim noted that he represented Plimus "in connection with Paymentech's unilateral termination" and that he was seeking a return of the $2.7 million reserve account that Paymentech was holding.[177] In their March 30, 2018 response, Paymentech explained the amount of the reserve account; roughly $500,000 was for estimated chargeback exposure, and the remaining amount, over $2 million, was for threatened fines by the credit card associations and a "substantial fine" threatened by the Reserve Bank of India.[178] During April 2011, Perkins Coie continued to engage with Paymentech, in one instance reporting back that when asked for specifics, the Paymentech representative "wasn't entirely sure" of the reason fines were threatened.[179] By mid-April,

---

[173] JX 179, at 205–208 (lines 2272–2280).
[174] Trial Tr. 2306:13–2307:1 (Herzog).
[175] JX 179, at 51 (line 2295).
[176] Trial Tr. 2391:19–2392:15 (Herzog); *id.* at 2421:11–2422:14, 2486:22–2488:3 (Kleinberg).
[177] JX 284.
[178] Paymentech wrote that the fine threatened by the Reserve Bank of India alone could exceed $1 million. JX 305.
[179] JX 312.

Paymentech agreed to release all the amounts held for threatened fines, leaving $500,000 to $600,000 in the reserve account for chargeback exposure.[180] In an April 18, 2011 e-mail, Klahr commented to Goldman that the return of the majority of the reserve account is "a positive outcome[, which] [s]hows that they are backtracking and indicates the issue is relatively minor."[181]

In a May 11, 2011 e-mail, Arnheim wrote to Klahr that the Paymentech termination "is looking increasingly 'ordinary course'" and that Paymentech had "confirmed the associations (Visa and [MasterCard]) are not asserting fines as previously suggested."[182] Therefore, by the time Great Hill signed the Letter of Intent on May 26, the Paymentech relationship had officially terminated, and Paymentech had returned the majority of the reserve account and confirmed there would be no fines.

*E. Great Hill Conducts Due Diligence: The Paymentech Disclosure, Vendor Terminations, and Plimus Chargebacks*

After signing the Letter of Intent on May 26, 2011,[183] Great Hill began its due diligence. Great Hill hired Kirkland & Ellis LLP ("K&E") to serve as its deal counsel in connection with the merger.[184] K&E conducted due diligence,

---

[180] JX 318; JX 325. Paymentech used a formula based on historical data to calculate the reserve amount necessary to cover chargeback exposure and held this amount for 180 days, which was the amount of time that customers had to claim a chargeback. JX 318.
[181] JX 325.
[182] JX 366.
[183] JSUF ¶ 133.
[184] *Id.* ¶ 136.

27

interviewed Plimus management, drafted legal documents, and maintained contact with Plimus's deal counsel, Perkins Coie.[185] Great Hill also hired several consultants to aid in the due diligence process. PricewaterhouseCoopers LLP ("PwC") was hired to conduct financial, tax, and information technology due diligence.[186] PwC also had a division of payment processing experts who conducted due diligence on Plimus's policies, procedures, and payment processing relationships.[187] Greenwich Strategies was hired to conduct due diligence on Plimus's vendor clients.[188] And the Gerson Lehrman Group was hired to locate industry experts for Great Hill to consult during due diligence.[189]

Plimus maintained its company counsel, Perkins Coie, as its deal counsel.[190] Perkins Coie, Raymond James, and Plimus management together were responsible for responding to due diligence requests.[191] Within Plimus management, Plimus's CFO Assi Itshayek ("Assi")[192] was largely in charge of responding to diligence requests because the majority of requests related to information controlled by his office; Assi would ensure that the portions of diligence requests outside his control

---

[185] *Id.* ¶ 137.
[186] *Id.* ¶ 134.
[187] *Id.* ¶ 135.
[188] *Id.* ¶ 138.
[189] *Id.* ¶ 139.
[190] *Id.* ¶¶ 114, 137.
[191] Trial Tr. 1887:13–19 (Klahr).
[192] I refer to Assi Itshayek ("Assi") by first name to avoid confusion with Defendant Irit Segal Itshayek ("Itshayek"); no disrespect is intended.

were received by the proper member of Plimus management.[193] While Klahr and Goldman had no role in responding to diligence requests, they, along with SGE in-house counsel Jason Wolfe, did review and comment on documents related to the merger.[194] Herzog and Kleinberg played no role in the due diligence process or the drafting of merger documents.[195]

Between May 26, 2011 and August 3, 2011, when the initial merger agreement was signed, the Great Hill deal team and its representatives conducted on-site visits to Plimus's headquarters in Fremont, California and Plimus's office in Israel, had in-person meetings with Plimus management at Great Hill's offices in Boston, and were in contact with Plimus management via phone and e-mail.[196] Based on its due diligence investigation, the Great Hill deal team prepared a due diligence memo that it presented to Great Hill's partners on July 11, 2011.[197]

The events significant to this litigation related to due diligence of Plimus's business during this time period were: a legal disclosure on the end of the Paymentech relationship; on-site meetings at Plimus's offices where Plimus's policies and payment processor relationships were reviewed; PayPal's notice to

---

[193] *E.g.*, Trial Tr. 1268:5–1272:14, 1280:18–24, 1283:22–1285:20 (Itshayek); *id.* at 1456:19–1458:20 (Tal).
[194] *E.g.*, *id.* at 1781:19–1786:2, 1806:23–1808:8 (Klahr); *id.* at 1950:1–1951:4, 2107:6–2117:24 (Goldman).
[195] *Id.* at 2284:14–2286:6 (Herzog); *id.* at 2340:13–24 (Kleinberg).
[196] JSUF ¶ 140.
[197] *Id.* ¶ 141.

Plimus to terminate a vendor and the subsequent termination of an additional sixteen vendors; Plimus's responses to Great Hill's diligence requests; and Great Hill's due diligence presentation to the Great Hill Partners.

### 1. The Paymentech Disclosure

On May 3, 2011, another Perkins Coie attorney wrote to Arnheim that both SGE and Assi had asked Perkins Coie why the correspondences related to the end of the Paymentech relationship (the "Paymentech Termination Letters") were not in the data room.[198] In a May 4, 2011 e-mail to Tal, Arnheim wrote, "I am fine disclosing it now. I think its been contained to a small enough issue that I don't feel its material," but Arnheim wanted to make sure he and Tal were in synch.[199] Tal responded "I am also fine with this, I need to think about ways to communicate this."[200] Arnheim maintained in his deposition that the Paymentech Termination Letters were subsequently placed in the data room.[201] Tal, Goldman, and Klahr all testified that they believed the Paymentech Termination Letters had been released to the data room.[202] While Itshayek had posted materials to the data room early in the bidding process, she was asked to stop in April 2011.[203] Itshayek did not visit the

---

[198] JX 343, at 1. I note that the attorney referred to them as "the correspondence with Paymentech regarding the payment dispute." *Id.*

[199] *Id.*

[200] *Id.*

[201] Arnheim Dep. 354:19–356:10, 357:2–361:11, 362:25–364:12, 367:24–370:7.

[202] Trial Tr. 1612:9–1613:17 (Tal); *id.* at 1931:5–1932:3 (Klahr); *id.* at 2198:22–2199:14 (Goldman);

[203] *Id.* at 1229:2–1230:6 (Itshayek).

data room after that time and had no subsequent knowledge of its contents.[204]  As an objective fact, the Paymentech Termination Letters were not in the data room.[205]

As part of the sales process, Perkins Coie drafted a disclosure schedule to accompany the prospective merger agreement. This draft disclosure schedule included a disclosure on Paymentech's termination of Plimus in the "Legal Proceedings" section; Plimus had deployed its legal counsel to obtain release of the Paymentech reserve account, and Paymentech still retained the amount held for chargeback exposure.  Arnheim circulated the draft to Klahr on May 11, 2011.[206] This draft legal disclosure stated that "Paymentech notified Plimus that it was terminating the agreements governing" the relationship, and that "Paymentech's stated basis for the termination was Plimus'[s] alleged breach of the agreements and the related rules promulgated" by Visa and MasterCard.[207]  It went on to detail the initial large reserve account, the subsequent release of the majority of this account, and the confirmation that the card associations would not be assessing any fees.[208] Klahr approved this draft legal disclosure, writing "[t]his feels fine to me."[209] Perkins Coie then shared the draft legal disclosure with Assi and Raymond James in

---

[204] *Id.*
[205] *Id.* at 1496:19–24 (Tal).
[206] JX 365.
[207] *Id.*
[208] *Id.*
[209] JX 366.

31

a May 13, 2011 e-mail.[210] Assi forwarded this e-mail to Tal and asked "Di[d] you go over it? Please confirm you feel OK with it."[211]

Tal and Charlie Born, Plimus's Vice President of Marketing, discussed the legal disclosure related to Paymentech, and other disclosures in the disclosure schedule on May 13, 2011.[212] Born then prepared for Tal a new draft disclosure on Paymentech based on their discussions.[213] This alternative disclosure, with some insignificant edits, replaced Perkins Coie's original draft disclosure in the draft disclosure schedule, which was then shared with Great Hill on May 20, 2011.[214] Therefore, the legal disclosure that Great Hill received read, in pertinent part, that:

> [Plimus] and Paymentech . . . entered into an exclusive . . . Agreement . . . . [which] was scheduled to be renewed in September 2011. However, in early 2011, [Plimus] decided that it did not want to continue working with [Paymentech] under the then negotiated terms . . . . [Plimus] then attempted to negotiate modified terms . . . . However, [Paymentech] refused . . . . In February and March 2011, [Paymentech] encountered issues related to the Royal Bank of India . . . . [Paymentech] asked Plimus to make specific changes to the Company's platform . . . . Since [Plimus] did not feel this would in its best interests, [Plimus] and [Paymentech] instead mutually agreed to terminate the agreement . . . . As of May 13, 2011, [Paymentech] continues to hold a reserve of approximately $500,000 to cover future potential refunds and chargebacks . . . .[215]

---

[210] JX 370.
[211] JX 374.
[212] JX 379.
[213] *Id.*
[214] JX 379; JX 381; JX 413.
[215] JX 413, at 7–8.

32

The legal disclosure on the Paymentech termination was later removed and did not appear in the disclosure schedule that accompanied the initial merger agreement.[216]

Great Hill was aware that Plimus's relationship with Paymentech had ended in March 2011.[217] When Great Hill and its representatives conducted on-site due diligence at Plimus's offices, they discussed the end of the Paymentech relationship with Tal and Itshayek,[218] and reviewed Plimus's contract with Paymentech.[219] These discussions were consistent with the description of the end of the Paymentech relationship in the legal disclosure, *i.e.* that a decision to leave Paymentech had been made prior to the expiration of their relationship, that pricing had consistently been an issue, and that the inability to process transactions in India was the primary reason the relationship ended when it did.[220] Itshayek did not provide the Paymentech Termination Letters directly to PwC during these discussions, nor did anyone else from Plimus.[221] Based on her discussions with PwC during on-site diligence, Itshayek had the impression that PwC had not seen the Paymentech Termination Letters.[222] As a result, Itshayek gave hard copies to Tal to show PwC, which Tal in

---

[216] JX 648, at 9.
[217] JSUF ¶ 95.
[218] Trial Tr. 138:4–139:16, 140:10–142:1 (Busby); *id.* at 894:6-18, 907:6–18 (Cayer).
[219] JX 582, at 46.
[220] Trial Tr. 138:4–139:16 (Busby); *id.* at 894:6–18, 907:6–18 (Cayer); *id.* at 1395:11–1396:18 (Ithshayek); *id.* at 1497:1–17 (Tal).
[221] *Id.* at 112:8–113:1 (Busby); *id.* at 943:6–15 (Cayer); *id.* at 1165:17–1166:10, 1228:18–1230:8 (Itshayek).
[222] *Id.* at 1228:3–17 (Itshayek).

turn offered to PwC before PwC left. [223]   However, PwC did not accept the hard copies at that time because PwC believed that the letters could be otherwise obtained.[224]  Great Hill did not attempt to reach out to Paymentech as part of the due diligence process.[225]

## 2. The Due Diligence Request and On-Site Meetings

On June 2, 2011, Great Hill sent Tal a written due diligence request, which listed, among other things, requests under the title "Compliance."  Great Hill's "Compliance" due diligence requests included a request for "any communications received from any of the Major Credit Card Companies reporting any noncompliance," and another request for a description of any fines or penalties paid in connection with such communications.[226]  Plimus had disclosed that it paid $610,000 in "One-Time Expenses" in 2010, including a $250,000 for "Credit Card Association Fines."[227]  On June 9, 2001, Cayer told Busby that "the company was charged $250k last year by V/M through Paymentech for excessive chargebacks;" Cayer had asked Tal for documentation but had been told "the amount was deducted from the Paymentech invoice directly and [Tal] did not have additional documentation."[228]  The June 2, 2011 diligence request also asked for information

---

[223] *Id.* at 1230:7–1232:14 (Itshayek); *id.*at 1496:24–1496:18 (Tal).
[224] *Id.* at 1230:7–1232:14 (Itshayek); *id.*at 1496:24–1496:18 (Tal).
[225] Cayer Dep. 36:21–24; Vettel Dep. Tr. 113:3–6.
[226] JX 447, at 11–12.
[227] JX 463.
[228] JX 463, at 1.

on the eight hundred vendors terminated by Plimus in the first quarter of 2011, as disclosed in Plimus's CIM.[229]

During their June 2011 on-site diligence meetings, PwC met with Tal and Itshayek on-site at Plimus's office in California. In October 2010, Itshayek had been given responsibility over Plimus's processor relationships; as such, she was the appropriate person to discuss processor relationships with PwC.[230] Itshayek provided PwC with several recent monthly processor statements and went through them with PwC during these meetings, but Itshayek did not provide processor statements for all months of 2010.[231] The processor statements contained all the granular information on Plimus's processor relationships; they included data on processed transactions and on fines Plimus paid, including the amount, where it came from, and the reason for the fine.[232] These processor statements that Itshayek provided reflected that Plimus had paid $250,000 in fines to Paymentech in 2010,

---

[229] Plimus's CIM noted that Plimus had terminated a group of eight hundred "underperforming sellers," who generated high chargebacks and engaged in business models that "were not attractive to the Company's . . . payment processing partners." JX 241, at 59 n.4. Great Hill's June 2, 2011 diligence request asked for Plimus to "describe the types of activities that caused the 800 referenced sellers to be removed from the Company's platform, how the Company became aware of such activities, and whether the Company has had or expects to have any liability in connection with such sellers/activities." JX 447, at 12.

[230] Trial Tr. 1142:24–1145:18, 1156:5–12, 1300:6–20 (Itshayek). Itshayek had worked for Great Hill since March 2008; she served as Chief Financial Officer from July 2008 until October 2010, and took on the role of Vice President of Financial Strategy and Payment Solutions from April 2010 until she left Plimus in January 2012. JSUF ¶ 13. However, the overlap in positions from May 2010 to October 2010 was a technicality, as Itshayek was on leave during that time, and she actually assumed her new role when she returned. Trial Tr. 1142:24–1144:2 (Itshayek).

[231] JX 582, at 23; Trial Tr. 1158:11–6, 1161:6–7 (Itshayek).

[232] Trial Tr. 1157:23–1158:6 (Itshayek).

35

primarily related to Visa. Approximately $225,000 was for excessive chargebacks related to Visa, and the remaining $25,000 was for a failure to register as a Member Service Provider ("MSP") related to MasterCard.[233] Plimus had also paid fines in addition to the described $250,000 for excessive chargebacks in relation to MasterCard in 2010.[234] During these in-person meetings, Itshayek "went through whatever happened with Visa and MasterCard throughout the years [sic] of 2010" and "showed . . . PwC that [Plimus was] over the excessive chargeback program both in MasterCard and in Visa."[235]

The credit card associations had "excessive chargeback monitoring programs" for merchants designed to incentivize these merchants to reduce their chargebacks.[236] Generally, merchants entered the programs when their chargeback ratio exceeded a certain threshold for a number of consecutive months.[237] After that point, the merchant would be charged a fine per chargeback (on top of already paying the amount of the chargeback and a fee), and the amount of the fine per chargeback would increase the longer the merchant remained in the program.[238] Once the

---

[233] *Id.* at 1106:4–1133:22 (Itshayek).
[234] *Id.* at 1152:12–1155:8 (Itshayek).
[235] *Id.* at 1165:21–1166:4 (Itshayek).
[236] *Id.* at 2557:15–23 (Layman).
[237] *Id.* at 1412:17–1417:12 (Itshayek); *id.* at 2557:15–23 (Layman); JX 582, at 23; JX 601, at 38; JX 1129 ¶¶ 34, 35; JX 1130 ¶¶ ¶18, 19.
[238] Trial Tr. 1412:17–1417:12 (Itshayek); Trial Tr. at 2557:15–23 (Layman); JX 582, at 23; JX 601, at 38. In fact, MasterCard's fine remained flat over time. Romano Dep. 299:14–18, 301:11–17.

chargeback ratio fell below the threshold, the merchant would generally be removed from the excessive chargeback program.[239] The key metric was the chargeback ratio, which was generally calculated by dividing the number of chargebacks in a month by the total number of transactions in the same month.[240] Visa and MasterCard calculated the chargeback ratio slightly differently; MasterCard used the previous month's transaction volume to calculate the chargeback ratio.[241] Visa and MasterCard would place merchants in excessive chargeback monitoring programs if the merchant's chargeback ratio for United States transactions exceeded one percent for two consecutive months.[242]

Technically, Plimus's vendors generated the chargebacks, but under Plimus's reseller model, Plimus was the merchant of record. As a result, from the viewpoint of the credit card associations and processors, the chargebacks were generated by Plimus, and they calculated a chargeback ratio for Plimus as a whole. Paymentech notified Plimus of excessive chargebacks for Visa and MasterCard in February 2010.[243] Plimus subsequently entered both Visa and MasterCard's excessive chargeback monitoring programs in April 2010.[244] Plimus exited both programs in

---

[239] Romano Dep. 300:17–301:23; JX 582, at 23; JX 1129 ¶ 35.
[240] Trial Tr. 1356:7–16, 1408:10–24 (Itshayek); JX 601, at 38; JX 1129 ¶¶ 34, 35; JX 1130 ¶¶ 18, 19.
[241] Trial Tr. at 1356:7–16, 1408:10–24 (Itshayek); JX 601, at 38; JX 1129 ¶ 34; JX 1130 ¶ 18.
[242] JSUF ¶ 68.
[243] *Id.* ¶¶ 69, 70.
[244] *Id.* ¶ 71.

July 2010.[245] Plimus, as it disclosed to Great Hill, passed all the fines and fees associated with chargebacks to the vendors who had generated them, and Plimus even made a profit in the process.[246]   Part of Plimus's value proposition was proprietary software that automated the routing of transactions through different processors to minimize processing costs.[247]  During PwC's visit, Itshayek told PwC that in order to lower chargebacks, it would sometimes proactively refund their vendor's customers so they would not ask for chargebacks, and it would also route transactions to spread out chargebacks among different processors.[248]

On June 10, 2011, PwC followed up on the previous day's conversations with Assi and Itshayek, and asked that certain documents be added to the data room, including a specific request for Itshayek to add "all information related to the $250k MC fine, as well as any other association related warnings/fines."[249]  The processor statements that Itshayek had reviewed with PwC reflected the fines that Plimus had paid but not did not necessarily include all relevant detail.   Plimus did not communicate directly with the card companies or the acquiring banks; instead, those institutions communicated with Paymentech, which in turn communicated with Plimus.  When Paymentech notified Plimus that Plimus had violated card network

---

[245] Romano Dep. 299:5-9, 300:14-301:7, 302:14-304:6; JX 124; JX 138; Trial Tr. 1349:14–1350:13 (Itshayek).

[246] JX 307, at 52; JX 582, at 1; JX 601, at 37.

[247] Trial Tr. 934:7–23 (Cayer); *id.* at 1363:14–1364:3 (Itshayek).

[248] Tr. 1353:24–1356:1 (Itshayek); JX 582, at 18.

[249] JX 470; JX 474.

38

rules and would be fined, sometimes Paymentech would attach the actual correspondence that Paymentech itself had received from the card associations, sometimes Paymentech would only copy and paste sections of the card association letter into their notifications to Plimus, and other times would provide none of the original correspondence.[250] Neither Itshayek nor anyone else from Plimus provided to Great Hill or PwC, either during or after the June 2011 meetings with PwC, any of the particular correspondence Plimus had received from Paymentech associated with the Visa or MasterCard fines levied against Plimus for excessive chargebacks or the fine for failure to register as an MSP.[251]

Based on their due diligence review, PwC prepared a report for Great Hill.[252] In their report, PwC wrote:

> The one-time expenses provided by the Company indicate a $250k item for "credit card association fines." Management was only able to provide the processor statements reflecting the fines over a period of several months, which total $250k.
> It appears that the Company was fined for experiencing a chargeback ratio of greater than 1%. Management has asserted that they have not incurred additional fines since this time (2010). However, there was no formal communication from the associations clearly defining the nature of the fines. Communication on the matter was limited to the Company and the processor account manager, Paymentech.[253]

---

[250] Trial Tr. 1118:4–1118:15 (Itshayek).
[251] Trial Tr. 1118:19–1131:6 (Itshayek).
[252] JX 582.
[253] JX 582, at 23.

PwC added that "the Company should consider a more proactive approach to dealing with the card associations on these matters."[254]

PwC had also reviewed and discussed with Plimus management various Plimus policies and procedures, including those on adding new vendors and risk monitoring.[255] PwC reported that Plimus "delays the majority of the seller underwriting process until the point at which the seller is most likely to begin processing to avoid unnecessary underwriting expenses."[256] In line with this approach, Plimus used a "self-serve" model for adding "long-tail" vendors, in which the vendors logged onto the Plimus website and filled out an application.[257] While there was some initial fraud control,[258] these vendors could start processing almost immediately after opening an account and before any substantial fraud review.[259]

According to Plimus's operational procedures, which were provided to Great Hill, Plimus initially screened new vendors for violations of "Plimus terms of use and prohibited items policy," and "whenever [Plimus] receive[d] an alert from a processing partner relating to a Plimus seller or product . . . [Plimus] react[ed] based

---

[254] *Id.*
[255] Trial Tr. 887:8–894:5 (Cayer).
[256] JX 582, at 21. In PwC's report, the "underwriting process" is depicted in three stages: first, the application, where there is initial screening; second, integration, where there is additional screening; and third, processing and ongoing monitoring, where there is daily and monthly review.
[257] *Id.* at 20.
[258] JX 457, at 35–36; JX 582, at 20.
[259] Plimus's "initial" and "additional" fraud screenings involved verifying the e-mail address and website of the vendor and manually reviewing the vendor's first five transactions. JX 457, at 35–37; JX 582, at 20.

on the partner's requirements and the Plimus policy and procedure."[260]  Plimus

monitored its vendors on a monthly basis for excessive chargebacks and copyright

infringement issues.[261]  With respect to copyright infringement, K&E noted in their

report to Great Hill that Plimus "occasionally receives notices by third party

copyright holders in the ordinary course," and in K&E's experience Plimus's

compliance procedures were "common for business operating in this space."[262]  The

vendors Plimus's systems identified for fraud and high chargebacks could then be

subject to removal.[263]  Cayer acknowledged that Great Hill's diligence showed some

of Plimus's vendors could avoid meaningful chargeback review and termination for

30 days, and in some cases even months.[264]

### 3. Plimus Terminated 17 "Biz Opp" Vendors in June 2011

In March and April 2011, Plimus added new vendors who had left a

competitor, ClickBank,[265] including a vendor called GoClickCash.[266]  GoClickCash

and several other of these new vendors were known as business opportunity, or "biz

opp," vendors and were involved in "get rich quick" schemes.  There was some

worry within Plimus that these "biz opp" vendors could be problematic,[267] and by

---

[260] JX 457, at 35–37.
[261] JX 582, at 20.
[262] JX 596, at 48–49.
[263] JX 307, at 52.
[264] Trial Tr. 1027:3–1029:24 (Cayer).
[265] JSUF ¶ 169.
[266] Trial Tr. 1360:18–1361:11 (Itshayek).
[267] *E.g.*, JX 317, at 4–5; JX 383.

May 2011, they were already producing high chargebacks.[268]  PayPal, which was processing most of Plimus's United States transactions by this time through Plimus's PayPal Pro account,[269] raised concern about these types of vendors on a June 2, 2011 call with Plimus.[270]  On subsequent call on June 16, 2011, PayPal told Itshayek that Plimus should terminate GoClickCash; PayPal had been notified by the card associations that GoClickCash had been identified as a "get rich quick" scheme, which violated card association rules.[271]  Plimus immediately terminated GoClickCash[272] and decided to terminate similar vendors;[273] after an internal review, Plimus came up with a list of sixteen additional vendors to terminate.[274]  While Plimus and PayPal continued to communicate regularly, it was not until an August 2011 phone call that PayPal suggested that there may be a fine related to GoClickCash,[275] and it was not until September 22, 2011 that PayPal informed Itshayek definitively that a $200,000 fine would be imposed.[276]

During phone calls on June 23, 2011 and June 29, 2011, Great Hill was informed that Plimus had terminated GoClickCash and the other sixteen similar

---

[268] JX 368.
[269] JSUF ¶ 168.
[270] JX 475.
[271] JX 499; Trial Tr. 1168:7–1171:3, 1197:17–1203:2 (Itshayek).
[272] JX 499.
[273] JX 501, JX 502.
[274] JX 510; JX 547.
[275] Trial Tr. 1191:2–1191:17 (Itshayek).
[276] JX 827, at 3.

vendors.[277]   Itshayek told Great Hill that PayPal had brought GoClickCash to Plimus's attention and that Plimus had taken the initiative to identify and terminate the other sixteen similar vendors.[278]   Itshayek also disclosed to Great Hill that the termination of these vendors was likely to negatively affect chargeback ratios going forward.[279]   Even though Plimus had terminated these vendors, their customers would continue to request refunds from the card associations over the next few months, generating chargebacks.   Plimus would then have the chargebacks associated with these terminated vendors without the benefit of any offsetting transactions.[280]   Given this dynamic, chargeback ratios often became a greater problem *after* problematic vendors were terminated.[281]

Great Hill was aware that the terminated biz opp vendors represented 10.6% of the year-to-date transaction volume of Plimus, and that four of the top five year-to-date volume vendors had been terminated.[282] As part of the due diligence process, Tal went to Great Hill's offices in Boston on June 27.  The following day he sent an e-mail to Busby and noted that "open items" included "CB details. (lets setup a call) [sic]" and "list of account [sic] that we closed or [sic] planning to close."[283]   In

[277] JX 524; JX 536; JX 549; JX 571.
[278] JX 549; Trial Tr. 1179:16–1183:8 (Itshayek).
[279] JX 601, at 37; Trial Tr. 1032:6–22 (Cayer).
[280] Trial Tr. 1410:11–1411:3 (Itshayek).
[281] *Id.*
[282] JX 547; JX 585.
[283] JX 564.

advance of a June 29, 2011 call, Tal provided Great Hill with a spreadsheet containing historical chargeback data dating back to 2010 for Plimus's Paymentech and PayPal Pro accounts, a recent daily chargeback report, and a recent "bad vendor" report.[284] Great Hill claimed it viewed the termination of the seventeen vendors, on balance, as a positive; Busby testified that it demonstrated that Plimus had systems for identifying and removing high-chargeback merchants, which outweighed, in Great Hill's view, the negative impact on the financial performance of the business in the near term.[285]

### 4. Plimus Responded to Great Hill's Due Diligence Request and Due Diligence Ends

On June 18, 2011, Plimus submitted a preliminary response to Great Hill's June 2 written diligence requests.[286] This response indicated that a large number of the requests were still "in process."[287] Specifically, in response to the request for communications from the card companies reporting non-compliance and the request for description of any fines paid in connection with such communications, Plimus wrote that the "Company will provide if further review of its records results in responsive documents."[288] Subsequently, on June 25, 2011, Plimus provided a

---

[284] JX 562; JX 564. The daily chargeback report showed the month-to-date chargeback ratio for each processor by card network. *See e.g.*, JX 641. The bad vendor report listed the Plimus vendors with the highest numbers of chargebacks. Trial Tr. 1409:10–1410:10 (Itshayek).
[285] Trial Tr. 255:7–18 (Busby).
[286] JX 507.
[287] *Id.*
[288] *Id.* at 17.

substantial update to its June 18 response (although some requests were still in process).[289] Regarding the request for communications from the major credit card companies, Plimus maintained the response that Plimus "will provide if further review of its records results in responsive documents."[290] Regarding the request for a description of fines paid, Plimus wrote "[t]he Company paid $250,000 for an excessive chargeback monitoring program in 2010 due to [an] increase in chargebacks related to the Company's poker chip vendors. As discussed below, all such vendors have been removed."[291]

Great Hill had sought additional information with respect to the termination of these poker chip vendors, as Plimus referenced in its response to the request for a description of fines. Plimus wrote in its diligence response that the eight hundred vendors, terminated in the first quarter of 2010, were: "[p]arty poker chip vendors, underperforming utility software vendors, and certain online services with high rate [sic] of dissatisfaction."[292] The vendors had been terminated for issues with "excessive customer disputes and chargeback activity" and "business models that were not attractive to [Plimus's] . . . payment processors."[293] Plimus wrote in its

---

[289] JX 553.
[290] *Id.* at 58.
[291] *Id.*
[292] *Id.* at 59
[293] JX 241, at 59 n.4.

45

diligence response that: "The Company became aware of these issues upon reviewing each vendors' chargeback history."[294]

With due diligence complete, the Great Hill deal team drafted a due diligence memo and set out to make a presentation to the Great Hill partners. Despite testifying at trial that Great Hill viewed the June 2011 termination of seventeen vendors as a net positive, in early July 2011, as the Great Hill deal team prepared its due diligence memo, it was considering reducing the purchase price from $115 million to $100 million because of the removal of those vendors.[295] It included this recommendation in a draft of the due diligence memo. However, the Great Hill deal team decided to continue with the original purchase price and removed this recommendation from the final version of the due diligence memo submitted to the Great Hill partners.[296] Great Hill was confident that the growth of both new sellers and the growth of an existing seller, Wix, would mean that Plimus could still achieve Great Hill's original financial projections for the fourth quarter of 2011, which was the basis for its purchase price.[297]

Wix sold "do it yourself" website building and hosting services, for which it charged a monthly subscription fee.[298] At the time of the due diligence memo,

---

[294] JX 553, at 59.
[295] JX 3040, at 3; JX 3045, at 3; Trial Tr. 452:11–15 (Busby).
[296] JX 601, at 4; Trial Tr. 452:16–453:2 (Busby).
[297] Trial Tr. 452:16–453:22 (Busby).
[298] JX 601, at 27.

Plimus managed only a portion of these subscription payments for Wix, but it expected to manage all of Wix's transactions by the end of second half of 2011.[299] Great Hill projected that Wix would represent sixteen percent of Plimus's volume in the fourth quarter of 2011, making it Plimus's largest vendor.[300] Vettel and Cayer actually met with Wix as part of the due diligence process.[301] Great Hill also noted in its due diligence memo that projected transaction volume growth for Plimus in 2012 was "due to expected growth from Wix and MyHeritage," another large subscription service company.[302] Plimus was actively seeking more enterprise/large business clients like Wix, a process that required dedicated sale staff, unlike its "long-tail" vendors that onboarded themselves.[303]

### 5. The Great Hill Deal Team Presented to Great Hill Partners on July 11, 2011

The Great Hill deal team presented their due diligence memo to the Great Hill partners on July 11, 2011. The due diligence memo included the termination of GoClickCash and similar vendors; the memo tied the termination of these "bad" sellers to high chargebacks and graphed historical chargeback ratios for Plimus, as a whole, from June 2009 to June 2011.[304] The graph indicated that Plimus had

---

[299] JX 601, at 33.
[300] JX 604, at 33.
[301] Trial Tr. 455:15–24 (Busby). During Great Hill's diligence check with Wix, Busby was able to verify Plimus's expectations as to Wix. *Id.* at 455:20–24 (Busby).
[302] JX 601, at 24. MyHeritage provided online genealogy services. *Id.* at 27.
[303] Trial Tr. 666:2–667:9 (Vettel).
[304] JX 601, at 37.

47

exceeded a general one percent chargeback ratio threshold for much of 2010, the ratio had fallen below one percent in 2011, and that it had increased above one percent in June 2011 because of the termination of the seventeen vendors in that month. Great Hill wrote of the June 2011 increase in chargebacks that "management believes Plimus will not trigger excessive aggregate chargebacks for >3 consecutive months, and thus does not expect to be fined by Visa/MasterCard."[305] The final version of the presentation to the Great Hill partners made no mention that the Great Hill deal team had considered reducing the sales price because of the same issue.[306]

The due diligence memo, as mentioned, highlighted Wix and its role in projections for Plimus going forward. The due diligence memo also included statements on Plimus's vendor quality and risk monitoring systems. The memo listed as vendor risks, "[vendor] experiences high level of chargebacks due to bad product or services," and "[vendor] shifts business to unacceptable vertical."[307] The memo also noted that Plimus's "self service" vendors had high quarterly churn rates.[308] Great Hill was not concerned about the high churn rate because Plimus

---

[305] *Id.*

[306] *Id.* at 3.

[307] *Id.* at 19. The Great Hill deal team also listed as a threat in their "SWOT analysis" of Plimus that "[f]raudulent sellers use the Plimus platform to conduct illegal activities or offer products with services that have a high number of chargebacks." *Id.* at 47.

[308] *Id.* at 23

added new vendors at a high rate, and because the vendors Plimus retained showed growth.[309]

Based on the due diligence memo and the presentation by the Great Hill deal team, Great Hill's investment committee voted unanimously to proceed with the transaction.[310]

### 6. Chargeback Ratios in June and July 2011 Exceeded One Percent

Chargeback ratios were calculated monthly and Plimus could calculate its ratio month-to-date using its own data, but it would not receive a formal notification that it had exceeded a chargeback threshold until the month was complete.[311] Accordingly, PayPal told Plimus in July 2011 that it had exceeded a one percent chargeback ratio in June for both Visa and MasterCard.[312] Great Hill knew and had expected that Plimus would exceed the one percent chargeback ratio for both card networks in June, given the termination of the "biz opp" vendors.[313] During the end of June and the beginning of July, Great Hill had multiple conversations with Itshayek and Tal regarding chargebacks.

On July 5, 2011, Tal provided Great Hill information on chargebacks for PayPal Pro for both Visa and MasterCard, showing previous months' chargeback

---

[309] Trial Tr. 930:13–931:8 (Cayer).
[310] *Id.* at 731:22–732:12 (Vettel).
[311] *Id.* at 1287:21–1288:21 (Itshayek).
[312] JSUF ¶ 172.
[313] Trial Tr. 148:8–13 (Busby); *id.* at 1032:6–18 (Cayer).

ratios and providing projections for July and August.[314]  In the first table Tal provided, the chargeback ratio for June exceeded one percent for both Visa and MasterCard, projections for July and August showed chargeback ratios for both months exceeding one percent for both Visa and MasterCard.[315]  Another table titled "Missing Transactions" added transactions from Wix's expected ramp up; with these extra transactions the chargeback ratio for Visa was still projected to be above one percent in July but then fall below one percent in August, and the chargeback ratio for MasterCard was projected to be below one percent for both months.[316]

On July 27, 2011, Itshayek e-mailed Busby to tell him that Plimus did not expect the PayPal Pro chargeback ratio to exceed one percent for July for either Visa or MasterCard.[317]  Busby replied immediately, "great news."[318]  This was the last direct contact Itshayek had with the Great Hill deal team until after closing.[319]

On July 31, 2011 an internally-generated Plimus report showed the PayPal Pro chargeback ratio for MasterCard was over one percent for July.[320]  On August 3, Great Hill signed the initial merger agreement, which included an indemnification

---

[314] JX 588.

[315] *Id.* at 3.

[316] *Id.*

[317] JX 634.  As of July 27, 2011 the chargeback ratio for both Visa and MasterCard through PayPal Pro was roughly 0.77%.  JX 634; *see also* JX 641.

[318] JX 635.

[319] Trial Tr. 1311:11–1312:8 (Itshayek).

[320] JX 641.  The report showed that MasterCard reached a one percent chargeback ratio on July 28. *Id.*

provision specifically for fines related to excessive chargebacks.[321]  The following day PayPal e-mailed Plimus to inform Plimus that it had exceeded a one percent chargeback ratio with PayPal Pro for MasterCard in July, the second consecutive month for MasterCard.[322]

### F. Tal's Earn-Out Dispute and Roll-Over Negotiations

Tal was integral to Great Hill's acquisition of Plimus, as Great Hill was, in effect, buying into Tal's vision of the company.[323]  Parallel to the due diligence process, Great Hill and Tal negotiated the terms of his continued employment.  Great Hill wanted Tal to demonstrate his commitment by rolling over a large portion of his merger proceeds into equity in the new Plimus (the "Roll-Over").  According to the Letter of Intent, which Tal signed, "GHP will require the management team to re-invest at least 50% of their after-tax net equity proceeds (GHP estimated at $4 million) unless otherwise agreed upon."[324]  Tal's proceeds from the merger were composed of the equity he owned in Plimus (which Great Hill was buying) and transaction bonuses that SGE and the Founders had previously agreed to pay Tal in the event of a sale.  Tal's liquidity directly following the merger was then determined by his combined merger proceeds less the amount of the Roll-Over.[325]

---

[321] JSUF ¶ 142; JX 649, at 70.
[322] JSUF ¶ 173.
[323] Trial Tr. 693:20–694:2 (Vettel).
[324] JX 428, at 2.
[325] Trial Tr. 1504:14–20 (Tal).

51

### 1. Tal Entered Into Earn-Out Agreements with SGE and the Founders when SGE/SIG Fund Bought into Plimus in 2008

Just as Great Hill wanted Tal to maintain an ownership stake in Plimus after the acquisition,[326] SGE had wanted Tal to invest his own money into Plimus when SGE/SIG Fund bought in,[327] which Tal did.[328] Additionally, as part of the SGE investment in 2008, SGE and Tal entered into an earn-out agreement (the "SGE Earn-Out"), sometimes referred to as a "side letter."[329] Under this agreement, if Plimus was later sold, SGE would pay Tal a transaction bonus, calculated as a percent of SGE's profit on the sale, with the percent of profit paid to Tal to vary according to how much profit SGE made.[330]

Tal separately, but relatedly, entered into earn-out agreements with Herzog and Kleinberg in 2008. Tal and the Founders exchanged e-mails on the subject, and Tal used the SGE earn-out agreement as a basis for the agreement with the Founders.[331] Both sides believed that they had reached an agreement in 2008 (the "Founders' Earn-Out"); however, at the time of the sales process in 2011, no signed agreements could be found.[332] Klahr was aware of the Founders' Earn-Out,[333] and

---

[326] *Id.* at 639:21–640:4 (Vettel).
[327] JX 11; JX 481.
[328] JX 11; Trial Tr. 1824:14–1826:1 (Klahr).
[329] JSUF ¶ 55.
[330] *Id.* ¶ 56.
[331] JX 14; JX 17; JX 18.
[332] JX 14; JX 17; JX 18; JX 3000; Trial Tr. 1498:6–1499:2, 1557:6–1560:4 (Tal); Trial Tr. 2325:6–24, 2355:23–2357:13, 2383:13–23 (Herzog); Trial Tr. 2423:11–21, 2496:1–13 (Kleinberg).
[333] JX 26.

understood the agreement to be that the Founders together would pay Tal a transaction bonus equal to a twenty percent discount to the amount SGE would pay Tal.[334]

### 2. Tal and the Founders Disagreed Over the Conditions of Their 2008 Earn-Out Before and After Executing the Letter of Intent

At some time before May 11, 2011, Tal, Kleinberg, and Herzog discussed proposed deals and the resulting earn-out payments;[335] at this time, the bidding process was ongoing and Great Hill had yet to submit its final bid. In a May 11, 2011 e-mail to Tal, Kleinberg summarized a dispute that had arisen on the subject: Tal believed that the Founders' Earn-Out entitled him to a twenty percent discount to what SGE would pay him; whereas Kleinberg and Herzog believed the Founders' Earn-Out was for a twenty percent discount of the *percentages* SGE was using to calculate the SGE earn out; those discounted percentages were then supposed to be applied to the *profit* Kleinberg and Herzog would make on a sale.[336] Tal immediately forwarded the e-mail to Goldman,[337] who forwarded it to Klahr, who noted that it "feels kind of ugly."[338] Tal responded to Kleinberg on May 14, 2011, stating that he

---

[334] JX 26; JX 146; Trial Tr. 2167:7–13 (Goldman).

[335] JX 361, at 1.

[336] *Id.* In other words, the Founders believe their earn-out was based on the SGE earn-out, in the sense that the structure was the same, but replaced with the Founders' profits and lower percentages. Tal believed the earn-out from the Founders was based on the SGE earn-out, in the sense that the amount of the SGE earn-out was used as a base for the Founders' earn-out by simply applying a twenty percent discount.

[337] JX 364.

[338] *Id.*

53

understood the earn-out agreement differently, that the money from the earn-out would be his only income from a deal, and that without it he had limited interest in a deal.[339]  At a deal price of $115 million, the SGE Earn-Out entitled Tal to roughly $2.5 million.[340]  At that price, the two interpretations of the Founders' Earn-Out resulted in very different transaction bonuses; under Tal's interpretation he would be owed eighty percent of $2.5 million, or $2 million, from the Founders; this compared with (at most) $500,000 under the Founders' interpretation.[341]

On May 14, 2011, Kleinberg and Herzog discussed among themselves potential replies to Tal's e-mail and vented their initial concerns.  Notably, Kleinberg wrote to Herzog that "once he understands what he gets from us, maybe then he can go and ask Johnny for more (schita [or blackmail] money)."[342]  The Founders determined that SGE had to be apprised of the dispute.[343]  Kleinberg accordingly sent Tal an e-mail, in which he wrote that Klahr should be involved because "a 'black-mail' style sentence like 'if you don't give me money I don't want the deal' is something the entire board needs to hear."[344]  Tal responded to the e-mail with surprise at the word "black-mail" and informed Kleinberg that he had updated

---

[339] JX 410, at 3.
[340] JX 146; Trial Tr. 2167:7–13 (Goldman).
[341] JX 386, at 2–3; JX 509.
[342] JX 386, at 1.
[343] *Id.*
[344] JX 410, at 2.

Goldman since the first e-mail.[345] Tal also separately wrote to Herzog and expressed his discomfort with Kleinberg's e-mail and stated that "this wasn't my intention at all."[346]

Goldman then stepped in to mediate the dispute. During the mediation, Herzog and Kleinberg accepted that Tal was not attempting to black-mail them, but rather, that the dispute was an honest disagreement on the interpretation of the Founders' Earn-Out.[347] While Goldman told Herzog and Kleinberg that Tal's interpretation was reasonable,[348] the Founders remained unwilling to adopt it and pay Tal substantially more than they believed the correct (*i.e.* their) interpretation entitled Tal to.[349] On June 19, 2011, Kleinberg e-mailed Goldman and Klahr; he told them that the Founders were not willing to pay more, and wrote that, if Tal needed to leave money in the company, "he never could have found a better deal for himself . . . [as] he will have a nice % of stock in the new company which is already worth a lot of money and will be much more."[350] The next day, Goldman asked the Founders whether their dispute was worth disrupting the sale and costing both SGE

---

[345] JX 410, at 1.
[346] JX 3021, at 2.
[347] Trial Tr. 2382:11–2383:4 (Herzog); *id.* at 2511:19–2512:11, 2513:22–2514:14 (Kleinberg).
[348] Before the dispute SGE's interpretation of the Founders' Earn-Out was the same as Tal's. JX 146; Trial Tr. 2167:7–13 (Goldman). Although Goldman came to understand that "there was a reasonable difference of opinion" on the interpretation, Goldman "felt [Tal] should get what was due to him." Trial Tr. 2013:7–2015:12, 2170:14–2171:23 (Goldman).
[349] JX 509.
[350] *Id.* at 4.

and the Founders more than the difference between the earn-out interpretations.[351] In response, the Founders again expressed that they "wouldn't be surprised if at the end of the Plimus saga [Tal] ends up with more money than us" and restated their unwillingness to give Tal more money. The Founders also wrote "if the deal is not meant to happen, I'm sure a better one will come at some point,"[352] and ended by telling Goldman and Klahr that if they did not feel Tal was being paid enough, then they should "feel free to chip in."[353]

Despite these hard negotiations, the Founders agreed to pay Tal more money. By June 28, 2011, the Founders agreed to a resolution of the Founders' Earn-Out with Goldman. Under the resolution, the Founders would each pay Tal $625,000, which is more than they believed they owed under the Founders' Earn-Out, but still less than Tal believed he was owed.[354] SGE agreed to make up the difference by paying Tal an additional $750,000.[355] Under the resolution, Tal would not receive more than he had maintained consistently that he was owed in total under those same side letters.[356] This resolution effectively solved the dispute over the Founders'

---

[351] *Id.*
[352] *Id.* at 3.
[353] *Id.*
[354] JX 569, at 1.
[355] *Id.*
[356] Trial Tr. 2171:9–16 (Goldman).

56

Earn-Out once it was presented to Tal;[357] Tal did not ask for additional earn-out money afterward.

### 3. SGE Cautioned Tal on Negotiating the Roll-Over

Tal negotiated his Roll-Over with Great Hill in June 2011, at the same time Goldman mediated the Founders' Earn-Out dispute. Under the May 26, 2011 Letter of Intent, Plimus's management team agreed to invest at least fifty percent of their after-tax net equity proceeds as equity in the post-Merger company.[358] However, Tal wanted to negotiate this provision and gain more liquidity by rolling over less equity.[359] Tal, an Israeli citizen, also had several other concerns, including remaining in the United States and the personal tax implications of his stock sale.[360]

On June 8, 2011, in connection with the Roll-Over, Tal provided Great Hill with a spreadsheet created by SGE in October 2010.[361] The spreadsheet showed that at a price of $115 million, SGE would pay Tal $2.5 million and the Founders would pay Tal $2 million under their respective side letters.[362] Great Hill had asked for that information to determine how much Tal would be rolling over into equity. In a June 12, 2011 e-mail, Klahr gave Tal some advice on the Roll-Over, writing that "the

---

[357] JX 569.
[358] JSUF ¶ 158.
[359] JX 481; JX 566.
[360] JX 566 ("I also need to stay in the company and the US for longer than I planned"); Trial Tr. 508:4–509:4 (Busby).
[361] JX 465.
[362] *Id.*

57

things management ask for are a big indicator for investors . . . A big emphasis on liquidity is generally a big indication [management] aren't believers . . . Please think and consider your requests to your new potential partners very carefully."[363] On June 26, in advance of Tal's meeting with Great Hill in its Boston offices, Goldman wrote to Tal that he was still working with the Founders to resolve the Founders' Earn-Out dispute and that Tal should "go easy on pushing the greathill [sic] guys. They won't say anything to you, but I [guarantee] you that every time you push on the liquidity issue you are sending them a signal that you don't believe in the business or aren't committed," and that "I'm not sure the alternative of no deal is a great one for any of us."[364]

4. The Earn-Out and Roll-Over Converged and Are Solved

On June 28, 2011, after meeting with Great Hill in its Boston offices, Tal wrote an e-mail to Goldman to tell him that the meeting had gone well.[365] Tal also addressed the issue of Founders' Earn Out and wrote, "I see no reason to compromise on this subject and that is mainly because of your promise to me that we are on the same boat when it come[s] to the exit."[366] Tal further stated that he was sure he earned his commission "even if you guys do not read the contract some [sic] way I

---

[363] JX 481.
[364] JX 566.
[365] *Id.*
[366] *Id.*

58

do."[367] Tal continued, writing "GHP is buying Plimus for the vision and the future that the team and I are creating . . . So in fact, I am not getting more than 50% of my money in this process, and I also need to stay in the company and in the US for longer time than I planned, and all this for you guys to get your money."[368] In a different June 28, 2011 e-mail, Tal followed up with Busby regarding his meeting with Great Hill and noted that the "new contract and roll over" for management was still an "open item."[369]

Goldman and Klahr discussed how to respond to Tal's e-mail on June 28, 2011. Klahr suggested they "let him cool down a little," and "if he calls give him the improved offer and tell him we have tried our hardest but that the new offer is contingent on him taking what is on the table from GHP," and that "if he blows up the deal he looses [sic] big in lots of ways, the chief of them being financially."[370] Goldman wrote in response, "He ain't blowing up this deal. But I do feel like slapping him back now rather than later."[371]

Goldman and Tal did talk on June 28, 2011, and Goldman presented the resolution to the Founders' Earn-Out to Tal. Goldman reported to Steele of Raymond James that Goldman had "settled the 'side letter' issue with [Tal]," that

---

[367] *Id.*
[368] *Id*.
[369] JX 564.
[370] JX 570, at 1.
[371] *Id.*

59

the Founders had each "agreed to give [Tal] $625k . . . [and] SGE will make up the additional $750k to get him to his $2M goal from these guys in addition to our current side letter."[372] Goldman told Steele that Tal "has also agreed that he'll stop negotiating his deal with GHP and move on."[373] Steele responded that he had just spoken to Tal who had also told him things were resolved.[374] Steele "also spoke to GHP and they just echoed that Monday's session went well, they are working towards signing and from their perspective they had alignment with [Tal] so felt like they were done there."[375] On June 29, 2011, Goldman reported to the Founders that Great Hill had flagged Tal's Roll-Over as the major remaining open item, that Goldman had presented the resolution to the Founders' Earn-Out to Tal, and that Tal "has agreed that given [that] solution [] that he will sign up for that deal and stop negotiating with GHP."[376]

During this animated dispute over the Founders' Earn-Out, at Tal's June 27, 2011 meeting with Great Hill, Vettel had asked Tal what was left to prevent closing. In response, Tal told Vettel that there was an issue with Tal's side letters. When asked what Great Hill could do to help, Tal told Vettel that they could call Goldman.[377] Vettel did call Goldman on June 28, 2011; this was the only time that

---

[372] JX 569.
[373] *Id.*
[374] *Id.*
[375] *Id.*
[376] JX 573.
[377] Trial Tr. 1569:12–1574:13 (Tal).

Great Hill and SGE had any direct contact.[378]  During the call, Vettel identified the main outstanding issue on the deal as Tal's Roll-Over and noted that Tal, in turn, was having an issue with his side letters. Vettel then asked Goldman to help resolve the issue and Goldman replied that he believed they had a solution.[379]  The Founders' Earn-Out issue was resolved that same day.  On June 30, Tal wrote an e-mail to Vettel with the subject line "thanks" and the body "for the call with SIG !!," to which Vettel responded, "I hope you get the issue resolved quickly."[380]  In other words, despite testimony to the contrary, Great Hill was aware of the Founders' Earn-Out dispute and its relationship to Tal's Roll-Over prior to entering into the initial merger agreement.

While the Founders' Earn-Out issue was resolved in principle by the end of June 2011 and was formalized during the month of July,[381] Tal's Roll-Over negotiations continued to be an issue for several weeks, at least in regard to the specific mechanics.  On July 20, 2011, Goldman provided Steele with an updated spreadsheet that detailed the new breakdown of Tal's earn-out agreements, which Steele then provided to Great Hill.[382]  The new spreadsheet reflected the resolution to the Founder's Earn-Out; compared to the spreadsheet Tal had originally provided

---

[378] JX 3030; Trial Tr. 694:3–696:5 (Vettel); Trial Tr. at 2182:22–2184:10 (Goldman).
[379] Trial Tr. 2184:11–2185:15 (Goldman).
[380] JX 575.
[381] JX 576; JX 598.
[382] JX 623.

to Great Hill, Tal's total earn-out remained virtually the same.[383]  Steele wrote to Goldman that Great Hill wanted the information in order "to try to understand what [management] is getting in totality."[384]

The fact that the Roll-Over issue had not yet been fully resolved irritated Goldman.  In a separate July 20, 2011 e-mail, Goldman wrote to Tal, in reference to a phone call, "I didn't understand what you were saying -- you promised us when we agreed to increase your side letter that you would roll at least $3m or even all your stock. Why is this even an issue? . . . What is going on? Why can't we close."[385] Arnheim of Perkins Coie e-mailed Goldman on July 21, 2011 and told him that Tal had not yet agreed to the Roll-Over.[386]  Arnheim also detailed how he expected Tal's Roll-Over to be structured to account for the side letter payments; the expected structure of the Roll-Over was complex given Tal's various holdings in preferred shares, vested and unvested common shares, and common share options, and all the associated tax consequences.[387]  Goldman responded to Arnheim on the same day and asked him to tell Tal that "SGE's position is that it's additional funds to his side letter . . . was contingent on him agreeing to roll $3m . . . . [Tal] told us he agreed with this . . . . He also represented to us that he would stop negotiating with GHP on

---

[383] There was a small difference attributable to rounding, as the new spreadsheet used the entire number and the previous spreadsheet was in millions.

[384] JX 620.

[385] JX 616.

[386] JX 624, at 1.

[387] *Id.*

62

the issue."[388]  It is also clear from a July 23, 2011 e-mail between Busby and Tal that, at least, the details of the roll-over still had not been fully resolved by then.[389]

The ultimate result of the e-mails and calls and accusations of blackmail is that Tal was paid the total earn-out he anticipated before Great Hill ever submitted its final bid.  Furthermore, at the end of the negotiations with Great Hill, Tal agreed to roll over fifty percent of his merger proceeds, as originally envisioned in the Letter of Intent.  In fact, Tal put more than fifty percent of his merger proceeds into the new company; he left an additional portion of his merger proceeds in Plimus as a secured promissory note,[390] although this was primarily for tax purposes.

*G. From the Signing of the Initial Merger Agreement to Closing*

Following the Letter of Intent and due diligence review, Great Hill agreed to acquire Plimus at a purchase price of $115 million.[391]  The Plimus Board of Directors held a telephonic meeting on August 2, 2011, in which they approved the merger.[392]  Great Hill was also given log-in credentials to Plimus's reporting portal on that day, which allowed direct access to certain Plimus data.[393]  An initial merger agreement was signed on August 3, 2011, accompanied by a disclosure schedule.[394]  Following

---

[388] *Id.*
[389] JX 628.
[390] JSUF ¶ 159.
[391] *Id.* ¶ 34.  The exact structure of the transaction is not relevant.
[392] JX 646.
[393] JX 645.
[394] JSUF ¶ 35.

the initial merger agreement, Cayer visited Plimus's offices on August 16 and 17 to meet with Tal.[395] Cayer was working on financial projections for Plimus.[396] Cayer and Tal continued to correspond regarding financial projections throughout September.[397] Great Hill was particularly focused on Wix, the vendor that was projected to constitute a substantial portion of Plimus's future transaction volume. Wix, however, was not ramping as expected, and as a result, Great Hill reduced projections for Plimus's transaction volume and EBITDA projections for the fourth quarter of 2011.[398] On September 15, Cayer sent Great Hill's latest Plimus projections to Tal, which reflected lower EBITDA projections in the near term compared to what had been presented to Great Hill partners in the due diligence memo.[399]

While the initial merger agreement was dated August 3, 2011, the merger did not close until September 29, 2011.[400] Closing was delayed because Tal needed a new visa to continue working in the United States and Great Hill did not want to close before they were sure he had obtained one and could act as CEO of the new

---

[395] JX 3057.
[396] JX 687.
[397] *E.g.*, JX 3062.
[398] JX 667; JX 687; JX 701; JX 737; JX 738; JX 3062.
[399] JX 601, JX 3062.
[400] JSUF ¶ 152.

company.[401] Great Hill was aware of the visa issue before signing the initial merger agreement, but felt comfortable signing it regardless.[402]

### 1. Plimus Continued to Exceed a One Percent Chargeback Ratio for MasterCard through PayPal Pro

Plimus had three separate PayPal accounts: a PayPal Wallet account, a PayPal Israel account, and a PayPal Pro account. PayPal Wallet was an alternative payment method, under which consumers entrusted PayPal with their financial information and PayPal then provided payment directly, so that the merchant never saw the consumer's financial information.[403] PayPal Wallet stored consumers' financial information, which made it more convenient for consumers to transact.[404] Plimus's own PayPal Wallet account allowed it to accept payments from consumers' PayPal Wallet accounts.[405] Plimus's PayPal Israel account was also a PayPal Wallet account, but for international, primarily Israeli, transactions, and was maintained separately from the PayPal Wallet account.[406] By comparison, Plimus's PayPal Pro account was simply a payment processing account, largely indistinguishable from the service provided by Plimus's other payment processors.[407] Plimus opened its

---

[401] JX 628, at 2.
[402] *Id.*
[403] Trial Tr. 912:20–913:23 (Cayer); *id.* at 2567:4–15 (Layman).
[404] *Id.* at 2566:1–2567:3 (Layman).
[405] *Id.*
[406] JX 329, at 58–63; Trial Tr. 1308:9–20, 1310:11–13 (Itshayek); Trial Tr. 1651:23–1652:10 (Dangelmaier); JX 582, at 46.
[407] JX 29.

PayPal Wallet account in 2002,[408] its PayPal Pro account in 2009,[409] and its PayPal Israel account in 2010.[410]

After the end of the Paymentech relationship, PayPal Pro became Plimus's top processor by volume, and its only United States-based processor.[411] However, Plimus could process transactions in the United States through its non-United States-based processors.[412] Tal viewed PayPal Pro as a "gap solution."[413] Plimus planned to register as an Internet Payment Service Provider, which would allow Plimus to work around the processors and deal directly with acquiring banks.[414] Plimus also worked to add more United States-based processors.[415] Plimus did add another a United States-based processor, Litle, during September 2011 before closing.[416] Great Hill was aware and supportive of both initiatives.[417]

On August 4, 2011, PayPal informed Plimus that Plimus had exceeded a one percent chargeback ratio for MasterCard for July 2011, the second consecutive month.[418] Plimus did not exceed a one percent chargeback ratio for Visa in July.[419]

---

[408] Trial Tr. 1308:4–1309:6 (Itshayek); JX 329, at 31–50.
[409] JX 29; JX 329, at 51–57.
[410] JX 329, at 58–63.
[411] JSUF ¶ 168; Trial Tr. 392:17–393:11 (Busby).
[412] Trial Tr. 183:21–187:22 (Busby); *id.* at 1421:2–21 (Itshayek); *id.* at 1676:4–8 (Dangelmaier).
[413] JX 460, at 2.
[414] JX 582 at 18; JX 707, at 100.
[415] Trial Tr. 182:23–183:7 (Busby); *id.* at 910:4–17 (Cayer).
[416] JSUF ¶ 178.
[417] Trial Tr. 182:23–183:7 (Busby); JX 460, at 2; JX 707, at 100.
[418] JSUF ¶ 173; JX 654.
[419] JX 641.

During an August 11, 2011 call with PayPal, PayPal told Plimus that if the chargeback ratio for MasterCard exceeded one percent for a third month, PayPal could issue a 30-day termination notice and thus end its relationship with Plimus.[420] Jason Edge, a Payment Assistant at Plimus, memorialized this call in an e-mail to Tal, writing "Paypal will issue a 30 day notice to potentially shut down Plimus'[s] ability to process on the Pro account unless numbers improve."[421]

On August 15, 2011, Edge e-mailed PayPal in reference to the August 11 call; he detailed Plimus's efforts to reduce chargebacks, which included mass refunds to the customers of vendors that were suspended in June and July.[422] In addition to mass refunds, Plimus also manually rerouted transactions in an attempt to reduce the chargeback ratio,[423] a practice known as "load balancing."[424] By routing more transactions through PayPal Pro, Plimus could reduce the chargeback ratio by increasing the number of transactions, the denominator in the chargeback ratio.[425] Neither mass refunds nor load balancing was explicitly prohibited by card

---

[420] JX 670.
[421] *Id.*
[422] JX 679.
[423] JX 690; JX 695.
[424] Trial Tr. 2558:23–2559:12 (Layman).
[425] *Id.*

association rules at the time.[426]  PayPal was aware that Plimus was load balancing, but did not raise any formal objection to the practice to Plimus.[427]

Despite these efforts, PayPal continued to threaten termination, and in mid-August 2011, it explained to Plimus that the chargeback ratio for August would be determinative.  Itshayek memorialized an August 18, 2011 call with PayPal, writing to thank them for an earlier call and stating that "[u]ntil today, it was our understanding that September will be the crucial month and not August" and that Plimus had concentrated its efforts on reducing September chargebacks.[428]  According to PayPal internal e-mails, PayPal also threatened termination in calls with Plimus on August 19, August 26, and September 1.[429]  However, based on previous experience with other processors, neither Tal nor Itshayek believed that a third month of excessive chargebacks would actually result in a thirty-day termination letter.[430]

Separately, on August 16, 2011, Itshayek received a request from PayPal for information on a Plimus vendor, Home Wealth Solutions, which PayPal said Visa was requesting because the vendor's chargeback ratio was 1.65%.[431]

---

[426] Trial Tr. 2589:13–21 (Layman).  While the Plaintiffs disapprove of the practice of mass refunds, they do not contend that issuing mass refunds violated credit card association rules.
[427] JX 756, at 2.
[428] JX 692, at 2.
[429] JX 693, at 1; JX 702; JX 754, at 4.
[430] Trial Tr. 1416:23–1417:23 (Itshayek); *id.* at 1604:6–1605:6 (Tal).
[431] JSUF ¶ 175; JX 681.

The chargeback ratio for Visa through PayPal Pro did not exceed one percent in August 2011,[432] however, Plimus exceeded the one percent chargeback ratio threshold again for MasterCard in August.[433] Itshayek e-mailed PayPal on September 9, 2011 to memorialize a call PayPal had with Tal. In the e-mail, Itshayek summarized the events and chargeback ratios of the past few months, and ended by telling PayPal, "we would highly appreciate receiving one additional month to prove the actions taken by Plimus to reduce and control [the chargeback] ratio and general risk."[434] Plimus did not receive a thirty-day termination letter in September,[435] and PayPal did not notify Plimus of any further plans or threats to terminate any of Plimus's PayPal accounts during the rest of the month.[436] However, Plimus and PayPal continued to communicate. In one instance in late September, PayPal reviewed a list of Plimus vendors and recommended that certain vendor categories be "shut down if [Plimus] want[ed] *to keep* [their] relationship with [PayPal]."[437] I find that at the time of closing, Tal and Itshayek did not believe PayPal would terminate Plimus's PayPal Pro account, and believed that Plimus's chargeback ratio for MasterCard would not exceed one percent for September.[438] An internal PayPal

---

[432] *See e.g.*, JX 731; JX 857.
[433] JX 731.
[434] *Id.*
[435] JX 828 (PayPal did not issue a termination notice to Plimus until October).
[436] JX 754, at 4; Trial Tr. 1418:11–1419:11 (Ithshayek).
[437] JX 771 (emphasis added).
[438] JX 731; Trial Tr. 1590:20–1591:13 (Tal).

69

e-mail sent on September 29, 2011 reflected that an official decision on whether to terminate Plimus had not been made as of that date.[439]

Great Hill did not receive a specific update on Visa or MasterCard chargeback ratios for PayPal Pro after Itshayek's July 27, 2011 e-mail, in which she wrote that Plimus did not expect the July chargeback ratios to exceed one percent. Great Hill concedes that it also did not ask for updates on these specific ratios after that e-mail. Great Hill did, however, continue to track Plimus's aggregate chargeback ratio and calculated it from Plimus's materials (such as the "huge excel files") that Great Hill had been provided with.[440] The information they received and reviewed in these materials did not provide the detail necessary to calculate the chargeback ratios by processor and region, which were the relevant chargeback ratios for PayPal Pro purposes.[441] However, in an August 26, 2011 e-mail, Madden (of Great Hill) noted to Cayer that Plimus's aggregate chargeback ratio in July continued to exceed one percent.[442] This did not prompt further inquiry by Great Hill into Plimus's current chargeback ratio status.

Throughout August and September 2011 Great Hill paid close attention to the transactions of new vendors and paid particularly close attention to Wix, which was

---

[439] JX 810.

[440] The "huge excel files," so called because they were very big, were monthly reports detailing all Plimus vendors in that month and their volume/transaction data. Trial Tr. 388:15–389:8 (Busby).

[441] *Id.* at 392:1–13 (Busby).

[442] JX 710; Trial Tr. 391:10–392:16 (Busby).

still not ramping as expected.[443] The slower ramp in Wix had caused Great Hill to revise down Plimus's projected EBITDA for the third quarter of 2011.[444] The slower-than-expected ramp worried Great Hill. For example, after Cayer reported the September 2011 Wix run rate to Busby, Busby wrote "You're killing me. Is there any good news?" to which Cayer replied, "This is my life…I have lost sleep (and hair) on these volume trends."[445] The Wix ramp up had been a key assumption in Tal's July 5, 2011 chargeback tables, which anticipated chargeback ratios to fall below one percent in July and August.

### 2. Tal and Busby Met in Israel in September

Tal and Busby met in Israel on September 13, 2011.[446] Plimus was hosting an industry conference in Israel, and Busby attended at Tal's invitation.[447] During the conference, Busby briefly met the representative for Plimus's PayPal Israel account, Oded Zehavi.[448] This was Great Hill's only contact with PayPal pre-closing, and Great Hill never attempted to reach out to PayPal formally during due diligence.[449] At trial, Tal's and Busby's recollections of the trip differed materially. Tal testified that during this trip he informed Busby: (1) that PayPal had threatened

---

[443] JX 667; JX 687; JX 737.
[444] JX 687.
[445] JX 737.
[446] JSUF ¶ 174.
[447] Trial Tr. 160:18–161:4 (Busby).
[448] *Id.* at 161:5–162:6 (Busby).
[449] *Id.* at 754:19–757:8 (Vettel).

to terminate the PayPal Pro account; (2) that Tal did not believe they would actually terminate that account; and (3) that they had other processors even if PayPal did terminate.[450]  Tal also testified that he provided Busby with a further update on PayPal by phone a few days before closing.[451]

Busby's recollection is entirely different.  He testified that he was not told of *any* threatened PayPal termination, either in Israel or in a call prior to closing,[452] but that he did remember discussing the PayPal-Plimus *relationship* in Israel.  According to Busby, he and Tal discussed Plimus's goal of adding more processors, at which point Busby asked Tal for an assurance that Plimus would still keep PayPal as a processor, to which Tal agreed.[453]

I find neither Tal nor Busby's accounts credible.  It is not credible that Tal told Busby that PayPal, Plimus's principal account, threatened termination and that Busby did nothing to alert the rest of the Great Hill deal team or Great Hill's deal counsel.  Busby's testimony also lacks credibility.  Specifically, I find it unlikely that in the course of a discussion limited to *adding* processors, Busby demanded an assurance from Tal that Plimus would maintain its PayPal relationship, despite the fact that (per Busby) he had no reason to suspect that the Plimus-PayPal relationship

---

[450] *Id.* at 1599:2–1600:14 (Tal).
[451] Tal testified that he told Busby on this call that Plimus's chargebacks through PayPal looked good for the month of September and that he continued to believe there would be no termination. *Id.* at 1601:15–1603:3 (Tal).
[452] *Id.* at 122:17–22, 159:8–160:14 (Busby).
[453] *Id.* at 164:12–165:16 (Busby).

was in doubt. Furthermore, as discussed below, Busby's muted response when he ultimately learned that PayPal had terminated Plimus suggests that Busby already knew there was, at least, some issue with the PayPal relationship. Most likely, I find, Tal disclosed to Busby that Plimus and PayPal were having some dispute, but did not disclose the extent of the issue or that it involved explicit threats of termination. This disclosure, accompanied with a comment on the availability of other processors, prompted Busby to seek assurance that the PayPal relationship would be maintained. The lack of a complete disclosure also fits with Tal's own misplaced confidence at that time that PayPal would not, in fact, terminate its relationship with Plimus.

### 3. SGE Organized a Bring Down Call on September 12, 2011

In preparation for closing, Klahr and Wolfe organized a "bring down call" with Plimus management for September 12, 2011.[454] The purpose of the call was to see if there had been any changes to the business between signing the initial merger agreement and the upcoming closing that would require the disclosure schedule, which had accompanied the initial merger agreement, to be amended.[455] On

---

[454] JX 730. The call was also referred to in the organizing e-mail as a "breaches of representations call." *Id.*

[455] *Id.*; Trial Tr. 1910:9–1911:2 (Klahr).

September 9, 2011, Klahr circulated a list of questions for the upcoming bring down call, which Klahr made clear that all Plimus management were required to review.[456]

Tal was unable to participate in the call.[457] However, Tal spoke with Itshayek in advance of the bring down call, and they identified three business issues responsive to Klahr's list of questions: (1) a potential fine related to GoClickCash, (2) PayPal's termination threats, and (3) the recent request from PayPal for information on Home Wealth Solutions.[458] Tal and Itshayek determined that Itshayek, who would be participating in the call, should bring up *only* the request for information on Home Wealth Solutions.[459] They agreed that Itshayek should not bring up the PayPal threats or the potential fine for GoClickCash because Plimus had not yet received formal notices for either.[460] Importantly, Tal also told Itshayek that he would bring up both issues personally with Great Hill prior to closing.[461]

Itshayek did as discussed, and during the bring down call, she raised only Home Wealth Solutions.[462] Klahr followed up with Itshayek about Home Wealth Solutions.[463] Itshayek forwarded the PayPal e-mail she had received on the

---

[456] JX 732.

[457] Trial Tr. 1372:12–21 (Itshayek). Most likely because Tal would be traveling to Israel for Plimus's conference.

[458] *Id.* at 1375:3–1378:10 (Itshayek).

[459] *Id.*

[460] *Id.*

[461] *Id.*

[462] JX 744; Trial Tr. 1378:23–9 (Itshayek); Trial Tr. 1914:20–1915:24 (Klahr).

[463] JX 758; Trial Tr. 1915:14–1916:15 (Klahr).

vendor,[464] which was in turn forwarded onto to Perkins Coie,[465] who provided it to K&E on behalf of Great Hill.[466] The supplemental disclosure schedule attached to the amended merger agreement[467] included a disclosure which stated that Plimus had received an information request regarding Home Wealth Solutions.[468] The supplemental disclosure schedule did not, however, reference the potential GoClickCash fine or the threatened PayPal termination.[469]

Itshayek had been notified during an August call with PayPal that a fine might be imposed on Plimus due to a MasterCard inquiry related to GoClickCash.[470] On September 22, 2011, after the bring down call, PayPal informed Itshayek that a $200,000 fine would, in fact, be imposed regarding GoClickCash.[471] Itshayek shared this information with Tal.[472] Although Tal testified that, on a call with Busby a few days prior to closing, he informed Busby of the GoClickCash fine,[473] the supplemental disclosure schedule did not reference this fine or GoClickCash.[474]

---

[464] JX 761.
[465] JX 762.
[466] JSUF ¶ 175; JX 766.
[467] JSUF ¶ 152.
[468] JX 797, at 6.
[469] *Id.*
[470] Trial Tr. 1191:2–1191:17 (Itshayek).
[471] JSUF ¶ 176.
[472] *Id.*
[473] Trial Tr. 1601:15–1603:21, 1607:12–24 (Tal).
[474] JSUF ¶ 177.

Tal and Itshayek did not raise PayPal Pro excessive chargebacks, the GoClickCash fine, or PayPal's threats of termination to the Plimus Board of Directors.[475]  As a result, Goldman, Klahr, Herzog, and Kleinberg were unaware that Plimus had exceeded one percent chargeback ratios in June, July, or August 2011, or that Plimus was being fined related to GoClickCash.[476]  They were similarly unaware that PayPal had threatened termination of Plimus's account.[477]  The Plimus Board of Directors did not a hold another meeting after the August 2, 2011 meeting approving the initial merger agreement.[478]

*H. The Deal Closes*

The Parties entered into the Amended Agreement and Plan of Merger (the "Merger Agreement") on September 29, 2011.  At issue in this action are four representations and warranties in the Merger Agreement, and the provisions related to indemnification.

1. <u>Relevant Representations and Warranties in the Merger Agreement</u>

Article 3 of the Merger Agreement lists representations and warranties.[479]  Section 3.09, titled "Financial Statements," includes the representation that

---

[475] Trial Tr. 1425:15–1426:13 (Itshayek); *id.* at 1616:8–1617:3 (Tal).

[476] *Id.* at 1811:10–1812:2, 1814:8–24, 1906:13–16 (Klahr); *id.* at 2069:19–23, 2196:20–23 (Goldman); *id.* at 2401:12–2402:12 (Herzog); *id.* at 2490:21–2491:11, 2522:7–20 (Kleinberg).

[477] *Id.* at 1816:11–1817:5 (Klahr); *id.* at 2102:9–12 (Goldman); *id.* at 2401:12–2402:12 (Herzog); *id.* at 2490:17–20, 2523:1–4 (Kleinberg).

[478] *Id.* at 2490:7–12 (Kleinberg).

[479] JX 796, at 31–49.

76

"[n]either the Company nor any of its Subsidiaries, taken as a whole, have any material liabilities or obligations (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known, whether due or to become due and regardless of when asserted)," with certain exceptions.[480]

Under Merger Agreement Section 3.16, titled "Contracts," all contracts to which Plimus was a party were required to be listed in the disclosure schedule that accompanied the Merger Agreement, except for certain contracts that did not meet minimum thresholds.[481]  As to the contracts that were required to be listed, Section 3.16 included a representation that:

> Neither the Company nor any Subsidiary of the Company, nor, to the Company's Knowledge, any of the other parties thereto, is in default in complying with any material provisions thereof, nor has the Company or any of its Subsidiaries received written notice of any such default, and, to the Knowledge of the Company, no condition or event or facts exist which, with notice, lapse of time or both, would constitute a default thereof on the part of the Company . . . . There is no material dispute under any Contract required to be disclosed in Section 3.16 of the Disclosure Schedule.[482]

Plimus's contract with PayPal was among those listed in the disclosure schedule.[483]

In Section 3.23, "Certain Business Practices," of the Merger Agreement, there is a representation that:

---

[480] JX 796, at 37–38.
[481] *Id.* at 42–43.
[482] *Id.* at 43.
[483] JX 648, at 18–19.

The Company . . . is and has been in compliance with the bylaws and operating rules of any Card System(s), the Payment Card Industry Standard (including the Payment Card Industry Data Security Standard), the operating rules of the National Automated Clearing House Association, the applicable regulations of the credit card industry and its member banks regarding the collection, storage, processing, and disposal of credit card data, and any other industry or association rules applicable to the Company . . . in connection with their respective operations.[484]

Section 3.26, "Significant Customers; Suppliers," contains the representation that:

There are no suppliers of products or services . . . that are material to [the Company's] business with respect to which alternative sources of supply are not general available on comparable terms and conditions in the marketplace. No supplier of products or services to the Company . . . had notified the Company . . . that it intends to terminate its business relationship with the Company . . . .[485]

## 2. Indemnification Provisions in the Merger Agreement

Article 10 of the Merger Agreement addresses "Certain Remedies." Section 10.01, defines the survival period of the representations and warranties of the Merger Agreement; the four representations and warranties restated above are included in "all other representations and warranties . . . [which] terminate on the date which is twelve (12) months following the Closing Date."[486] Section 10.02 is titled "Indemnification Obligations; Claims," and details the indemnification obligations of "Effective Time Holders."[487] An "Effective Time Holder" is defined, in pertinent

---

[484] JX 796, at 47–48.
[485] *Id.* at 49.
[486] *Id.* at 68.
[487] *Id.* at 69.

part, as "each holder of Company Capital Stock as of immediately prior to the Effective Time."[488] Under Section 10.02(a),

> Subject to the terms of this <u>Article 10</u>, after the effective time, each Effective Time Holder, individually as to himself, herself or itself only and not jointly as to or with any other Effective Time Holder, shall indemnify Parent and the Surviving Corporation and each of their respective Subsidiaries and Affiliates, and each of their respective directors, officers . . . (each a "<u>Parent Indemnified Person</u>") against such Effective Time Holder's Pro Rata Share of any actual loss, liability, damage, obligation, cost deficiency, Tax, penalty, fine or expense, … (collectively, "<u>Losses</u>" and individually" a "<u>Loss</u>") which such Parent Indemnified Person suffers, sustains or becomes subject to, as a result of, in connection with or relating to: (i) any breach by the Company of any representation or warranty of the Company set forth herein, in any Disclosure Schedule or in the Company Closing Certificate; (ii) any breach by the Company of any of the covenants or agreements of the Company set forth herein to be performed on or before the Effective Time . . . ; or (iii) any fines, penalties or similar assessments imposed against the Company . . . for violating applicable credit card association policies, procedures, guidelines or rules with respect to excessive chargebacks or similar recurring payments during the period between the Agreement Effective Date and the one year anniversary of the Closing Date, by a credit card association, card-issuing bank, other credit card issuer or third-party payment processor with respect to, and only to the extent of, transactions occurring prior to the Closing Date.[489]

Section 10.03, titled "Certain Limitations," provided a limitation on indemnification liability of Effective Time Holders for breaches of the representations and warranties, and states, "in no event shall the Effective Time Holders' aggregate liability for Losses pursuant to Section 10.02(a)(i) . . . exceed, in

---

[488] *Id.* at 12.
[489] *Id.* at 69.

the aggregate, the Escrow Amount, subject to the other terms of this <u>Article 10</u>."[490]

The Escrow Amount of $9.2 million[491] was funded by withholding a pro rata share of each Effective Time Holder's merger consideration,[492] and would be held for the Escrow Period (twelve months after closing)[493] or until any prior claims were finally adjudicated.[494]  Under Section 10.03(b):

> The Escrow Amount will be the sole source of funds from which to satisfy the Effective Time Holders' indemnification obligations under <u>Section 10.02(a)(i)</u> . . . . In no event shall any individual Effective Time Holders' liability for Losses pursuant to <u>Section 10.02(a)(i)</u> . . . exceed, in the aggregate, the lesser of (x) such Effective Time Holder's Pro Rata Share of the Escrow Amount, or (y) as to each and any claim for indemnification under <u>Section 10.02(a)(i)</u> . . . , such Effective Time Holder's Pro Rata Share of the Losses relating to such claim, subject to the other terms of this <u>Article 10</u>.[495]

Under Section 10.04, "Effect of Knowledge," of the Merger Agreement:

> By virtue of this Agreement, each Effective Time Holder agrees that Parent's rights to indemnification for the express representations and warranties set forth herein are part of the basis of the bargain contemplated by this Agreement; and Parent's rights to indemnification shall not be affected or waived by virtue of . . . any knowledge on the part of the Parent of any untruth of any such representation or warranty of the Company expressly set forth in this Agreement, regardless of whether such knowledge was obtained through Parent's own

---

[490] *Id.* at 71.
[491] *Id.* at 13.
[492] *Id.* at 22. "Pro Rata Share" is defined as the percentage of Total Outstanding Common Shares held by the Effective Time Holder as of the Effective Time.  *Id.* at 17.
[493] *Id.* at 22.
[494] *Id.* at 74.
[495] *Id.* at 71.

investigation or through disclosure by the Company or another Person . . . .[496]

Finally, under Section 10.10, "Exclusive Remedy:"

> Following the Closing, except (a) in the case of fraud or intentional misrepresentation (for which no limitations set forth herein shall be applicable), . . . , the sole and exclusive remedies of the parties hereto for monetary damages arising out of, relating to or resulting from any claim for breach of any covenant, agreement, representation or warranty set forth in this Agreement, the Disclosure Schedule, or any certificate delivered by a party with respect hereto will be limited to those contained in this <u>Article 10</u>.[497]

### 3. <u>The Merger Closed on September 29, 2011</u>

On September 29, 2011, the Merger Agreement was executed and the merger was closed.[498]  Tal, Goldman (as managing director of both SGE and SIG Fund), Herzog, and Kleinberg were all signatories to the Merger Agreement.[499]  The merger was funded by approximately $90 million in cash from Great Hill, $23 million in debt financing from Madison Capital Funding LLC, and $3 million in equity that Tal rolled over.[500]  As envisioned in the Merger Agreement, $9.2 million was deposited in an escrow account, where it remains today.[501]  On July 20, 2011, in anticipation of the merger, SGE donated preferred shares in Plimus to two charities, Defendants Kids Connect Charitable Fund and Donors Capital Fund, Inc. (the

---

[496] *Id.* at 72.
[497] *Id.* at 74–75.
[498] JSUF ¶ 152.
[499] JX 796, at 84, 87–91.
[500] JSUF ¶ 153.
[501] *Id.* ¶¶ 154, 155.

"Charity Defendants").[502]   Therefore, Kids Connect and Donors Capital were "Effective Time Holders," as defined by the Merger Agreement.  Itshayek, Tal, Goldman on behalf SIG Fund, Herzog, Kleinberg, and representatives of Kids Connect and Donors Capital all executed letters of transmittal for their stock in Plimus.[503]

Itshayek received $355,227 in merger proceeds, of which $35,997 is held in the escrow account.[504]  Tal received $5,274,775 in merger proceeds; $478,656 is held in escrow, $3,000,000 was rolled over, and $678,505 was left with Plimus in the form of a promissory note.[505]  In this context, "merger proceeds" does not include the payments Tal received from his side letter agreements.  SIG Fund received $49,908,911 in merger proceeds, $3,323,060 is held in escrow.[506]  Herzog and Kleinberg both received $21,170,686 in merger proceeds, and $1,972,611 of each of their respective merger proceeds is held in escrow.[507]  Kids Connect received $2,201,317 in merger proceeds, $146,569 of which is held in escrow, and Donors Capital received $8,482,419 in merger proceeds, $605,068 of which is held in escrow.[508]

---

[502] *Id.* ¶ 58.
[503] *Id.* ¶¶ 144–150.
[504] *Id.* ¶ 157.
[505] *Id.* ¶ 159.
[506] *Id.* ¶ 160.
[507] *Id.* ¶¶ 161, 163.
[508] *Id.* ¶¶ 165–66.

*I. Plimus Post-Merger Events*

Plimus was renamed BlueSnap after the transaction closed;[509] for simplicity I will continue to refer to the post-closing entity as Plimus. PayPal notified Plimus on September 30, 2011 that the fine related to GoClickCash would appear on its processor statement as "MasterCard Violation-July 2011."[510] Plimus asked for more detail on October 6, and PayPal, for the first time,[511] told Plimus that the underlying violation was a BRAM (or "Business Risk Assessment and Mitigation") violation,[512] which are considered severe violations.[513] Plimus asked PayPal for the actual MasterCard notice; a PayPal risk analyst instead prepared a short letter on PayPal letterhead that stated, with little detail, that PayPal was debiting Plimus $200,000 for a BRAM violation related to GoClickCash.[514] At trial, the Plaintiffs' and the Defendants' industry experts disagreed whether the underlying violation was, in fact, a BRAM violation.[515] In any event, PayPal considered the violation to be a BRAM violation, but did not share this perspective with Plimus until October 6, 2011.

---

[509] Trial Tr. 240:12–241:2 (Busby).

[510] JX 827, at 3.

[511] In internal e-mails, PayPal had previously referred to the GoClickCash violation as a BRAM violation, but October 6 was the first time that PayPal told Plimus it was such. JX 756.

[512] JX 827, at 2.

[513] Violations of MasterCard's BRAM program are considered very serious threats to a merchant's relationship with their processors, the acquiring banks, and the card networks. Trial Tr. 2542:16–2543:21 (Layman); *id.* at 2877:8–18, 2890:4–8 (Moran).

[514] JX 839; JX 3065, at 1–4. The PayPal risk analyst denied having a copy of the notice; however, internal e-mails showed he was provided one. JX 827, at 1; JX 819.

[515] Based on this original notice, the violation does not appear to be a BRAM violation; for example, the MasterCard notice in fact details two different violations, and does not use the term BRAM or cite the MasterCard rule numbers specifically defined as BRAM. Apparently, payment

Plimus's PayPal Pro chargeback ratio for MasterCard in September 2011 did *not* exceed one percent.[516] Nonetheless, on October 7, 2011, PayPal sent Plimus a notice of termination, thereby ending its relationship as Plimus's largest processor. Following a call with Itshayek, PayPal sent a formal notice in the afternoon of October 7, 2011. According to the formal notice, "upon review your account poses an unreasonably high risk exposure to PayPal."[517] PayPal chose to terminate Plimus's PayPal Pro account, and it also terminated Plimus's other PayPal accounts; PayPal Wallet and PayPal Israel, and set a termination date for all three accounts of November 11, 2011.[518] Itshayek informed Tal of the termination on October 7,[519] and eventually forwarded the e-mails and notices to Tal on October 9, 2011.[520]

On the day PayPal terminated its relationship with Plimus, Tal was flying back from a business trip to Germany, and he did not receive notice of the PayPal termination until his flight landed in California on Friday, October 7, 2011, when he spoke with Itshayek.[521] Tal observed the Jewish holiday of Yom Kippur from the

---

experts disagree on exactly what a "BRAM violation" is. The Plaintiffs' payment expert testified at trial that the two violations detailed in the notice were not specifically defined as BRAM violations, but in his opinion were considered as severe and, again, while not defined in the rules as such, were considered by the industry to be violations of a broader group that the industry referred to as "BRAM Rules and Standards." Trial Tr. 2542:10–2543:3, 2582:5–2587:16 (Layman); *Id.* at 2877:8–2880:14 (Moran).

[516] JX 857; Trial Tr. 1591:7–10 (Tal).
[517] JX 828, at 1.
[518] *Id.* at 4–6.
[519] Trial Tr. 1594:17–1595:5 (Tal).
[520] JX 832.
[521] JX 3088; Trial Tr. 1594:22–1595:5 (Tal).

night of October 7, 2011 to sundown on October 8, 2011, and conducted no business during that period.[522] In the late afternoon of October 7, 2011, Busby had sent an e-mail to Tal, seeking to schedule a Tuesday meeting to follow-up on Tal's European business trip.[523] Tal responded to this e-mail on Sunday, October 9, 2011. In this e-mail Tal confirmed a Tuesday time for this meeting and added "We got a termination letter from PayPal meeting them tomorrow to get more update."[524] Busby responded by e-mail on Monday, October 10, 2011, "Ok. Let's discuss on Tuesday. Are we on schedule with Litle? Do you anticipate any issues in finding a North American processing solution?"[525] Plimus had entered into a processing agreement with Litle, another United States-based payment processor, by that point.[526] Busby was referring to replacing PayPal Pro with Litle.

Testimony at trial from Tal and Busby regarding Great Hill's reaction to the PayPal news is irreconcilable. Busby testified that he received the news in a "shocking call" from Tal while driving "on the Mass Pike, westbound, near the

---

[522] Trial Tr. 1595:6–1596:20 (Tal).

[523] JX 834, at 2. Busby first sent an e-mail earlier in the day to request this meeting. Tal had responded to this e-mail: "Let's do that and other issues like asknet and budget on Monday." Busby then wrote back that Monday was a holiday and their offices would be closed. Busby said he was nonetheless available Monday but suggested Tuesday would be better, so that Vettel could join the call. Busby ended his e-mail with "Hope the travels back from Europe went well." JX 834; JX 3087.

[524] JX 834, at 1.

[525] *Id.*

[526] JSUF ¶ 178.

Brighton exit,"[527] before he received Tal's e-mail.[528] As a result, Busby testified, his response to Tal's e-mail was muted, because Tal had already informed him by phone of the termination.[529] According to Busby, he was shocked when he received the news by phone. Tal, by contrast, denies that any such termination call took place.[530] I do not find Busby's testimony about this termination call credible.[531] I instead find that Tal first notified Busby about the PayPal termination via e-mail, a finding consistent with the text of the e-mail. I note that I have already found that Tal did not disclose PayPal's termination threats to Busby in Israel or in phone calls prior to

---

[527] Trial Tr. 157:3–15, 222:16–23 (Busby).

[528] *Id.* at 156:23–157:2, (Busby). Busby testified that he then called Vettel and Cayer to relay the news. *Id.* at 157:23–158:9; 554:8–560:13 (Busby). Vettel testified the call from Busby gave him a "sickening feeling." *Id.* at 652:3–653:8 (Vettel). Cayer also remembers how his "stomach churned" when he received the call from Busby with news of the termination. *Id.* at 971:5–974:2 (Cayer).

[529] *Id.* at 220:2–224:17 (Busby).

[530] *Id.* at 1588:4–14, 1595:11–15, 1596:16–20 (Tal).

[531] Busby does not remember the date or time of the call, only that he was most likely driving home from work. *Id.* at 202:2-203–4 (Busby). Busby testified that he immediately called Vettel, who in turn testified he received a call from Busby but similarly could not remember the date and time of this follow-on call. *Id.* at 801:11–19 (Vettel). Cayer also testified to receiving a follow on call and guessed it was around a week after closing, which, if taken literally, would place the call before PayPal terminated Plimus on October 7. *Id.* at 971:5–13 (Cayer). If Busby's testimony is to be believed, the phone call could only have occurred after the Friday October 7, 2011 notice of termination and before Busby's Monday October 10, 2011 response to Tal's e-mail. Phone records produced for the trial do not show any phone calls from Tal's work or cell phones to Busby after the termination letter was received on October 7 and before Busby's October 10, 2011 response. While I find that this call did not take place before Busby's October 10 response, Busby is, most likely, truthfully recollecting a call that took place after October 10. According to Tal and Busby's e-mail exchange, Tal planned to meet PayPal the following day. Tal no doubt updated Busby after this meeting, at which point Busby would have found out that the termination was real, despite Tal's misplaced confidence and belief that his connection to senior officials at PayPal would save the relationship; and that the termination involved all Plimus's PayPal accounts, which was not made clear in Tal's initial e-mail.

86

closing, but I find that Tal did disclose some level of problem with PayPal to Busby in Israel, which would explain Busby's muted response.[532] In other words, before Tal's e-mail, Busby was aware that PayPal's relationship with Plimus was troubled, but was unaware of PayPal's threats to terminate because Tal had withheld those threats from Great Hill.

Plimus's PayPal Pro and PayPal Wallet accounts terminated in November 2011;[533] Plimus's PayPal Israel account was not terminated until December 2011.[534] Plimus temporarily lost the ability to accept PayPal Wallet as a payment method. In January 2012, Plimus released a workaround, where Plimus's vendors would create their own PayPal Wallet accounts, and then turn them over to Plimus to manage.[535] The loss of PayPal as a processor and the temporary loss of PayPal wallet as a payment method affected Plimus's ability to do business. It also hurt Plimus's reputation, as it followed on the heels of the loss of Paymentech. Additionally, PayPal placed Plimus on the MATCH list on November 14, 2011, with reason code "Excessive Chargebacks."[536]

---

[532] Tal's PayPal termination e-mail to Busby did not explain that the PayPal termination applied beyond the PayPal Pro account to the PayPal Wallet and PayPal Israel account. JX 834. The lack of this critical information further explains Busby's muted response.
[533] Trial Tr. 1057:24–1058:4 (Cayer).
[534] Trial Tr. 1058:5–7 (Cayer); JX 883, at 2.
[535] JX 950.
[536] JX 921, at 5–6.

PayPal was not Plimus's only stumbling block after closing. Plimus entered into an agreement with Merchant e-Solutions, a payment processer, and began processing transactions by November 13, 2011.[537] Merchant e-Solutions terminated Plimus on January 5, 2012, and added Plimus to the MATCH list under reason code "Violation of MasterCard Standards."[538] In a letter "To Our Partners," Great Hill gave an annual report for the year ending on December 31, 2011, in which Great Hill noted that "Plimus was the only portfolio company to experience decline in valuation, as the company removed a number of high-risk clients from its payments platform, resulting in a negative short-term impact."[539] Great Hill wrote that Plimus had been terminated by PayPal and Merchant e-Solutions, "related to MasterCard violations by certain *Plimus* clients. Specifically, *Plimus'[s]* platform had been used by two customers to sell fraudulent 'get-rich-quick' schemes."[540] According to Great Hill, Plimus took "several corrective actions, including the immediate removal of a number of high-risk customers (which account for approximately 10% of volume)," which meant that Plimus fell short of its processing volume expectations. Great Hill wrote, "despite the near-term financial impact, our original investment thesis [in Plimus] remains intact and the longer-term prognosis for the business

---

[537] JSUF ¶¶ 179–80.
[538] *Id.* ¶¶ 181–82.
[539] JX 922, at 2.
[540] *Id.* at 4.

remains highly favorable."[541]  Great Hill also disclosed that Plimus's "financial performance has resulted in a financial covenant breach in Q4'11."[542]

A business summary report of Plimus's performance in the fourth quarter of 2011 similarly noted the termination by two processors, which related to two Plimus customers who sold fraudulent "get rich quick" schemes.[543] The summary noted that Plimus took corrective action following the processor terminations, including a January 2012[544] Plimus purge of approximately 500 vendors in "higher-risk merchant categories (auction/bid, forex software, media download, and virtual currency) and stopped accepting new merchants in these categories."[545]  In the summary, Great Hill noted that Plimus also changed its onboarding process, which added more review before new vendors could begin processing transactions.[546] Great Hill wrote that "the impact of these events and the decision to remove the higher-risk customers resulted in a decline in processing volume in December versus expectations, and we anticipate lower volumes into 2012."[547]  In the business summary report of Plimus's performance in the first quarter of 2012, Great Hill noted that Plimus's "key processing relationships appear to be stabilized."[548]

---

[541] *Id.*
[542] *Id.*
[543] JX 968.
[544] JX 2108, at 3.
[545] JX 968.
[546] *Id.*
[547] *Id.*
[548] JX 926.

Tal was fired as CEO in August 2012.[549] Great Hill filed this action on September 27, 2012, two days before the funds held in escrow were scheduled to be released. Additionally, SGE has not yet paid Tal the SGE Earn-Out.[550] The result of this litigation could affect SGE's profit on the sale of Plimus, which is in turn used to calculate Tal's transaction bonus.[551]

Great Hill made the decision to invest $20 million into Plimus during 2012 and 2013.[552] Plimus received an additional $28 million of funding in 2014, of which $15 million came from outside investor Parthenon Capital Partners.[553] In 2014, Plimus largely abandoned the reseller model and was instead forced to operate as a payment facilitator.[554] Processors and acquiring banks preferred the payment facilitator model,[555] which, compared to the reseller model, mandated much greater transparency on the identity of Plimus's vendors.[556]

*J. Procedural History*

The Complaint in this action was filed on September 27, 2012. Since then, this Court has issued written Opinions on November 15, 2013,[557] November 26,

---

[549] Trial Tr. 1060:23–1061:4 (Cayer).
[550] *Id.* at 1447:23–1448:9 (Tal).
[551] *Id.* at 1448:10–23 (Tal); *id.* at 2206:12–2207:6 (Goldman).
[552] JX 927; JX 1035; JX 1036.
[553] JX 1055.
[554] Trial Tr. 1674:10–1675:2 (Dangelmaier).
[555] *Id.* at 1709:22–1710:5 (Dangelmaier).
[556] *Id.* at 1673:18–1675:2 (Dangelmaier).
[557] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155 (Del. Ch. 2013).

2014,[558] and July 26, 2017.[559] For a complete procedural history, I refer the reader to those Opinions. The matter was bifurcated, and trial on the Defendants' liability took place over ten days from November 29, 2017 to December 12, 2017. I heard Post-Trial Oral Argument on August 7, 2018.

## II. LEGAL ANALYSIS

The Plaintiffs allege that Tal, Itshayek, Goldman, and Klahr committed fraud and fraudulent inducement in selling Plimus to Great Hill. The Plaintiffs further allege that Herzog, Kleinberg, the SIG Fund, and SGE (as well as Goldman and Klahr if they are not implicated in the fraud) aided and abetted this fraud, and that all the Defendants, except the two Charity Defendants, committed civil conspiracy. Great Hill seeks indemnification against Tal, Itshayek, Herzog, Kleinberg, SIG Fund, SIG Management, and the Charity Defendants for the losses it suffered as a result of breaches of the representations and warranties in the Merger Agreement. Furthermore, Great Hill argues that, given the alleged fraud, indemnification should not be limited to the escrow fund established by the Merger Agreement, and that liability should attach to all indemnifying defendant regardless of their participation in or knowledge of the alleged fraud. Finally, the Plaintiffs bring unjust enrichment

---

[558] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980 (Del. Ch. Nov. 26, 2014).

[559] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2017 WL 3168966 (Del. Ch. July 26, 2017).

91

claims against Tal, Itshayek, Herzog, Kleinberg, SIG Fund, and the Charity Defendants. Liability and damages were bifurcated, and this Opinion addresses issues of liability only, assuming damages. Much of this action is based on the fraud and fraudulent inducement claims; I turn to them first.

*A. The Fraud and Fraudulent Inducement Claims Against Goldman, Klahr, Tal, and Itshayek*

While the Plaintiffs, unhelpfully, argue in briefing that the "fraud in this action was extensive, and cannot be recounted in full here," they "highlight [] four major interrelated components" of the fraud.[560] The Plaintiffs highlight: (1) the Paymentech termination, (2) Plimus's history of violations and risk monitoring systems, (3) the dispute over the Founders' Earn-Out, and (4) PayPal's notices of violations and threats to terminate.

### 1. The Legal Standard

The Plaintiffs allege that Goldman, Klahr, Tal, and Itshayek (the "Fraud Defendants") fraudulently induced Great Hill to bid for Plimus, enter into the Merger Agreement, and close the transaction. The Plaintiffs similarly allege that Goldman, Klahr, Tal, and Itshayek committed fraud on the same grounds. Under Delaware

---

[560] Pls. Opening Post-Tr. Br. 162.

law, the elements of fraudulent inducement and fraud are the same.[561] The elements

of fraud are:

> (1) a false representation, usually one of fact, made by the defendant;
> (2) the defendant's knowledge or belief that the representation was
> false, or was made with reckless indifference to the truth; (3) an intent
> to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's
> action or inaction taken in justifiable reliance upon the representation;
> and (5) damage to the plaintiff as a result of such reliance.[562]

It is beneficial to first expand on several of these elements before applying them to

the facts of this case.

A false representation is not only an "overt misrepresentation"—that is, a

lie—but can also be a "deliberate concealment of material facts, or [] silence in the

face of a duty to speak."[563] The Plaintiffs allege that the Fraud Defendants

committed all three types of false representation at various times. To show active

concealment, a plaintiff must prove that the defendant "took some action affirmative

in nature designed or intended to prevent, and which does prevent, the discovery of

facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts

or some representation intended to exclude suspicion and prevent inquiry."[564]    A

---

[561] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018); *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010); *Haase v. Grant*, 2008 WL 372471, at *2 (Del. Ch. Feb. 7, 2008).
[562] *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *see also Trascent Mgmt. Consulting*, 2018 WL 4293359, at *12.
[563] *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983).
[564] *Metro Comm. Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.3d 121, 150 (Del. Ch. 2004) (quoting *Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. 1981)).

duty to speak can arise before the consummation of a business transaction, when a party to that transaction acquires information that the speaker "knows will make untrue or misleading a previous representation that when made was true."[565]

After showing that a false representation was made, a plaintiff must show that the defendant had knowledge of the falsity of the representation or made the representation with reckless indifference to the truth. The Plaintiffs here allege that Goldman and Klahr, given their access to information and their duties as directors, made representations on several occasions with such reckless indifference. Ordinary negligence is insufficient to show reckless indifference; the Plaintiffs must show, for example, that Goldman and Klahr "consciously ignored specific warning signs" related to alleged issues.[566]

Having shown a false representation and knowledge of the falsity, a plaintiff must show that the defendants intended for the plaintiff to rely on the false representation. To establish this requisite *scienter*, a plaintiff can show the defendants either "committed the misstatement recklessly or with intent."[567] In this context, recklessness is "an extreme departure from the standards of ordinary care."[568] Recklessness or intent can be shown through circumstantial evidence.[569]

---

[565] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013) (quoting Restatement (Second) of Torts § 551 (1977)).
[566] *Metro Comm. Corp. BVI,* 854 A.3d at 147.
[567] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009)
[568] *Id.* (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004)).
[569] *Id.*

For example, in *Deloitte LLP v. Flanagan*, a partner at an accounting firm was accused of trading in the securities of his clients and making fraudulent misrepresentations about this trading.[570] At the summary judgment stage in *Deloitte LLP*, this Court found that there was a reasonable inference of *scienter* based on the "magnitude of unauthorized trades, the incredibly prescient trading in those clients for which [the defendant] had material nonpublic information, along with his misuse of the Trading & Tracking system."[571] The timing of misrepresentations is also informative, especially when made during a due diligence investigation.[572] Facts that establish a motive and opportunity to commit common law fraud can also be used to establish *scienter*.[573]

To commit fraud, not only must a defendant have intended for the plaintiff to rely on a false representation, but the plaintiff must have taken, or refrained from, action in justifiable reliance upon that representation. This reliance element of fraud has several facets. As an initial matter, the plaintiff must have actually relied.[574] For example, "a party who gains actual knowledge of the falsity of a representation, structures a contract to address the risk of loss associated with the false

---

[570] *Id.*, at *1.
[571] *Id.*, at *8.
[572] *Paron Cap. Mgmt., LLC v. McConnon*, 2012 WL 2045857, at *6 (Del. Ch. May 22, 2012).
[573] *Deloitte LLP*, 2009 WL 5200657, at *8.
[574] "To prove common law fraud, the recipient of the false representation 'must in fact have acted or not acted in justifiable reliance' upon it." *Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *14 (Del. Ch. July 1, 2013) (quoting *NACCO Industries, Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009)).

representation, and proceeds to closing cannot claim justifiable reliance."[575] This Court sometimes explicitly separates from justifiable reliance the requirement that reliance be reasonable.[576] A plaintiff's diligence efforts can be evidence that her reliance on a false representation was reasonable because she made efforts to verify the representation and discovered no reason to doubt its truth.[577] The fact that a plaintiff's diligence efforts do not uncover fraud does not render such efforts unreasonable, especially when the fraud was intentionally hidden.[578] Whether reliance is justifiable is an objective standard.[579] In addition to being reasonable, justifiable reliance also "requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question."[580] In other words, a plaintiff can be said to "rely" on a matter only when it is material to the action she takes, or from which she forbears. For such a reliance to be actionable, the inducing "representation must not

---

[575] *Id.*

[576] *See e.g.*, *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983) ("the plaintiff [at common law] had to demonstrate that he reasonably or justifiably relied on the defendant's statements"); *Standard General L.P. v. Charney*, 2017 WL 6498063, at *12 (Del. Ch. Dec. 19, 2017) ("To prove fraud under Delaware law, a party must show, among other things, reasonable reliance on a false representation.").

[577] *Paron Cap. Mgmt., LLC*, 2012 WL 2045857, at *7.

[578] *Cobalt Operating LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007).

[579] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018).

[580] *Craft v. Bariglio,* 1984 WL 8207, at *8 (Del Ch. Mar. 1, 1984).

only be material, but must concern 'an essential part of the transaction.'"[581]  Relying

on this understanding of the law, I turn to the Plaintiffs' allegations of fraud.

### 2. The Paymentech Termination

Paymentech communicated the termination of its business relationship with Plimus via letters to Plimus of February 4, February 14, March 1, and March 3, 2011. The Plaintiffs allege that Great Hill was not provided with these four Paymentech termination letters, and that because the letters were responsive to due diligence requests, including the June 2, 2011 diligence request, the omission was a "deliberate concealment of material facts" sufficient to support a finding of fraud.[582]  The Plaintiffs further argue that a May 18, 2011 legal disclosure that described the termination as "mutual" was a fraudulent misrepresentation.  They point out that an accurate disclosure was part of an early draft disclosure schedule prepared by Perkins Coie, and note that this accurate disclosure was removed from the draft disclosure schedule that was provided to Great Hill.  I turn first to the alleged concealment of the termination letters.

---

[581] *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999) (quoting *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 512 (Del. 1931)).
[582] *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983).

### a. Tal, Itshayek, Goldman, and Klahr Did Not Knowingly Conceal the Paymentech Termination Letters from Great Hill

All the Fraud Defendants argue that the Paymentech termination letters were disclosed. Nevertheless, the Plaintiffs have shown that Great Hill never received them—neither during nor after the bidding process. The Plaintiffs argue generally that the "Fraud Defendants concealed material information;"[583] however, they make no specific allegations beyond the fact that Great Hill never received the letters. SGE, and therefore Goldman and Klahr, noticed that the letters were not in the data room in early May and asked Perkins Coie to release them, and expressed an understanding that the Paymentech termination had been resolved and was ordinary course. Goldman and Klahr subsequently believed that the letters had been released to the data room. As a result, Goldman and Klahr had no knowledge of the omission of the letters, nor were they recklessly indifferent to the omission, as they had no responsibility regarding the data room or responding to diligence requests. Itshayek did have responsibility to respond to diligence requests that were directed to her, but she also believed that the letters had previously been placed in the data room. Itshayek told Tal that she believed PwC had yet to see the letters in June, when PwC performed on-site diligence. She gave physical copies to Tal, which he offered to PwC. PwC, however, declined to take the documents from Tal, because it, too,

---

[583] Pls. Opening Post-Tr. Br. 166.

believed that the letters were available in the data room. Tal has similarly maintained that he believed the letters were in the data room, and this belief is corroborated both by his assent to their release to the data room when Perkins Coie asked for his permission to do so, and by his offer of the documents to PwC. Therefore, I find that none of the Fraud Defendants intentionally concealed these documents. No finding of fraud, therefore, can be based on failure to provide the Paymentech correspondence to Great Hill.

### b. The Representation Describing the Paymentech Termination As "Mutual" Was False

Tal, Itshayek, Goldman, and Klahr had all reviewed the Paymentech termination letters; the Plaintiffs, therefore, argue that the Fraud Defendants all knew that the legal disclosure on the Paymentech termination in the May 18, 2011 draft disclosure schedule—describing the termination as "mutual"—was affirmatively false. The Plaintiffs further contend that the disclosure constituted active concealment. This disclosure described the termination as "mutual;" it did not reveal that Paymentech initiated the termination and that it had provided alleged violations of card association rules as the basis for termination. The Fraud Defendants maintain that the disclosure made by Plimus is a truthful and accurate depiction of the Paymentech termination. I disagree. While the termination was "mutual" in the sense that Plimus did not care to oppose it, Paymentech clearly initiated the termination. Despite Plimus's reasons to be dissatisfied with Paymentech, which it

99

truthfully shared with Great Hill, Plimus had no incentive to prematurely end the relationship, which was due to expire in September 2011. On the other hand, Paymentech could incur risk when Plimus routed its transactions through Paymentech. In this regard, Paymentech was worried specifically about the risk of cross-border transactions in India, where it did not have a license to process such transactions. Therefore, Paymentech did have an incentive to end the relationship when it did, and the description of the end of the relationship as "mutual" is a false representation.

The Plaintiffs argue not only that the disclosure was false, but also that Tal, Itshayek, Goldman, and Klahr actively concealed the "real reasons" for the Paymentech termination, which the Plaintiffs allege were "improper business practices and poor risk management."[584] The Plaintiffs, quoting *Corporate Property Associates 14 Inc. v. CHR Holding Corporation*,[585] argue "that active concealment can be established by showing that defendants made a 'representation intended to exclude suspicion and prevent inquiry.'"[586] The Plaintiffs further claim that outside the disclosure, Tal and Itshayek continued the active concealment when they told Great Hill during the diligence process that Plimus had decided to leave Paymentech.

---

[584] *Id.* at 162–63.

[585] *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *7–8 (Del. Ch. Apr. 10, 2008)

[586] Pls. Opening Post-Tr. Br. 163.

As an initial matter, the legal disclosure predated on-site diligence, during which time PwC and Great Hill did, in fact, ask more questions about the Paymentech relationship. The Defendants have shown that Plimus had long been unhappy with Paymentech's service and rates, and when Paymentech stopped supporting transactions outside the US, Canada, and the European Union, Plimus made a decision not to renew the relationship when it expired later in the year. All of this was disclosed to Great Hill.

Furthermore, as described above, there was no attempt to conceal the Paymentech correspondence, which Tal, Itshayek, Goldman, and Klahr believed had been released to the data room. It is possible that the Fraud Defendants intended their misleading disclosures to distract attention away from the letters—perhaps even preempt their review—and thus conceal the "real" reason for the Paymentech termination. However, the "real" reason for the termination was shared with Great Hill; it was the incompatibility of Paymentech and Plimus around transactions outside the US, Canada, and the European Union. Therefore, it is far more likely that the intent of the Fraud Defendants was to supplement and provide context to the end of the Paymentech relationship beyond what was in the Paymentech termination letters, which the Fraud Defendants believed had been disclosed. As a result, I find that there was no active concealment by the Fraud Defendants. Nonetheless, the

101

representation that the end of the Paymentech relationship was "mutual" was false.[587]

### c. Tal, Goldman, and Klahr Knew the "Mutual" Termination Representation Was False

I turn next to the Plaintiffs' argument that Tal, Itshayek, Goldman, and Klahr had knowledge that the representation in the legal disclosure was false. Tal clearly had such knowledge, because he authored the legal disclosure and was intimately familiar with the Paymentech termination. Furthermore, his comment, when approving the release of the Paymentech termination letters, that he "need[ed] to think about ways to communicate this," foreshadows the disclosure he then crafted as an attempt to spin the termination in a misleadingly positive light. While Itshayek also knew Paymentech had taken the first step in terminating the relationship, the Plaintiffs do not allege that she helped draft, review or even that she saw the disclosure that Tal prepared. As a result, Itshayek did not have the requisite knowledge that the disclosure was false to support a fraud claim against her.

Goldman and Klahr, by contrast, knew that Paymentech had taken the initiative in ending the relationship. They, along with SIG Fund's in-house counsel, reviewed and even supplied edits to the draft disclosure schedule. Furthermore,

---

[587] Having found a false statement, I will not dwell further on the sometimes "prosciutto-thin distinctions" between the various theories of false representation. *Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *8 (referring to the difference between the theories of fraud by silence in the face of a duty speak and fraud by active concealment).

102

Goldman and Klahr both saw the previous draft of the legal disclosure prepared by Perkins Coie, which stated that Paymentech had notified Plimus that it was terminating the relationship based on alleged breaches. Goldman and Klahr argue that they lacked knowledge of the representation's falsity because they relied on management and counsel, and that the description of the termination was consistent with their understanding of the end of the relationship based on what management had told them. The Plaintiffs have shown that Goldman and Klahr were at least recklessly indifferent. It is true that Goldman and Klahr honestly did believe the end of the relationship was, in a sense, "mutual." Nonetheless, they had investigated the Paymentech termination in their capacity as directors, they knew that it was Paymentech who had ended the relationship, and they approved a disclosure that said otherwise. Therefore Tal, Goldman, and Klahr had knowledge of the false representation describing the Paymentech termination as "mutual."

### d. The Intent Behind the False Representation

The Plaintiffs spill much ink commenting on what they consider the enormity of the Fraud Defendants' behavior. They argue that the failure of the Silver Lake deal and the Fraud Defendants' purported belief that Plimus's business was about to tank, together support every inference that the Fraud Defendants' intent was to mislead Great Hill in order to facilitate a quick sale. Without addressing every allegation, suffice it to say that the record convinces me to the contrary on the

103

Plaintiffs' theory of motive. The Fraud Defendants ultimately had confidence in Plimus's viability and profitability. Nonetheless, it is clear that the Fraud Defendants believed the deal with Great Hill was advantageous to them, and wished it to close. Tal wanted liquidity and new investors with the capital to support roll-ups going forward;[588] SGE believed in supporting management, including through sale,[589] and the deal price met its profit goals;[590] the Founders, who are accused of aiding and abetting the alleged fraud, wanted to cash out.[591] Therefore, I find that the Fraud Defendants generally intended for Great Hill to rely on the disclosures and the representations in order to facilitate the sales process, merger agreement, and closing. That is sufficient to my finding that Tal created the disclosure stating that the Paymentech termination was mutual, with the intent that Great Hill believe it in support of the sale closing, and that Goldman and Klahr approved the misleading disclosure for the same reasons.

To reiterate, the Fraud Defendants believed that the Paymentech termination letters were released to Great Hill, therefore they could not have seriously intended, through the legal disclosure, to cover up the contents of those letters. Furthermore, the main purpose of the disclosure was to provide information on ongoing legal

---

[588] Trial Tr. 1622:7–10 (Tal), *id.* at 1864:4–1864:11 (Klahr).
[589] *Id.* at 1864:12–1864:19 (Klahr).
[590] *Id.* at 1863:17–1864:3 (Klahr).
[591] JX 179, at 162–64 (lines 1881–1927), 195–96 (lines 1877–1906), 202–04 (lines 2155–2185).

proceedings, not to detail the end of business relationships. However, a description of the termination as "mutual" was untrue and constitutes a false representation. It is also too far from the truth to be accidental; rather, it is an attempt to frame the end of the relationship in a misleading way and to have Great Hill rely on that framing. Therefore, I find that Tal, Goldman, and Klahr intended for Great Hill to rely on the description of the Paymentech termination as "mutual," and turn to the next element, justifiable reliance.

### e. There Was No Justifiable Reliance Because the False Representation on the Paymentech Termination Was Not Material

Goldman and Klahr identified the Paymentech relationship to be disadvantageous to Plimus when they conducted their own due diligence in 2008. After Tal informed Goldman and Klahr of the Paymentech termination in 2011, Goldman and Klahr pushed Plimus to involve legal counsel, Perkins Coie, in the Paymentech termination. Perkins Coie found that the termination was "ordinary course," achieved a release of the majority of the reserve account of Plimus's funds held by Paymentech to cover potential fines, and confirmed that no fines would result from the alleged violations in the original termination letter. Tal, Goldman, and Klahr all knew by the time the legal disclosure to Great Hill was made that Paymentech had released the majority of the reserve account and would not pursue fines or additional action for the alleged violations. The real point of friction

105

between Plimus and Paymentech was the cross-border transactions in India, which Paymentech refused to continue supporting, and which Plimus refused to stop transacting. The legal disclosure identified the cross-border issue as the main reason for the end of the Paymentech termination. Tal and Itshayek truthfully disclosed this information to Great Hill and its representatives during on-site diligence, in addition to disclosing truthfully the other reasons Plimus had to be dissatisfied with the relationship.

Great Hill, therefore, knew before closing that Plimus had previously had a disadvantageous contract with Paymentech, that Paymentech had decided to stop supporting certain cross-border transactions, and that as a result of that decision the Plimus-Paymentech relationship ended. What was not disclosed was that Paymentech had taken the definitive step to end the relationship and had also justified the termination with alleged violations that it did not thereafter pursue. To show justifiable reliance, the Plaintiffs must show that "the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question,"[592] and "concern 'an essential part of the transaction.'"[593] In other words, the Plaintiffs must show that

---

[592] *Craft v. Bariglio*, 1984 WL 8207, at *8 (Del Ch. Mar. 1, 1984).
[593] *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999) (quoting *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 512 (Del. 1931)).

Paymentech's initiation of the termination and certain alleged violations cited by Paymentech were material information.

The relationship between Paymentech and Plimus became unworkable for both parties and ended before Great Hill offered to buy Plimus. Paymentech was no longer available to Plimus to process transactions as part of Plimus's business. This information was material, and was accurately and timely disclosed to Great Hill. What was concealed by the misleading disclosure was that Paymentech initiated the termination. In the context of this case, that fact was not material, notwithstanding the Plaintiffs' assertions to the contrary. The additional fact that Paymentech had an incentive to end the relationship before it came to a natural close does not materially add to the information that Great Hill had regarding this relationship. The cross-border transaction dispute that ended the relationship was known to Great Hill. The other allegations made by Paymentech were, I find, pretextual, and cannot have been material to Great Hill; they resulted in no actual fines and no further investigation by Paymentech. Given that Great Hill understood both that the Paymentech-Plimus relationship had ended and the reason therefor, the concealed information did not addresses an essential part of the transaction. Great Hill knew it was buying a Plimus that did not have Paymentech as a processor, and knew the primary reason why Paymentech was no longer a processor.

The Plaintiffs seek to establish the materiality of the concealed information by puffing up the importance of Paymentech to Plimus. Paymentech was Plimus's largest supplier, but it supplied commodity processing services, which could be (and were) easily replaced at the time. While the accelerated termination posed a "challenge" for Plimus, it was a temporal technical challenge of transitioning to new processors in a short period of time. Tal correctly downplayed the seriousness of the loss of Paymentech to the Plimus Board of Directors given Plimus's other processing relationships. Fundamentally, moreover, the importance of Paymentech to Plimus is irrelevant to the materiality of the fact that Paymentech unilaterally discharged Plimus, given Great Hill's accurate understanding as of the time of the transaction. I find, therefore, that the Fraud Defendants' misrepresentations regarding Paymentech cannot support liability for fraud.

### 3. Plimus's History of Violations and Risk Monitoring Systems

The Plaintiffs allege that the Fraud Defendants misrepresented the quality of Plimus's business by hiding a long history of violations (including violations related to PayPal Pro after the initial merger agreement was signed), and by fabricating Plimus's risk monitoring prowess. In 2010, Paymentech fined Plimus on many occasions. Almost all the fines related to excessive chargebacks, and one fine related to acting as an aggregator without a license, a situation that Plimus subsequently remedied. During 2011, Plimus exceeded allowed chargeback ratios for PayPal Pro,

and, before closing, was apprised that PayPal would levy a fine regarding Plimus's vendor GoClickCash, although the actual notice was not received until after closing. Plimus's payment processor (in this situation, either Paymentech or PayPal) would e-mail Plimus when Plimus exceeded chargeback ratios, entered into excessive chargeback programs, or otherwise violated card network rules and regulations. These e-mails were not provided to Great Hill. The e-mails at least contained a description of the problem, and sometimes included language copied and pasted from a notice the processor received from the card networks—in some cases, they even included the whole notice. The Plaintiffs point out that the e-mails were responsive to diligence requests, and the response they received indicated that no such communications existed. That response on Plimus's behalf, per the Plaintiffs, was fraudulent.

In terms of Plimus's risk monitoring and vendor termination policies and systems (collectively, "risk monitoring systems"), the Plaintiffs claim that the Fraud Defendants represented that Plimus had "robust" and "proactive" risk monitoring systems. The Plaintiffs argue that these representations were made in presentations given by Plimus management and were reinforced by management after the termination of seventeen vendors in 2011. The Plaintiffs allege that these representations were false because the mass vendor terminations in 2010 and 2011 were initiated by Plimus's processors, and did not arise from Plimus's own internal

risk monitoring. The Fraud Defendants argue that no written materials describe their risk monitoring systems as "robust" or "proactive;" rather, the management presentation said only that Plimus monitors the performance of sellers and "cleanse[s] sellers with negative perception, consistent issues with buyers or high chargeback ratios."[594] They contend that this was a truthful statement. The Fraud Defendants therefore maintain that they made no misrepresentation regarding Plimus's risk monitoring systems. I first turn to the allegations concerning the risk monitoring systems, and then analyze whether the failure to provide notice of violation e-mails sent by Plimus's processors was fraudulent.

> a. The Fraud Defendants Did Not Make Any False Representations on Plimus's Risk Monitoring Systems, and In Any Event, Great Hill Did Not Justifiably Rely on the Representations They Allege Were Fraudulent

Plimus's written policy on risk review, disclosed to Great Hill, states that Plimus reviews vendors for violations of *Plimus's* terms of use and for copyright infringement, and will react to alerts from processors "based on the [processor's] requirements."[595] This written policy is consistent with Plimus's termination of vendors in 2010 and 2011.

In terms of the 2010 vendor terminations, Plimus had received notices from Paymentech, its processor, that Plimus as a whole was exceeding the one percent

---

[594] JX 307, at 52.
[595] JX 457, at 35.

chargeback ratio ceiling. These were not individualized notices specific to each Plimus *vendor* with chargebacks over one percent.[596] Plimus then identified and terminated certain vendors with high chargebacks in order to reduce the Plimus-wide chargeback ratio and exit the excessive chargeback programs. There is no indication that prior to their termination these vendors—which were primarily "poker chip" vendors—violated Plimus's terms of use. The Plaintiffs point to a June 25, 2011 diligence disclosure, which stated that "the Company became aware of these issues upon reviewing each vendors' [sic] chargeback history."[597] According to the Plaintiffs, this was a false representation, because it conveyed the impression that Plimus's own internal procedures led to this review, which in fact arose based on communication from the processor. Nothing about the disclosure, however, suggests that the review was independent of communications with Paymentech, and the disclosure is not otherwise inconsistent with Plimus's disclosed written policies. Accordingly, I find that the Fraud Defendants did not make false representations in Plimus's written statements—either in the CIM or disclosures around vendor termination—about Plimus's risk monitoring systems. The Plaintiffs' allegations against Goldman and Klahr stem only from their involvement in drafting management presentations and reviewing the diligence disclosure. Since these do

---

[596] *See, e.g.*, JX 37.
[597] JX 553, at 24.

not contain false representations, the Plaintiffs have failed to show fraud against Goldman and Klahr in relation to Plimus's risk monitoring systems.

The Plaintiffs' claims against Tal and Itshayek regarding Plimus's risk monitoring systems, on the other hand, also allege that Tal and Itshayek made oral representations on the strength and proactivity of the risk monitoring systems during meetings and phone calls with Great Hill. In particular, the Plaintiffs allege that Itshayek told Great Hill that the 2011 termination of *sixteen vendors* was the result of Plimus's risk monitoring systems.[598] This statement, however, was not false. Plimus terminated *seventeen vendors* during that particular vendor purge. Itshayek testified credibly that she told Great Hill that the 2011 vendor termination started with a PayPal notice on one vendor, GoClickCash, and that Plimus then identified *sixteen similar vendors* and terminated them also. While Plimus may have felt that the sixteen similar vendors would cause problems with PayPal in light of PayPal's initial notice, it was still Plimus who identified the sixteen problematic vendors, and Plimus who decided to terminate the additional vendors based on the assessment of the risk imposed on Plimus. Itshayek's description of the termination is therefore consistent with Great Hill's own account and matches Plimus's written policy on risk monitoring. Therefore, at least in regard to the particular termination of the seventeen vendors in 2011, there was no false representation.

---

[598] Pls. Opening Post-Tr. Br. 172.

Assuming that the Plaintiffs could demonstrate that Plimus's risk monitoring systems and policies were mischaracterized to Great Hill because Tal and Itshayek allegedly described these systems and policies as "robust" or "proactive," the Plaintiffs are unable to demonstrate justifiable reliance on these statements. PwC, on Great Hill's behalf, investigated Plimus's vendor monitoring systems, among much else. In fact, PwC's resulting diligence report to Great Hill states that Plimus should be more "proactive" in dealing with chargebacks.[599] PwC's report also detailed the self-service onboarding process by which vendors enrolled themselves as Plimus clients. In PwC's own words, Plimus "delay[ed] the majority of the seller underwriting until the point at which the seller is most likely to begin processing."[600] Additionally, Cayer testified that he understood before closing that vendors could onboard themselves and avoid scrutiny for months. Therefore, Great Hill's own diligence disclosed the limited extent to which Plimus could be said to have a "robust" or "proactive" risk monitoring system.[601] Furthermore, Great Hill was aware that Plimus engaged in sporadic large-scale purges of vendors, as opposed to continuous small-scale terminations consistent with proactive risk monitoring. Given their own diligence findings, the Plaintiffs could not justifiably rely on Tal

---

[599] JX 582, at 23.
[600] *Id.*, at 21.
[601] I make no determination whether the terms "robust" or "proactive," if false, were sufficiently definitive to constitute fraud.

and Itshayek's allegedly false representations regarding Plimus's risk monitoring systems.

> b. The Plaintiffs Have Not Shown Justifiable Reliance on False Representations Made About Plimus's History of Violations

I next turn to Plimus's failure to provide Great Hill with documentation concerning excessive chargebacks. Paymentech's (and later PayPal's) notices regarding chargebacks and other violations were provided to Plimus, accompanied by varying levels of detail as to the nature and consequences of the chargebacks. These documents were requested by Great Hill as part of its diligence, but were not turned over to Great Hill; Itshayek testified as much at trial. Furthermore, despite Tal and Itshayek possessing these notices, Plimus's June 18, 2011 and June 25, 2011 responses to Great Hill's diligence request implied that no such notices existed. The PwC report states that, regarding the $250,000 in fines that were disclosed, PwC was told that Plimus received "no formal communication from the associations clearly defining the nature of the fines."[602]

> i. Plimus's Disclosure of Only $250,000 In Fines and Plimus's Representation That Plimus Did Not Have Communications on Violations Are False Representations

Plimus did not report to Great Hill all the fines it received in 2010. Instead, Plimus reported only $250,000 in fines. The Plaintiffs correctly aver that the

---

[602] JX 582, at 23.

disclosure on the amount of the fines constitutes a false representation because it implies that Plimus paid only $250,000 in fines in 2010. At trial, the Plaintiffs showed that the $250,000 figure constituted the fines Plimus paid for Visa excessive chargebacks in 2010 and a MasterCard violation for acting as an aggregator without a license, and did not include the fines Plimus paid in 2010 for MasterCard excessive chargebacks. Furthermore, it was false for Plimus to represent in diligence responses that no communications from Paymentech or PayPal regarding violations existed when, in fact, they did. The Plaintiffs argue that all the Fraud Defendants committed actionable fraud by these actions, and that they all violated a duty to speak when Plimus updated its response to Great Hill's diligence request without changing its response that no violation-related communications existed. Since the disclosure of only $250,000 in fines and the omission of communications on violations (collectively, "Plimus's history of violations") constitute false representations, I discuss next which Fraud Defendants had knowledge of the false representations.

### ii. Only Tal and Itshayek Had Knowledge that the Representations on Plimus's History of Violations Were False

The Plaintiffs contend that Tal, Itshayek, Goldman, and Klahr all had knowledge of the false representations on Plimus's history of violations. Tal and Itshayek were recipients of the various violation notices from processors throughout 2010 and 2011, did not provide them as sought in Great Hill's diligence requests,

115

and therefore knew when they participated in the drafting of the relevant disclosure that it was false to represent that no such notices existed. Additionally, they were at least recklessly indifferent to the falsity of the $250,000 figure, which they were aware did not include all 2010 fines. Goldman and Klahr were copied on the disclosure requests and were involved in the drafting of the merger agreement, which included a representation that Plimus "is and has been in compliance"[603] with card network rules. However, Goldman and Klahr did not possess the 2010 notices from Paymentech and were not informed of any notices from PayPal, and they furthermore were not responsible for diligence requests. As directors, Goldman and Klahr did not manage Plimus's day-to-day operations (and were not expected to), which included managing payment processor relationships. The Plaintiffs point out that Goldman and Klahr were copied on e-mails containing the diligence responses. Even if I were to assume that Goldman and Klahr actually read the diligence responses, that does not show that they knew the representations were false, given their limited knowledge of day-to-day operations. For a similar reason, Goldman and Klahr cannot be found to have had knowledge of, or to have been recklessly indifferent to, these false representations in the Merger Agreement; they had no reason to doubt the representations being made, but rather were entitled to rely on their counsel and Plimus management in this respect. I find that only Tal and

---

[603] JX 796, at 47–48.

Itshayek knowingly made false representations or concealments, in satisfaction of the second element of fraud. I next turn to *scienter*.

### iii. Tal and Itshayek Intended for Great Hill to Rely on the False Representations Concerning Plimus's History of Violations

The Plaintiffs argue that Tal and Itshayek can be presumed to have the requisite *scienter*, given the magnitude of misleading statements and omissions. The Plaintiffs make this argument on intent as to fraud in general and for all the Fraud Defendants, but it seems particularly focused here, where tens of notices on Plimus violations were responsive to diligence requests, yet were not provided. The Plaintiffs argue that Tal and Itshayek intended for Great Hill to rely on the false representations in order to create the illusion that Plimus was in "good standing with the credit card companies."[604] I previously found that the record satisfied, in general, the Fraud Defendants' intent to rely, based on a desire to facilitate the transaction, but I pause to add a few words on that general intent in the specific context of Plimus's history of violations.

The Plaintiffs' argument for intent to rely is somewhat undercut by the fact that Itshayek shared Plimus's processor statements with Great Hill, which reflected that Plimus had paid at least $250,000 in fines to Paymentech in 2010. Processor statements were monthly statements of all financial transactions between a processor

---

[604] Pls. Opening Post-Tr. Br. 184.

and Plimus, including fines and fees paid by Plimus to the processor. Furthermore, Tal and Itshayek disclosed Plimus's June 2011 PayPal chargeback issues to Great Hill. Both of these actions runs counter to the Plaintiffs' theory that Tal and Itshayek were trying to create an illusion of a company in good standing. However, despite Tal and Itshayek's willingness to discuss chargebacks with Great Hill, they withheld the actual notices that underlined those chargeback issues, even when PwC sent a specific diligence request for such notices after its on-site visit. Furthermore, the representation that Plimus had no such notices was reiterated with each update to Plimus's response to Great Hill's due diligence request—responses that were reviewed or drafted, in pertinent part, by Tal and Itshayek. This belies innocent mistake.

At trial, Itshayek admitted that the notices from Paymentech were responsive to Great Hill's requests and defended her oversight only by claiming that the processor statements should have been sufficient. Given the amount of notices extant, the fact that those notices were known to Tal and Itshayek, and that there were multiple prompts and opportunities to share them—including a specific request—I find that Tal and Itshayek were at a minimum reckless when they omitted the notices. Tal and Itshayek had a duty to share the notices, which they disregarded, and they falsely represented that no such documents existed with the intent that Great

118

Hill consummate the transaction. I find the intent requirement satisfied, and turn to reliance.

### iv. Great Hill Did Not Justifiably Rely on the False Representations About Plimus's History of Violations

I find that Great Hill cannot have relied on the false representations about Plimus's history of violations, nor could Great Hill have reasonably believed that Plimus was always a company in good standing with the card associations, based on Tal and Itshayek's false representations and omissions. The PwC report and Great Hill's own due diligence memo to its partners show that Great Hill was aware that Plimus exceeded chargeback ratios throughout 2010 and in June 2011. The PwC report created for Great Hill states that chargebacks demonstrate non-compliance and could result in fines, as does Great Hill's own due diligence memo. As a result, the Plaintiffs have failed to show actual reliance on the omission of the various communications with Paymentech regarding fines and violations in 2010, which would have simply confirmed Great Hill's understanding. The Plaintiffs have not demonstrated justifiable reliance on the exact amount of fines paid in 2010, the affirmatively false representation that documents explaining the fines and violations did not exist, nor on Tal's and Itshayek's silence when the due diligence responses were updated without correcting the original false representations. Any information provided to Great Hill in that regard would have been cumulative.

119

Turning to the communications on subsequent fines in 2011, Great Hill was alerted that Plimus exceeded chargeback ratio thresholds for PayPal in June 2011. While Tal and Itshayek told Great Hill in late July that they did not expect July chargeback ratios to exceed one percent, I note that modeling that Tal had previously provided to Great Hill informed Great Hill that Plimus's exceeding this threshold was a real possibility.[605] The Plaintiffs argue that Tal's and Itshayek's expectation proved to be wrong, and that Great Hill was not informed once those chargebacks exceeded one percent for July and August. Neither did Great Hill ask to be so informed. Great Hill had reason to not be overly concerned with chargebacks, as they had asked for and received an indemnity provision in the merger agreement specifically for fines for excessive chargebacks related to pre-closing issues.[606] Based on Great Hill's actual knowledge of Plimus's extensive history with chargebacks and Great Hill's bargained-for indemnity for fines related to pre-closing chargebacks issues, I find that there was no justifiable reliance on false representations about Plimus's history of violations and compliance with card

---

[605] Tal provided Great Hill with tables in early July 2011, which contained historical chargeback data and chargeback projections for July and August 2011. The tables projected that chargeback ratios would exceed one percent in July and August for both Visa and MasterCard without added transactions from an expected ramp up in volume from Wix. JX 588, at 3.

[606] A known risk addressed by indemnification cannot be used to support a claim of fraud. *See Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *14 (Del. Ch. July 1, 2013).

network rules.  As a result, the Plaintiffs have not proven fraud against Tal and Itshayek in relation to Plimus's history of violations.

> c. Other Miscellaneous Fraud Allegations Also Fail, Either Because They Are Not False or Because There Was No Justifiable Reliance

It is appropriate here to deal with several other miscellaneous misrepresentations and omissions that the Plaintiffs allege, which did not seem to be cabined within any of the four categories of alleged fraud in particular.  The previous discussion primarily revolved around chargeback violations; however, the Plaintiffs also point to other "violations" or practices, which they say were not disclosed and which reflected poor business quality or poor processor relationships.  The violations or practices included mass refunds, IP infringement, volume shifting/load balancing, and a BRAM violation.

To the extent I understand the allegation, the Plaintiffs appear to argue that Plimus engaged in mass refunds and volume shifting to avoid excessive chargebacks, and that this practice should have been disclosed.  Mass refunds and volume shifting/load balancing have already been described, and I will simply repeat that the evidence does not show that these were violations of card association rules at the time.  Therefore, Plimus was not required to disclose the practices as rule violations.  The Plaintiffs do not point to any affirmative misrepresentations in regard to mass refunds or volume shifting/load balancing.

121

The Plaintiffs also complain about disclosures on IP infringement. Plimus was often sent inquiries about IP infringement, and Great Hill, through its deal counsel, was aware that Plimus received such notifications on an ordinary basis, and that such notices were common in Plimus's industry. I find that the Plaintiffs have failed to demonstrate any misrepresentation with respect to IP infringement.

A BRAM violation, as described in more detail *infra*, is considered by processors and the credit card associations to be among the most serious of violations. In terms of the alleged BRAM violation in connection with GoClickCash, Plimus was not informed that PayPal considered Plimus's facilitation of GoClickCash transactions to be a BRAM violation until *after* closing. The Fraud Defendants could not misrepresent or hide something of which they were unaware, pre-closing. However, Plimus was aware, pre-closing, that PayPal would assess a fine against Plimus for a violation related to GoClickCash; I will address this non-disclosure when I review the PayPal component of the alleged fraud.

The Plaintiffs also contend that the Defendants made representations about the growth of the company, the visibility of financial performance, and the quality of vendors. To the extent that these statements were projections or expectations, there was no reliance.[607] Furthermore, the Plaintiffs have not made serious claims

---

[607] "The law has always been skeptical about grounding fraud claims in projections of future events for the obvious reason that the fact that a prediction might not come true does not mean the projection was not made in good faith and also because it is unreasonable to place much weight

122

that any such projections were not made in good faith. With respect to vendor quality, the Plaintiffs appear to contend that Plimus concealed or misrepresented the fact that many of its vendors' businesses were of questionable validity. Great Hill, however, knew before the transaction that the vast majority of Plimus's vendors were "long-tail" vendors, and that there was frequent churn of these vendors. Great Hill did an extensive review of these vendors, even noting which ones might be fraudulent. The purpose of the review was a point of contention at trial; Busby testified that Great Hill's review only concerned the *sustainability* of vendor's businesses, and that he did not ask his analysts for judgments on vendor's *legitimacy*. Regardless, Great Hill's analysts made such judgments. Furthermore, in their due diligence memo, Great Hill identifies vendors in "unacceptable vertical[s]" as a risk.[608] As already discussed, Great Hill was aware that Plimus's onboarding process allowed vendors—including illegitimate vendors—to potentially transact business through Plimus for months before discovery. This was the case with the "biz opp" vendors that were terminated in 2011, which, given the resulting financial impact, Great Hill lamented at the time.[609] In other words, Great Hill was well aware of Plimus's business model, including the quality of the vendors. Given how much

---

on such statements." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2005 WL 5757652, *12 (Del. Ch. Apr. 1, 2005).

[608] JX 601, at 3.

[609] The termination of these "get rich quick" scheme vendors negatively impacted Plimus's projected transaction volume and EBITDA. Given the financial impact, the Great Hill deal team considered—and ultimately rejected—lowering the transaction price.

Great Hill knew and accepted about Plimus's vendor quality, Great Hill cannot establish justifiable reliance on any misrepresentations that may have been made regarding vendor quality.

### 4. The Dispute Over Tal's Earn-Out Agreement with the Founders

As laid out in the Background section of this Memorandum Opinion, Tal had earn-out agreements with SGE and the Founders, which provided for payment of incentive funds to Tal upon sale of Plimus (under certain conditions). The terms of the Founders' Earn-Out agreement were ambiguous. During the bidding process, a dispute arose between Tal and the Founders over the interpretation of the Founders' Earn-Out. The dispute was resolved shortly before the initial merger agreement was signed. The Plaintiffs originally argued that the existence of a dispute between Tal and the Founders over the Founders' Earn-Out was not disclosed. The Plaintiffs have abandoned this claim in light of the evidence to the contrary, but continue to argue that the substance of the dispute was not disclosed, and that the partial disclosure was materially misleading.

The substance of their argument can be divided into two parts. First, the Plaintiffs claim that Tal had to be bribed to support the deal and to stay with Plimus after closing, and that settlement of the Founders' Earn-Out dispute in Tal's favor was, in fact, the bribe. The facts of this alleged blackmail and bribery were not disclosed, which, according to the Plaintiffs, amounts to fraud. The Plaintiffs'

second, related theory is that it was fraudulent for the Fraud Defendants to conceal the fact that the resolution of the Founders' Earn-Out dispute was made "contingent" on Tal capitulating in his Roll-Over negotiations with Great Hill. However, I find no fraud in regard to the Founders' Earn-Out dispute.

I address the "blackmail" claims first. If Goldman and Klahr needed to bribe Tal to support the deal, then it could certainly be a false representation to omit this information. However, it is clear that the ultimate restructuring of the side letter payments was the result of an honest business dispute over the interpretation of the original agreements, and not the result of Tal demanding funds to conceal his lack of faith in Plimus. There was no false representation in this regard. The Plaintiffs seize on the Founders' initial reactions to their earn-out dispute with Tal. Tal knew that the Founders supported a sale, and the Founders' first reaction was that Tal was leveraging this knowledge, to negotiate "blackmail" or "schita" payments to ensure his support. Goldman and Klahr ultimately made up a part of the difference between Tal's understanding of his entitlement under the Founders' Earn-Out, and that of the Founders; the Plaintiffs characterize this as "hush money" payments to Tal. The Plaintiffs argue that Tal did not believe in Plimus and that he demanded this hush money in order to support the deal with Great Hill, which (per the Plaintiffs) would be especially unattractive to Tal in light of the requirement that he roll over fifty

125

percent of his merger proceeds into equity in Plimus after the sale. The facts, however, are to the contrary.

When first accused of blackmail by the Founders, Tal immediately denied that such was his intention. Tal stoutly maintained to the Founders that he was entitled to the money he was demanding under his reading of the Founders' Earn-Out. While Tal frequently complained about being expected to participate in the Roll-Over, none of his communications with the Founders or the SGE Defendants suggest that he had any doubts about Plimus or its business prospects. Critically, Tal's interpretation of the Founders' Earn-Out arose early in the sale process, when the bidding was still ongoing and the identity of the buyer, and any roll-over requirements, had not yet materialized. Throughout the sales process, that interpretation never changed. Tal never asked for more than he originally and consistently maintained he was owed.

Goldman, when apprised of the dispute, stepped in to mediate between Tal and the Founders. Goldman believed that, given Tal's work in building Plimus, his interpretation of the side letter agreement should be honored in good faith. Throughout Goldman's mediation with the Founders on the dispute, no party expressed doubt in Plimus or implied that Tal had such doubts. In fact, the Founders clearly believed in Plimus and its prospects (to the point that they were willing to walk away from the Great Hill deal) and believed that Tal would benefit from the deal, given his equity interest in the new company. In other words, the Founders

126

viewed Tal's Roll-Over as a good opportunity for Tal. Therefore, they believed he should not be insistent on receiving the Founders' Earn-Out, as he would be well compensated financially in any event. It is therefore clear that there was no "blackmail" to disclose.

Perhaps acknowledging the weakness of the "blackmail" claim, the Plaintiffs argue derivatively that it was fraud not to disclose that the Founders' Earn-Out resolution offered to Tal was made "contingent" on Tal ending negotiations on the Roll-Over with Great Hill. The Plaintiffs argue that, regardless of the existence of any blackmail, the contingent nature of the settlement was material, and was omitted and concealed. The Fraud Defendants do not dispute that they considered the resolution of the Founders' Earn-Out disagreement in Tal's favor as requiring him to accept Great Hill's terms for the Roll-Over; they acknowledge that they were trying to facilitate the closing of the transaction.

Having already found that no blackmail took place, however, I do not find an intent by the Fraud Defendants to conceal information from Great Hill. It is obvious that the earn-out payments and the Roll-Over were intimately linked for Tal. That is because together, they determined his liquidity post-closing, and the amount of the side letter payments would itself have a bearing on the amount of the Roll-Over. Not only was this obvious in retrospect, but it was also known to Great Hill at the time. Tal met with Great Hill in their Boston offices on June 27; Great Hill identified

Tal's new employment contract as the only remaining obstacle to closing, and Tal disclosed that an earn-out dispute prevented him from ending negotiations on that employment contract. I find that Vettel of Great Hill then called Goldman and asked him to resolve Tal's earn-out dispute, so that Great Hill could, in turn, resolve Tal's employment contract and Roll-Over.[610] After this call, Goldman presented Tal with the resolution that Goldman had mediated with the Founders. As a result, Great Hill was aware that the resolution of Tal's earn-out dispute was contingent on Tal ending negotiations on his Roll-Over. Given this information, I do not find any false representation, either through omission or through concealment, with regard to the Founders' Earn-Out or the Roll-Over.

### 5. PayPal's Notice of Violations and Threats to Terminate

The most serious allegations of fraud involve PayPal's relationship with Plimus. In relation to the PayPal termination, the Plaintiffs allege fraud through the failure to disclose, and/or the active concealment of: PayPal's notice of violations and fines; Plimus's efforts to address chargebacks and other violations with PayPal; Plimus's practice of reactive vendor termination; and PayPal's threats to terminate.

---

[610] I find Vettel's testimony to the contrary not credible. Vettel testified he did call Goldman but only as a "reference check" on Tal, and that the reference check was the only thing they discussed. This is inconsistent with the preponderance of the evidence, as set out in the Background section of this Memorandum Opinion.

128

The Plaintiffs also claim that representations in the Merger Agreement were affirmatively false in light of PayPal's threats.

I first deal with PayPal's notices of chargeback problems, management's efforts to address those problems through load balancing and mass refunds, the GoClickCash BRAM Violation, and Plimus's policy of reactive vendor termination. I have already found that the Plaintiffs have not shown fraud as to notices of chargebacks, the practices of load balancing and mass refunds, and representations about business quality and risk management systems. I also found that there was no misrepresentation as to the BRAM Violation because Tal and Itshayek (and the other Fraud Defendants) were unaware, pre-closing, that PayPal considered the GoClickCash violation to be a BRAM violation. At issue here, then, are the alleged failure to disclose that PayPal was fining Plimus related to GoClickCash and the failure to disclose that PayPal was threatening to terminate its relationship with Plimus.

### a. Not Disclosing PayPal's Termination Threats and the GoClickCash Fine Constitute False Representations

The communications that led up to the PayPal termination show that PayPal's threats to terminate were tied primarily to excessive chargebacks. However, in its ultimate termination letter, PayPal claimed that Plimus brought too much risk to PayPal generally without citing specifics. Internally, PayPal talked about Plimus's GoClickCash BRAM Violation and PayPal terminated Plimus the day after it told

129

Plimus that that the GoClickCash violation was a BRAM Violation. Internal communications also show that PayPal was aware that Plimus was practicing load balancing and mass refunds. As I found earlier, those practices were not rule violations, but PayPal internally found them problematic. However, PayPal did not reprimand Plimus externally for employing mass refunds and load balancing, and the Plaintiffs have not shown that the Fraud Defendants were aware that these practices were disfavored.

PayPal began to threaten termination of its relationship with Plimus in August 2011 and continued to make threats into September 2011, although it did not follow through on its threats prior to closing. Tal and Itshayek did not believe that PayPal would actually terminate Plimus. While the Plaintiffs allege generally a violation of a duty to disclose and active concealment, they only argue specifically the violation of two representations in the Merger Agreement. The Plaintiffs allege that the Fraud Defendants made misrepresentations by asserting that they were in compliance with card network rules while not disclosing the GoClickCash fine, and by representing that no suppliers had threatened termination even though PayPal had made several such threats throughout August and September 2011.

Tal testified that he disclosed the GoClickCash fine in a phone call with Busby only a few days prior to closing. To recap, I found this assertion was not credible because the supplemental disclosure schedule contained no reference to

130

GoClickCash.[611]  Additionally, I found that Tal disclosed some level of problems with PayPal to Busby in Israel, but that this disclosure did not include PayPal's credible threats of termination.  The failure to disclose the fine and the termination threats are false representations.  Tal had a duty to disclose them to Great Hill, and to the extent they were not included in representations made in the Merger Agreement, those representations are also false.

> b. Only Tal Knew of the False Representations Regarding PayPal

Other than Tal, the Fraud Defendants are not implicated in these misrepresentations.  Only Tal had actual knowledge of the falsity.  Goldman and Klahr organized a bring down call prior to closing, specifically to inform SGE of any need to update the disclosure schedule that would accompany the Merger Agreement.  Tal and Itshayek spoke before this call and agreed not to disclose the possibility of a GoClickCash fine or the PayPal termination threats.  Tal told Itshayek that he would personally disclose these issues to Great Hill.  Given Tal's assurance, Itshayek had no reason to believe that, to the contrary, these facts would be withheld from Great Hill.  For this reason, Itshayek cannot be charged with knowledge that Tal ultimately did not make the necessary disclosures.  Tal did have

---

[611] By contrast, the parties made sure to include a last-minute disclosure on Home Wealth Solutions, which was only a third-parties' request for information.  Therefore, it is not plausible that Great Hill learned of an *actual* fine and inadvertently or innocently proceeded to closing without adding the fine into the disclosure schedule.

knowledge of the false representations because he knew the information would not be presented during the bring down call and did not thereafter inform Great Hill.

Goldman and Klahr were not previously informed of any chargeback issues related to PayPal, a fine related to GoClickCash, or of termination threats by PayPal. Thus, Goldman and Klahr had no knowledge of the parlous state of Plimus's relationship with PayPal. Moreover, they were not recklessly indifferent to such issues, as evidenced by their own efforts via the bring down call to inform themselves of any outstanding issues prior to closing. As a result, the Plaintiffs have shown only that Tal had knowledge of the false representations on Plimus's issues with PayPal.

### c. Tal Intended for Great Hill to Rely on the Non-Disclosure of the PayPal Issues

Tal was set to continue as CEO of Plimus after the merger. As I have previously alluded, I am not persuaded by the Plaintiffs' arguments that Tal lacked faith in the business. However, Tal wanted the merger to go forward, as it had advantages for him personally—he could become CEO of a better-capitalized company and would personally benefit from the earn-outs and the liquidity that he would realize from the sale. Tal testified that, despite its threats, he thought PayPal would not terminate Plimus. He believed that he could resolve the issues between PayPal and Plimus post-closing. I believe that testimony. Nonetheless, he undoubtedly recognized that Plimus's problems with PayPal could have a negative

132

effect on the merger. Therefore, and in line with the general intent I found when discussing the Paymentech termination, I find that Tal intended for Great Hill to rely on Tal's false representations in order to induce Great Hill to proceed with the transaction.

d. Great Hill Justifiably Relied on Tal's False Representations

Great Hill's reliance on these false representations was actual and justified. PayPal's termination threats were material information. PayPal Pro was a commodity processing service, similar to Paymentech. However the loss of Paymentech was disclosed, only certain details, which I found not material, were concealed. I find, by contrast, the possibility of losing a second major processor in a matter of few months to be material to a prospective buyer. Furthermore, unlike with Paymentech, Plimus was not ambivalent to the PayPal relationship, and the loss of PayPal would mean a major disruption to Plimus's business. And Tal knew that the grounds raised by PayPal—excessive chargebacks—were an ongoing problem for Plimus.[612]

Great Hill's reliance on Plimus's failure to disclose the PayPal problems was, I find, reasonable. The Fraud Defendants point out that Great Hill did not itself contact PayPal as part of its due diligence. Great Hill had completed its due

---

[612] Paymentech's termination notice used pretext to end the relationship. Plimus's chargeback problems with Paymentech had long been resolved, and Great Hill was aware of those problems. By contrast, the problems with PayPal were ongoing and were largely undisclosed to Great Hill.

133

diligence and signed the merger agreement before any PayPal termination threats were made. Thus, Great Hill could not have discovered these termination threats through pre-signing diligence. After the initial merger agreement was signed, the largest factor delaying closing was Tal's immigration visa. During this time, Great Hill could rely on Tal, as the SGE and Founder Directors did, to raise issues that required their attention. Plimus was contractually bound to disclose this information, and Great Hill was entitled to rely that disclosures were not knowingly false. Given this dynamic and the materiality of PayPal's threats, I find that the Plaintiffs have shown justifiable reliance.[613]

The findings above are sufficient to a finding of liability against Tal for fraud/fraudulent inducement. While damages are an element of fraud, the quantum of damages here awaits further litigation.

*B. Aiding and Abetting the Fraud*

The Plaintiffs allege that Herzog, Kleinberg, and all the SGE Defendants[614] (the "Aiding and Abetting Defendants") aided and abetted the fraud committed by Tal (and, per the Plaintiffs, Itshayek, Goldman, and Klahr). The Plaintiffs argue that that SGE and SIG Fund are imputed with the knowledge and actions of Goldman and Klahr, who are their agents. To impose liability for aiding and abetting,

---

[613] Nothing in this finding should be read as preventing any Defendant from pointing to the extent of Great Hill's diligence review as relevant to their unjust enrichment claims.
[614] Those are SGE, SIG Fund, and Goldman and Klahr, whom I have found did not commit fraud.

Plaintiffs must show that: (1) there is an underlying fraud; (2) which the aiding and abetting defendants had knowledge of that fraud; and that (3) they provided substantial assistance.[615]

The Plaintiffs failed to show fraud related to the Paymentech termination, Plimus's history of violations and risk management systems, and the dispute over the Founders' Earn-Out. While the Plaintiffs demonstrated fraud in relation to the PayPal termination, neither Herzog, Kleinberg, Goldman, nor Klahr were aware that PayPal was threatening termination. The Plaintiffs argue that under Delaware law, aiding and abetting liability can be imposed when a defendant lacks knowledge but is recklessly indifferent to the fraud.[616] The Aiding and Abetting Defendants disagree with Plaintiffs' assertion. The issue is moot, as I find that the Aiding and Abetting Defendants were also not recklessly indifferent to the PayPal termination threats; consistent with their practice as directors, they expected management to raise issues to the Board as necessary. As a result, the Plaintiffs have not shown that the Aiding and Abetting Defendants had knowledge of fraud related to the PayPal termination.

---

[615] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *14 (Del. Ch. March 28, 2018).

[616] Pls. Opening Post-Tr. Br. 188 (citing *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004).

For the sake of completeness, I add that the Plaintiffs are also unable to show substantial assistance on the part of the Aiding and Abetting Defendants. The Plaintiffs have failed to demonstrate any assistance to Tal in the sole area in which I have found fraud, involving the end of the PayPal relationship.

### C. Civil Conspiracy

The Plaintiffs' sole argument for civil conspiracy is that, "if Plaintiffs prove aiding and abetting liability, they will have necessarily proved civil conspiracy."[617] They rely on comments I made in my earlier Memorandum Opinion, deciding the Defendants' Motion to Dismiss in this case.[618] As I have found that the Plaintiffs have not proven aiding and abetting liability, I find they have not proved civil conspiracy.

### D. Indemnification

A claim for indemnification based on the breach of a representation and warranty is a claim for breach of contract.[619] A breach of contract claim, in turn, requires: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[620] It is worth noting the

---

[617] Pls. Opening Post-Tr. Br. 188 n.73.

[618] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014)

[619] *See, e.g.*, *Hudson's Bay Co. Luxembourg, S.A.R.L. v. JZ LLC,* 2011 WL 3082339, at *2 (Del. Super. July 26, 2011).

[620] *Cedarview Opportunities Master Fund v. Spanish Broad., Inc.*, 2018 WL 4057012, at *6 (Del. Ch. Aug. 27, 2018) (citation omitted).

fundamental difference between the showing necessary for contractual indemnification and that required for fraud. For indemnification, the Defendant's *scienter* requirement is absent. Moreover, the Plaintiffs need not show reasonable reliance; here, in fact, the parties agreed that even the Plaintiffs' prior "knowledge . . . of any untruth of any such representation or warranty of [Plimus] expressly set forth in [the Merger Agreement], regardless of whether such knowledge was obtained through [Great Hill's] own investigation or through disclosure by [Plimus]," is no bar to an indemnification claim.[621]

The Plaintiffs' indemnification claim requires some parsing. As an initial matter, the claim is brought against Tal, Itshayek, Herzog, Kleinberg, SIG Fund, SIG Management, and the Charity Defendants (the "Indemnification Defendants"). Indemnification claims were not brought against Goldman and Klahr, who were not shareholders of Plimus (although Goldman signed the Merger Agreement as representative of SIG Management and SIG Fund). Itshayek and the Charity Defendants were not parties to the Merger Agreement, but they executed letters of transmittal, in which they represented they had read the Merger Agreement and agreed to be bound by its provisions.[622] Tal, SIG Fund, Herzog, and Kleinberg similarly signed such letters of transmittal.[623] As a result, the Plaintiffs have shown

---

[621] JX 796, at 72.

[622] JSUF ¶ 144; JX2030 at 2, 5, 9; JX790 at 2, 5, 9.

[623] JX336 at 1, 4, 8; JX791 at 2, 5, 9; JX794 at 6; JX795 at 1, 4, 8.

that contractual obligations on the part of the Indemnification Defendants run to Great Hill.

The Plaintiffs allege that four representations and warranties in the Merger Agreement were breached. They interpret the indemnity provisions in the case of fraud to impose indemnification liability beyond the escrow amount on all parties who executed letters of transmittal, regardless of their participation in or knowledge of that fraud. Although the Indemnification Defendants admit indemnification liability for three fines related to pre-closing Plimus activity,[624] they contest the other alleged breaches; moreover, they argue that the correct interpretation of the indemnity provisions does not extend liability for fraud beyond actual tort-feasors.

1. <u>The Defendants Have Breached Certain of the Representations and Warranties in the Merger Agreement</u>

a. The Indemnification Defendants Did Not Breach the Representation on "Material Liabilities or Obligations"

The Plaintiffs allege that the Indemnification Defendants breached the representation in Section 3.09 of the Merger Agreement that there were no undisclosed "material liabilities or obligations."[625] The Plaintiffs argue specifically[626] that Plimus's revenue and profits, as represented in the disclosure schedule attached to the Merger Agreement, were inflated because they included

---

[624] Post-Tr. Answering Br. Defs. Tal and Itshayek 106.
[625] JX 796, at 37.
[626] The Plaintiffs also argue generally (and late in a 200-page brief) that "fundamental" flaws were concealed, but for support, they simply point at substantially all of their facts section.

138

vendors that were later terminated and did not reflect the loss of PayPal. Given that these vendors "had to be terminated after Plimus's repeated violations of the Card Network rules lest the company lose every payment processor,"[627] I assume the Plaintiffs are referring to the five hundred vendors that Plimus terminated in January 2012, *post-merger*.

I note at the outset that characterizing the loss of PayPal as breaching a duty to disclose "liabilities or obligations" is a strained interpretation of Plimus's contractual duties. At the time of closing, PayPal had threatened to terminate its relationship with Plimus, but had yet to make a definitive decision; furthermore, Tal did not believe that PayPal would actually terminate. Fundamentally, there was no known or unknown material *liability* related to the loss of PayPal at the time of closing.

Similarly, the post-closing termination of five hundred vendors in January of 2012, four months after closing, was not a material liability that existed at the time of closing. An unrealized threat to a business model is not a "liability." The Plaintiffs cite an internal Plimus e-mail sent on September 26, 2011 that summarized a call with a PayPal representative, in which the representative identified certain product categories prohibited by PayPal and considered high risk by the card

---

[627] Pls. Opening Post-Tr. Br. 201.

networks. [628] According to the representative, Plimus should "shut down [these vendors] if [Plimus] want[ed] to keep [its] relationship with [PayPal]."[629] The categories identified did include several categories of vendors that Plimus later terminated in January 2012. However, the fact that these categories should be shut down to "keep" PayPal suggests that PayPal was not lost as of September 26, 2011, only three days before closing. Moreover, while Plimus ultimately terminated these categories in January 2012, it did so not to *keep* PayPal, but in an effort to *regain* PayPal. Plimus's efforts to recoup PayPal, in any event, cannot be considered a material liability at the time of closing, when Plimus had yet to even lose PayPal. Additionally, the Plaintiffs' argument that Plimus must have recognized this need to discharge the vendors or "lose every processor" pre-closing is misplaced. The Plaintiffs have not shown that Plimus's relationships with its other processors were in any way, known or unknown, strained prior to closing, or that Plimus's other processors had made similar demands to remove certain vendors. Therefore, to the extent the five hundred vendors were terminated to save Plimus's other processor relationships, the termination was not a material liability at closing. For these reasons, I find that the Indemnification Defendants have not breached Section 3.09 of the Merger Agreement.

---

[628] JX 771; Pls. Post-Tr. Reply Br. 42 n.21.
[629] JX 771; Pls. Post-Tr. Reply Br. 42 n.21.

b. The Representations Concerning Compliance With Contracts

Next, the Plaintiffs allege that the Indemnification Defendants breached the representations in Section 3.16 of the Merger Agreement, by representing that Plimus was not in "default in complying" with all contracts, nor in "dispute" regarding those contracts.[630] The Plaintiffs assert that Plimus was in default of, or in dispute regarding its contract with PayPal. Again, this is a strained construction of the representations at issue. Plimus was not in "default" of, nor in a contractual "dispute" under, its contract with PayPal, although pursuant to that contract it was assessed a fine and threatened with termination of the PayPal relationship. In any event, any breach of this Representation and Warranty is duplicative of the breaches of the representations concerning supplier relationships and compliance with card system rules, as discussed below. Any resulting indemnification will also be the same. Therefore, I discuss these allegations in regard to those breaches of Representations and Warranties, below.

c. The Indemnification Defendants Have Breached the Representation on Compliance with Card System Rules

The Plaintiffs also argue that the Indemnification Defendants breached the representation in Section 3.23 of the Merger Agreement that Plimus "is and has been in compliance with the bylaws and operating rules of any Card System(s)."[631] The

---

[630] JX 796, at 42.
[631] *Id.* at 47.

141

Plaintiffs point to the numerous violation notices that Plimus received from Paymentech and PayPal.

The Indemnification Defendants admit that the compliance representation was breached, but only with respect to three fines from PayPal relating to pre-closing transactions. These, the Indemnification Defendants concede, demonstrate that Plimus had not been in compliance with card system rules.[632] The three fines were for excessive chargebacks in July, excessive chargebacks in August, and the fine related to GoClickCash. The Plaintiffs have not shown any additional fines or violations with regard to PayPal.[633] As a result, the Indemnification Defendants have breached this representation, as it relates to the three identified violations through PayPal.

Next, the Plaintiffs point to Plimus's failure to disclose violations in connection with Paymentech. Again, Plimus warranted that it "has been" in compliance with card system rules, a representation that was untrue with respect to Paymentech given, among other things, its excessive chargeback issues in 2011. It is true that any fines related to the Paymentech violations were paid before closing and the Paymentech relationship ended before the bidding process was even complete. As a result, the Plaintiffs will, perhaps, have difficulty showing any

---

[632] Post-Tr. Answering Br. Defs. Tal and Itshayek 106.
[633] In fact, the Plaintiffs do not specifically state any violations when alleging breach of this representation, and instead unhelpfully cited to certain of their fact sections generally.

142

damages with respect to Paymentech violations.  That inquiry, however, is for another day.  The Indemnification Defendants have breached Section 3.23 of the Merger Agreement.

>    d. The Indemnification Defendants Breached the Representation on Relationships with Suppliers

Finally, the Plaintiffs argue that, because PayPal threatened termination, the Indemnification Defendants breached the representation in Section 3.26(b) of the Merger Agreement that "[n]o supplier of products or services . . . has notified the Company . . . that it intends to terminate its business relationship with the Company."[634]  The Indemnification Defendants argue that they did not breach this representation because Plimus did not receive a termination notice prior to closing, and because PayPal's internal communications showed that a definitive decision regarding termination was not made prior to closing.  Plimus, however, was aware of the PayPal representatives' declarative statements that PayPal would send a termination notice once certain conditions were met.  Section 3.26(b)'s plain language does not require a notification of termination; only a notification of an *intent* to terminate.  PayPal representatives expressed such an intent to terminate in e-mails and calls to Plimus in August and September 2011.  As a result, the Indemnification Defendants have breached Section 3.26(b).

---

[634] JX 796, at 48.

2. The Fraud Exception Provision Does Not Allow Uncapped Indemnification Liability for the Fraud of Others

Pursuant to Section 10.03 of the Merger Agreement, the Defendants' indemnity liability for breaches of representations and warranties is limited to the lesser of their pro rata share of losses caused by such breaches and their pro rata share of the escrow amount.[635] The Exclusive Remedy clause in Section 10.10 of the Merger Agreement maintains that the sole and exclusive remedies for breaches of the Merger Agreement are those found within Article 10, "except in the case of fraud or intentional misrepresentation (for which no limitations set forth herein shall be applicable)."[636] The Plaintiffs argue that in the case of fraud, this provision removes the cap on indemnity liability, and imposes this uncapped indemnity liability on all the Indemnification Defendants even for the fraud of others; that is, *even upon those parties both innocent and ignorant of any fraud*. The Plaintiffs argue that the provision is unambiguous, that a different reading would render certain language illusory, and that their interpretation is reasonable in light of the real-world context. They note correctly that Delaware embraces a contractarian outlook. As a result, per the Plaintiffs, the Indemnification Defendants who were selling stockholders, known in the Merger Agreement as Effective Time Holders ("ETHs")—having agreed to unlimited liability for the frauds of others—must be

---

[635] *Id.* at 71.
[636] *Id.* at 74–75.

held to their bargain in the Merger Agreement. According to the Plaintiffs, this applies to the ETHs equally, that is, to the charitable interests who were donees of stock equally with the fraudsters.

As part of a prior Motion to Dismiss, certain Defendants previously sought a ruling, as a matter of law, that the Exclusive Remedy clause "simply exempts from the indemnification limitations in Section 10 any recovery *in tort* from fraudsters."[637] In my 2014 Opinion on the Motion to Dismiss, I declined to address the meaning of the Exclusive Remedy clause, noting that any decision at that time would not result in dismissing the entire count. Accordingly, I did not make a finding on whether or not the language was ambiguous on its face.[638] However, as the Defendants point out, I wrote that "I tend to agree that the Moving Defendants' reading is commercially reasonable," and the issue "would be helpfully illuminated by evidence of the parties' intent."[639] Because I have found above that Tal committed fraud when he did not disclose PayPal's termination threat, I must now grapple with the Exclusive Remedy clause.

I must first determine whether the Agreement, read as a whole, is ambiguous as to remedies available here. The pertinent provisions are set out below. In light

---

[637] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *26 (Del. Ch. Nov. 26, 2014).
[638] *Id.* at *27.
[639] *Id.* In any event, evidence of the parties' intent was presented at trial but was limited to self-interested recitations by the Defendants concerning their subjective intent, and is not helpful here.

of this language, I turn to the issue of ambiguity. "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings . . . . The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[640] The Plaintiffs point to Section 10.10, which mandates that the limited indemnification obligations of Section 10 to be the buyer's exclusive remedy for damages, "except . . . in the case of fraud or intentional misrepresentation (for which no limitations set forth herein shall be applicable)."[641] According to the Plaintiffs, this language is unambiguous; in case of fraud, all sellers agreed to personally indemnify the buyer for all damages, "without limits." The argument that Section 10.10 unambiguously provides such liability fails at inception; even when read in isolation, Section 10.10 does not address *whose* fraud will trigger the provision. The Plaintiffs' argument fails for a more fundamental reason as well: I must construe the contract as a whole,[642] and in doing so, it is clear that the language quoted exempts *fraudsters* from the benefits of the negotiated limits on liability.

---

[640] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[641] JX 796, at 74–75.
[642] *See, e.g.*, *Chicago Bridge & Iron Company N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–927 n.61 (Del. 2017); *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

In Article 10, the parties agreed to a carefully thought-out liability scheme on the part of the ETHs. Section 10.02 sets out the ETH's indemnification obligations. ETHs agreed to indemnify the buyer for the pro rata amount of all losses, as defined in the Section. Section 10.02(c) limits such liability to claims brought by notice on the ETHs during the contractual limitation period, made with specified detail. Section 10.03 then places limitations on claims against ETHs:

> (a)(ii) in no event shall the [ETH]'s aggregate liability . . . exceed, in the aggregate, the escrow amount . . . .

> (b) The Escrow Amount will be the sole source of funds from which to satisfy the [ETH]'s indemnification obligations . . . . In no event shall any individual ETH]'s liability for Losses . . . exceed, in the aggregate, the lesser of (x) such [ETH]'s Pro Rata Share of the Escrow Amount, or (y) . . . [the] Pro Rata Share of the losses."[643]

The provisions detailed above demonstrate a thoughtful, bargained-for liability scheme for ETHs—the parties agreed that losses from breaches of representations and warranties would be indemnified from a fund, which would be created from the sale proceeds of the ETH's, and that such fund would represent the limit on ETH liability. Section 10 contained benefits for *the buyer* as well. For instance, Section 10.04 preserved the buyer's rights of indemnification for breaches of representations and warranties, even if the buyer was aware of the falsity of the

---

[643] JX 796, at 71.

147

representation when made.[644] In this context, however, what is important is that the ETHs agreed to be liable without fault for violations of representations and warranties by Plimus management, at an amount capped by the escrow. Section 10.10 must be read in this context.

Section 10.10 provides that indemnification is the "sole and exclusive remedy" running to the buyer for "breach of any covenant, agreement, representation or warranty set forth in this Agreement;" remedies are "limited to those contained in this <u>Article 10</u>."[645] Three exceptions are carved out from the exclusivity of the indemnification remedy, of which two are not applicable here. The third involves fraud, for which damages are not "limited to those contained in this <u>Article 10</u>;" instead, in case of fraud or intentional misrepresentation, "no limitations set forth herein shall be applicable."[646] The question, then, is the meaning of the fraud exception. In light of the contractual liability scheme as a whole, I find the meaning unambiguous.

The ETHs agreed to set up an escrow fund. They agreed that damages for breaches of representations and warranties would be paid from this fund, regardless

---

[644] The Merger Agreement provides such rights of indemnification "are part of the basis of the bargain contemplated . . . and shall not be affected or waived by virtue of . . . any knowledge on the part of [the buyer] of any untruth of such representation or warranty . . . regardless of whether such knowledge was obtained by [the buyer's] own investigation . . . [and] whether such knowledge was obtained before or after the execution" of the Agreement. *Id.* at 72.

[645] *Id.* at 74–75.

[646] *Id.*

of any fault on the part of an individual ETH and regardless of pre-contractual notice of the falsity of the representations on the part of the buyer. This limited liability made sense from the point of view of the ETHs, since many of them would have limited or no opportunity to verify the representations and warranties personally. It also made sense from the point of view of the buyer, since it had a ready fund from which to be made whole in the event of a breach. The buyer could attempt, through due diligence, to insulate itself from harm exceeding the amount in escrow. It could not, however, reasonably anticipate fraud. Thus, it is unremarkable that while liability was "limited to" the Article 10 indemnification, in case of fraud "no limitations set forth herein" applied. This clause permitted the buyer to bring an action against tort-feasors for damages outside of Article 10, as the Plaintiffs have done here. This reading is consistent with Section 10.03(b), which provides that the "Escrow Amount will be the sole source of funds from which to satisfy the [ETH]s' *indemnification obligations . . . .*"[647]

The Plaintiffs, however, seek to expand the benefits of their bargain. They seek to convert a remedy "limited to" indemnification—except in the event of fraud, in which case "no limitations" are applicable—into something else altogether. They interpret the language as something akin to "in case of fraud, buyer may proceed in indemnification, without showing fault against indemnitors, and with no limit on

---

[647] *Id.* at 71 (emphasis added).

amount." To my mind, this is simply not a reasonable reading of section 10.10. The ETHs exposed themselves to indemnification liability for breaches of representations and warrantees, without regard to fault, even in cases where the buyer knew the truth of the misrepresentation before contracting; however, the ETHs strictly limited the amount of that liability. I find that to read the Merger Agreement as making the ETH's strict-liability exposure limitless does not comport with the language of the contract, nor does it comport with the closely-written liability scheme the parties created.[648] I find the language unambiguous: the Plaintiffs may seek indemnification for breaches; their right to recover is limited to indemnification under the contract from the escrowed funds, except in case of fraud, in which case they are free to pursue their remedies in tort as well.

The Plaintiffs contend that this eviscerates their bargain, and that it is against public policy because it encourages the ETHs to benefit by turning a blind eye to fraud. Neither argument is persuasive. In case of fraud, the Plaintiffs are entitled to indemnification as well as any recovery in tort—that is what they bargained for. And tort-feasors, including the fraudsters and those who conspired with them or aided

---

[648] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

and abetted the fraud, do not escape liability under my plain reading of the Merger Agreement.

### E. Unjust Enrichment

The Plaintiffs bring an unjust enrichment claim against Tal, Itshayek, Herzog, Kleinberg, SIG Fund, and the Charity Defendants. The Plaintiffs argue that such a claim is not precluded by the Merger Agreement because that Agreement does not fully define the relationship between the Plaintiffs and the Defendants.[649] The Plaintiffs point in this regard to the side letter payments and to the fact that Itshayek and the two Charity Defendants were not parties to the Merger Agreement. Furthermore, the Plaintiffs argue that unjust enrichment is a viable remedy when the contract itself constitutes unjust enrichment.

Unjust enrichment is a purely equitable cause of action and remedy. It involves the unjust retention by one party of a right or property of another, in a manner that is obnoxious to equity in a fundamental way, and where the plaintiff lacks a remedy at law. In order to vindicate a claim for unjust enrichment, a plaintiff must show (1) gain by one party; (2) loss by another; (3) that the gain and loss are related; (4) that the first party has retained the gain without justification; and (5) the absence of a remedy at law.[650]

---

[649] Pls. Opening Post-Tr. Br. 210.
[650] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

151

The Plaintiffs aver that, absent breaches of contract and fraud in connection with their purchase of Plimus, they would have avoided the sale, or paid less. They allege that the overpayment has been retained by certain Defendants, which warrants equitable relief. The Plaintiffs face a formidable barrier to recovery under a theory of unjust enrichment, because our courts have consistently held that a plaintiff may not pursue unjust enrichment "aris[ing] from a relationship governed by contract"[651]—here, the Merger Agreement. In any event, it would be premature, and risk an advisory opinion, to address potential entitlement to recovery under a theory of unjust enrichment here. This matter is bifurcated, with a trial on damages yet to come. I found it efficient to determine liability under tort and contract theories, to assume damages, and to set aside a determination of the extent of damages, if any, for another phase. Tort and breach of contract are legal causes where a plaintiff must demonstrate actionable behavior; they also impose the obligation to demonstrate damages arising from that actionable behavior before recovery. Unjust enrichment, however, is fundamentally different. In an action for unjust enrichment, loss and related gain are the marrow of the cause of action itself. Therefore, I decline to address unjust enrichment until the record is complete on damages.

---

[651] *Id.*

152

### III. CONCLUSION

For the forgoing reasons, I find that the Plaintiffs have shown that Tal is liable for fraud, and that the Plaintiffs are entitled to restitution for breaches of certain representations and warranties, in an amount capped by the funds in escrow. Issues of damages remain to be tried.